**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| IN RE: | Chapter 11 |
| THE FAIRBANKS COMPANY, | Case No. 18-41768 |
| Debtor. | |

**DECLARATION OF ROBERT P. LAHRE IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, under penalty of perjury, I, Robert P. Lahre, declare as follows:

1.      I am one of two Directors and the Chief Executive Officer, Secretary, and Treasurer of The Fairbanks Company (the "Debtor"), the debtor and debtor-in-possession in the above-captioned chapter 11 case (this "Chapter 11 Case"). I have been associated with the Debtor in various capacities since 1985.

2.      As the Chief Executive Officer, I am familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records. I also am familiar with the Debtor's efforts leading up to the filing of this Chapter 11 Case.

3.      Concurrently with the filing of this declaration (this "Declaration"), on the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Georgia, Rome Division (the "Court") commencing this Chapter 11 Case. The Debtor has requested certain relief in "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings") to

promote a seamless transition into this Chapter 11 Case and enable the Debtor to efficiently administer its estate and its affairs.

4.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and the Debtor's intended restructuring and in support of the Debtor's chapter 11 petition for relief and the First Day Pleadings.  As discussed in detail below, the sole reason for the commencement of this Chapter 11 Case is to rid the Debtor of existing and future asbestos personal injury claims (arising from the production of an asbestos-containing product in a Binghamton, New York facility that the Debtor sold in 1986) through formation of a plan of reorganization pursuant to section 524(g) of the Bankruptcy Code.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, information supplied to me by other members of the Debtor's management or the Debtor's professionals, my knowledge and review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

6.      Part I of this Declaration provides an overview of the Debtor's corporate history, operations, and capital structure.  Part II of this Declaration summarizes the circumstances leading to the commencement of this Chapter 11 Case.  Part III discusses the objectives of this Chapter 11 Case.  Part IV sets forth the relevant facts in support of the First Day Pleadings.

## I.    THE DEBTOR'S HISTORY, OPERATIONS, AND CAPITAL STRUCTURE

7.    The Debtor is a Georgia corporation with thirty-five (35) employees that manufactures customized industrial material handling equipment in its more than 200,000 square foot manufacturing and warehousing facility located in Rome, Georgia (the "Rome Facility"). The Debtor is a premier supplier of casters, wheels, hand trucks, platform trucks, and dollies, used mostly by industrial plants, institutions, and truck lines.

8.    The Debtor's history can be traced back to 1830 when Thaddeus Fairbanks invented the platform scale. Thaddeus and his brother, Erastus, formed E. & T. Fairbanks & Company to manufacture the scales as well as other products. They also established two branch houses for distribution of the scales, located in New York City and Chicago. The New York house operated under the name of Fairbanks & Co. and handled distribution of scales in the eastern part of the United States and abroad. The Chicago house handled distribution of scales in the western part of the United States. In 1891, Fairbanks & Co. incorporated as The Fairbanks Company (i.e., the Debtor) and the Chicago house incorporated as Fairbanks, Morse and Company.

9.    The Debtor expanded its operations in the years following its incorporation in 1891. The Rome Facility, which has been in operation since 1887, was acquired by the Debtor in 1894. The Debtor originally used the Rome Facility to manufacture portable platform wagon scales and railroad scales, hand trucks, and wheel barrows. In 1907, the Debtor acquired facilities in Binghamton, New York, to start a valve manufacturing plant. The Debtor also expanded its distribution capabilities such that, by about 1920, the Debtor had twenty-two branch offices within the eastern part of the United States and four abroad and was distributing products manufactured by thirty-six other manufacturers. This portion of the business was

discontinued in the early 1920's.  In 1927, the scale rights were sold to Fairbanks, Morse and

Company, and the Debtor since has focused on the products it manufactured, namely, valves and

material handling equipment.

10.    After acquisition of its facility in Binghamton, New York, the Debtor

started manufacturing a line of bronze and iron valves that were used in commercial and

industrial buildings and manufacturing plants.  Some of these valves contained asbestos packing.

The asbestos-containing valves were produced solely at the Binghamton facility.  The Debtor

sold the Binghamton facility in 1986, although it is not known when the Binghamton facility

ceased using asbestos-containing gaskets and packing in its valves.  The Rome Facility never

produced or distributed asbestos-containing products.

11.    Today, the Debtor is a small, profitable business that employs thirty-five

(35) individuals, all located at the Rome Facility—the Debtor's only remaining facility.  The

Rome Facility houses, among other things, metal and wood working shops, assembly

departments, and the Debtor's administrative offices.  The Debtor uses modern processing

technologies, including robotic welding and electrostatic power coating, to manufacture its

complete line of casters, wheels, hand trucks, platform trucks, and dollies.  With its modern

manufacturing capabilities and engineering design department, the Debtor is able to produce

customized material handling equipment to satisfy the specific needs of its customers.

12.    The Debtor enjoys approximately $6 million in annual gross sales, and the

Debtor expects to remain profitable while navigating the chapter 11 process.

13.    According to its books, the Debtor has total assets of approximately $2.1

million, consisting primarily of real property, machinery and equipment, inventory, and accounts

receivable.

14.    The Debtor has no secured debt.  The Debtor has outstanding unsecured promissory notes in the aggregate principal amount of $300,000.00, the proceeds of which were used in years past to finance the operation of the business.  The Debtor's trade debt consists of, among other things, amounts owed to utilities and suppliers of goods and services.  As of the Petition Date, the Debtor estimates that less than $100,000.00 is outstanding to its trade creditors. Other than as described herein, the Debtor does not have any other significant, undisputed debt obligations.

15.    All of the equity interests in the Debtor are owned by eleven (11) trusts, Betsy Colburn, Delos Dunton, LLC, The Colburn School, and myself.

## II.    EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

### A.    The Asbestos Claims

16.    As described above, the Debtor during its history manufactured, sold, or distributed a line of bronze and iron valves that contained asbestos packing.  As a result, for many years, the Debtor has been a defendant in litigation in multiple jurisdictions in which claimants (the "Claimants") seek money for personal injury and wrongful death as a result of alleged exposure to asbestos-containing products manufactured, sold, or distributed by the Debtor (the "Asbestos Claims").  As of the Petition Date, the Debtor estimates that there are more than 1,100 Asbestos Claims outstanding against the Debtor in various jurisdictions around the country.

### B.    The Coverage Action and Settlement Agreement

17.    Most, if not all, of the defense costs and indemnity for the Asbestos Claims has been provided by Liberty Mutual Insurance Company ("Liberty Mutual").

18.     In 2013, Liberty Mutual initiated an insurance coverage action (the "Coverage Action") against the Debtor in the United States District Court for the Southern District of New York.

19.     In 2016, Judge Koeltl, the District Judge presiding over the Coverage Action, appointed Helen Freedman, a former New York Supreme Court judge, as a Special Master for settlement purposes. Judge Koeltl stayed the Coverage Action several times to allow the parties to continue discussions with the help of the Special Master. The stay has been continued through August 13, 2018.

20.     During the Special Master process, an agreement (the "Liberty Mutual Settlement Agreement") was reached between the Debtor and Liberty Mutual to settle all Liberty Mutual's policies (which include known as well as lost or unknown policies) for $41,150,000.00, less certain adjustments as provided in the Liberty Mutual Settlement Agreement (the "Liberty Mutual Settlement Proceeds").

21.     As explained more fully in Part III below, if the Liberty Mutual Settlement Agreement is approved by the Bankruptcy Court in this Chapter 11 Case, the Liberty Mutual Settlement Proceeds will form the basis for establishment of an asbestos personal injury trust pursuant to section 524(g) of the Bankruptcy Code that will assume liability for existing and future Asbestos Claims against the Debtor.

**C.     Prepetition Understandings**

22.     As a requirement of the Liberty Mutual Settlement Agreement and a condition of filing this Chapter 11 Case, the Debtor was required to secure a restructuring support agreement (the "RSA") from Weitz & Luxenberg, P.C.—the law firm representing

Claimants in nearly half of the active asbestos-related lawsuits against the Debtor.  A copy of the RSA has been or shortly will be filed with the Court.

23.    Under the RSA, Weitz & Luxenberg agreed, subject to appropriate limitations under sections 1125 and 1126 of the Bankruptcy Code and the rules of professional conduct, to support and to recommend to its clients a plan of reorganization for the Debtor that includes approval of the Liberty Mutual Settlement Agreement and the formation of an asbestos personal injury trust.

### D.    Financing this Chapter 11 Case

24.    Under the Liberty Mutual Settlement Agreement, Liberty Mutual agreed to advance $1,500,000.00 (the "Advance") to pay the Debtor's fees and expenses leading up to, and incurred during the course of, this Chapter 11 Case.  Amounts utilized under the Advance will be offset against the total amount of the Liberty Mutual Settlement Proceeds.  The Advance, after payment of amounts owing on the Petition Date for prepetition organization costs associated with this Chapter 11 Case and to provide retainers to Debtor's proposed counsel, Reed Smith LLP and Ogier, Rothschild & Rosenfeld, PC, will be kept in a segregated debtor-in-possession account and disbursed for professionals' fees and expenses incurred during this Chapter 11 Case in accordance with the Bankruptcy Code and the Court's orders.

25.    Inasmuch as the fees and expenses of this Chapter 11 Case will be supported by Liberty Mutual, it is expected that the Debtor will be in a position to continue its business and operations during this Chapter 11 Case through use of its operating cash flow.

### III.    PURPOSE OF THIS CHAPTER 11 CASE

26.    The Debtor filed this Chapter 11 Case for the purpose of resolving all existing and future Asbestos Claims pursuant to section 524(g) of the Bankruptcy Code.  To

- 7 -

resolve the Asbestos Claims, the Debtor intends to seek confirmation of a chapter 11 plan of

reorganization that will provide for the establishment of an asbestos personal injury trust into

which certain assets of the Debtor, including but not limited to the Liberty Mutual Settlement

Proceeds and certain other insurance rights, will be transferred.  The trust will assume liability

for all Asbestos Claims and use its assets to review and resolve the Asbestos Claims and, if

eligible, compensate the holders of the Asbestos Claims.  By establishing procedures to govern

trust distributions, the trust will be able to value and pay Asbestos Claims in a fair and efficient

manner.

    27.  In conjunction with the establishment of the asbestos personal injury trust,

the Debtor will seek the issuance of a channeling injunction, which will enjoin any entity that

holds or asserts, or that may in the future hold or assert, an Asbestos Claim from taking any

action for the purpose of directly or indirectly recovering on such Asbestos Claim from the

Debtor, Liberty Mutual, and certain other protected parties.  Accordingly, if the Debtor's plan is

confirmed, the sole recourse of any current or future holder of an Asbestos Claim on account of

such Asbestos Claim will be against the asbestos personal injury trust.

## IV. SUMMARY OF FIRST DAY MOTIONS

    28.  Concurrently with its chapter 11 petition, the Debtor filed the following

First Day Pleadings:

  a.  Debtor's Emergency Motion Pursuant to 11 U.S.C. § 105 for an Order
Authorizing Maintenance of Existing Bank Accounts and Business Forms (the
"Bank Account Motion");

  b.  Debtor's Emergency Motion for an Order Under 11 U.S.C. §§ 105(a), 363(b),
363(c), 507(a), 1107(a), and 1108 (A) Authorizing Payment of Prepetition
Employee Obligations Including Wages, Salaries, and Employee Benefits,
(B) Authorizing Continuation of Employee Benefit Plans and Programs Post-
Petition, and (C) Directing All Banks to Honor Prepetition Checks for Payment of
Prepetition Employee Obligations (the "Wages and Benefits Motion");

c.      Debtor's Emergency Motion for Order Authorizing the Debtor to Honor
Prepetition Obligations to Shippers and Other Transportation Providers and to
Satisfy Prepetition Customs Duties (the "<u>Shippers Motion</u>"); and

d.      Debtor's Emergency Motion for Entry of an Order Establishing Notice and
Administrative Procedures (the "<u>Administrative Procedures Motion</u>").

29.     I am familiar with the contents of each First Day Pleading, and the facts set forth therein, insofar as I have been able to ascertain after reasonable inquiry, are true and correct to the best of my knowledge.  The relief sought in the First Day Pleadings: (i) is necessary to enable the Debtor to operate in chapter 11 with minimum disruptions; (ii) is important to the Debtor's achievement of a successful restructuring; and (iii) will enable the Debtor to efficiently administer its estate and affairs in the best interests of creditors.  I believe that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals identified above.

**A.     Bank Account Motion**

30.     Through the Bank Account Motion, the Debtor seeks authorization to continue using its existing bank accounts and business forms.

31.     The Debtor maintains three bank accounts:  (i) a lockbox account at Comerica Bank (the "<u>Lockbox Account</u>"); (ii) a zero-balance controlled disbursement account at Comerica Bank (the "<u>ZBA</u>"); and (iii) a payroll account at SunTrust Bank (the "<u>Payroll Account</u>" and, collectively with the Lockbox Account and the ZBA, the "<u>Bank Accounts</u>").  The Bank Accounts are identified more fully on Exhibit A attached to the Bank Account Motion.

32.     All receipts are deposited in the Lockbox Account.  Payment instructions related to the Lockbox Account are printed on the Debtor's invoices, and the Debtor's customers send payment directly to the Lockbox Account for deposit.  All payments are made from the ZBA.  Comerica Bank automatically sweeps sufficient funds from the Lockbox Account to the

ZBA on a daily basis for the purpose of satisfying amounts drawn on the ZBA.  The Debtor also transfers sufficient funds from the ZBA to the Payroll Account on Thursday of each week to meet its payroll, which is disbursed each Friday by hand-delivered checks drawn from the Payroll Account.

33.    I believe that the Debtor's transition to chapter 11 will be smoother and more orderly, with minimal disruptions and harm to the estate, if the Debtor is permitted to use the Bank Accounts.  By preserving business continuity and avoiding the disruption and delay to the Debtor's collection and disbursement procedures that necessarily would result from closing the Bank Accounts and opening new accounts, all parties in interest, including customers, employees, and vendors, will be best served.  Transferring bank accounts at this time would be disruptive, time consuming, and expensive.

34.    If the relief requested in the Bank Account Motion is granted, the Debtor will work closely with each of its banks (Comerica Bank and SunTrust Bank, together, the "Banks") to ensure that appropriate procedures are in place so that checks issued before the Petition Date, but presented after the Petition Date, are not honored absent Court approval.  To this end, the Debtor requests that the Banks be authorized and directed to accept and honor all representations from the Debtor as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date.  The Debtor also requests that no Bank that honors a pre-petition check or other item drawn on any account that is the subject of this Motion (a) at the direction to the Debtor, (b) with a good faith belief that the Court authorized such pre-petition check or item to be honored, or (c) as a result of an innocent mistake despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtor or its estate on account of such pre-

petition check or other item being honored post-petition.  I believe that having such flexibility

accorded to the Banks is necessary to induce the Banks to continue providing services to the

Debtor.

35.     Separately, the Debtor issues a large number of checks, and uses a large

volume of purchase orders, invoices, letterhead, envelopes, and other business forms

(collectively, the "Business Forms") in the ordinary course of business.  The Debtor maintains a

stock of pre-printed Business Forms that I anticipate will last for at least six months from the

Petition Date before new forms would need to be ordered.

36.     The Debtor requests that it be authorized to continue using its existing

checks in their present form, provided the Debtor (i) creates a clear break (50 checks) in check

numbers post-petition and (ii) stamps or writes "*Debtor in Possession, In re The Fairbanks

Company, Case No. 18-41768 (Bankr. N.D. Ga.)*" on all post-petition checks issued.  The Debtor

requests that it be authorized to continue using its existing Business Forms, including

electronically generated forms, substantially in the form existing immediately before the Petition

Date, provided that (i) notice of this Chapter 11 Case is sent to each party receiving a business

form or (ii) the business forms are stamped to indicate that the Debtor is a debtor-in-possession.

After exhausting such existing Business Forms, the Debtor will reorder its Business Forms with

the required "Debtor in Possession" designation as well as the case number for this Chapter 11

Case.

37.     I believe that by virtue of the nature and scope of the Debtor's business,

and its numerous employees, suppliers of goods and services, and others with whom the Debtor

transacts business, it is important that the Debtor be permitted to continue to use its existing

Business Forms.  A substantial amount of time and expense would be required to print new

business forms and stationery and being required to obtain new business forms also may result in a substantial risk of disruption to the Debtor's ordinary business affairs.

### B.    Wages and Benefits Motion

38.    Through the Wages and Benefits Motion, the Debtor seeks authorization to pay or otherwise honor various employee-related prepetition obligations to, or for the benefit of, its employees and to continue its employee benefit programs postpetition.

39.    As of the Petition Date, the Debtor employs approximately thirty-five (35) full-time employees and utilizes the services of five (5) additional temporary contractors provided by North Georgia Staffing (collectively, the "Employees"). The Employees perform a wide variety of functions that are critical to the Debtor's business and, ultimately, to the administration of this Chapter 11 Case and the Debtor's estate. In many instances, the Employees include personnel that have been employed by the Debtor for many years, who are intimately familiar with the Debtor's business, processes, and systems, who possess unique skills, knowledge, and experience, and/or have developed relationships with vendors and customers that are essential to the Debtor's business.

40.    I believe that the continued and uninterrupted support of the Employees is essential to the Debtor's success. The Employees perform a variety of critical functions for the Debtor's business, including, without limitation: producing casters, wheels, hand trucks, platform trucks, and dollies; procurement and supply; sales and marketing; accounting; administration; budgeting and planning; finance; safety; human resources and communication; and compliance. The Employees' skills and specialized knowledge and understanding of the Debtor's assets and operations, as well as their relationships with customers, vendors, and other

third parties, are essential to the administration of this Chapter 11 Case, the preservation of the value of the Debtor's estate, and the ability of the Debtor to effectively reorganize.

41.    I understand that many of the Employees rely on their compensation and benefits to pay their daily living expenses. These workers may be exposed to significant financial constraints if the Debtor is not permitted to continue paying their compensation and providing them with health and other benefits. Any interruption in payment of prepetition Employee-related obligations will impose severe hardship on Employees and may jeopardize their continued performance as the Debtor attempts to transition into this Chapter 11 Case. Moreover, if there is any doubt as to the Debtor's ability to pay the Employees, there is a material risk that these individuals will seek alternative employment to the detriment of the Debtor's estate and all of its creditors.

42.    The Debtor pays its Employees in arrears each Friday for wages earned during the pay period commencing on Monday of the preceding week and ending on Friday of the preceding week through a payroll system that is administered and maintained by a third-party vendor, Howse, Rice & Brown, PC. The majority of the Debtor's payroll is made by physical check hand-delivered to the Employees each week.

43.    The average gross payroll per weekly pay period for the Employees, including vacation, holiday, personal, and sick time, is approximately $31,000.00.

44.    Though the Debtor has remained current on its payroll and issued checks on July 26, 2018, covering the pay period between July 16, 2018 through July 20, 2018, as of the Petition Date, the Debtor is obligated to the Employees for pre-petition compensation in the form of accrued but unpaid wages and salaries covering the pay period between July 23, 2018 through July 27, 2018, in the aggregate amount of no more than $31,000.00 (plus an amount necessary

to ensure that all checks hand-delivered on July 26, 2018 clear the Debtor's accounts). No person, including insiders, will receive more than the statutory limit provided in section 507(a)(4) of the Bankruptcy Code. The Debtor seeks authority to pay such accrued compensation as it becomes due and owing in the ordinary course of the Debtor's business operations.

45.    For each applicable payroll period, the Debtor routinely deducts certain amounts from Employee paychecks, including, without limitation, pre- and after-tax deductions (the "Deductions") payable pursuant to certain of the employee benefit plans discussed herein. The Debtor remits the Deductions to the applicable third-party recipients and taxing authorities. In addition to the Deductions, federal and state laws require the Debtor to withhold amounts related to federal, state, and local income taxes and Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings"). The Debtor must then match the withheld amounts from their own funds for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (together with the Withholdings, the "Payroll Taxes"). In the aggregate, the Deductions and Payroll Taxes total approximately $10,700.00 per payroll period.

46.    In the ordinary course of its business, the Debtor reimburses Employees for certain reasonable and customary expenses incurred in the scope of their service on behalf of the Debtor (collectively, the "Reimbursable Expenses"), including, without limitation, expenses related to business travel. The Reimbursable Expenses are ordinary course expenses that Employees incur in performing their job functions and vital to the continued operation of the

Debtor's business and the preservation of the value of the Debtor's estate.  In the aggregate, the Employees incur approximately $550.00 per month in Reimbursable Expenses.

47.    The Debtor maintains and/or contributes to a number of Employee benefit programs (collectively, the "Benefit Programs"), including but not limited to various programs that offer health, vision, dental, short-term and long-term disability, and life insurance coverage, a 401(k) plan, an incentive compensation plan, and other similar employee benefits.

48.    Certain benefits require payments by the Debtor and may be unpaid as of the Petition Date because certain obligations under the Benefit Programs accrued either in whole or in part prior to the Petition Date, but were not payable in the ordinary course of the Debtor's business until after the Petition Date.

49.    The Debtor provides healthcare coverage to Employees under a preferred provider organization insurance plan administered by Blue Cross Blue Shield of Georgia and a vision and dental plan administered through Principal Financial Group, Inc. (together, the "Medical Plans").  The monthly premiums on account of the Medical Plans are pre-paid at the beginning of each month in the approximate aggregate amount of $55,000.00.

50.    The Debtor provides short- and long-term disability coverage and life insurance benefits for its Employees ("Disability and Life Insurance") through Principal Financial Group, Inc.  The monthly payment on account of Disability and Life Insurance is pre-paid at the beginning of each month in the approximate amount of $3,400.00.

51.    The Debtor maintains a retirement savings plan for the benefit of its Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  There are three types of contributions to the 401(k) Plan.  *First*, the Debtor contributes 3% of each eligible Employee's weekly gross pay to the Employee's 401(k) Plan.

*Second*, each Employee may elect to contribute up to a maximum of 20% of their weekly gross pay (subject to the limits set forth by the Internal Revenue Code) to the Employee's 401(k) Plan. *Third*, the Debtor will make a matching contribution to the Employee's 401(k) Plan in an amount equal to 50% of the Employee's contribution subject to a maximum Employee contribution of 4% of the Employee's weekly gross pay. Each Employee's 401(k) Plan contributions are deducted automatically from each paycheck. The 401(k) Plan is administered by Principal Financial Group, Inc.

52.     Each pay period, the Debtor deducts the Employees' 401(k) Plan contributions from the Employees' paychecks (the "401(k) Deductions") and holds such amounts in trust until they are forwarded to Principal Financial Group, Inc. by wire transfer on a weekly basis. The Debtor deducts approximately $950.00 in the aggregate each week from Employees' paychecks on account of the 401(k) Deductions. As of the Petition Date, the Debtor estimates that it owes approximately $950.00 on account of the 401(k) Deductions.

53.     The Debtor's 401(k) Plan contributions are made on a weekly basis. The Debtor pays approximately $1,100.00 per week on account of employer contributions to the 401(k) Plan. As of the Petition Date, the Debtor estimates that it owes approximately $1,100.00 on account of employer contributions to the 401(k) Plan.

54.     Many Employees' retirement savings consist solely of the 40l(k) Plan, and many Employees choose to participate in the 40l(k) Plan because of the Debtor's matching 40l(k) Plan contribution. Consequently, I believe that continuing the 40l(k) Plan and the matching contributions are essential to maintaining Employee morale and protecting Employee expectations. In addition, I understand from conferring with the Debtor's counsel that the 40l(k) Deductions are generally held in trust by the Debtor and are not property of its estate.

55.    For more than twenty-five years, the Debtor has maintained a discretionary incentive bonus program that compensates Employees based upon the overall profitability of the Debtor, each Employee's individual contributions to the Debtor, and other pertinent factors (the "Incentive Compensation Program").  The Incentive Compensation Program is incentivizing, not retentive, in nature, and is part of the Employees' historical compensation package.  To implement the Incentive Compensation Program, the Debtor maintains an annual profit sharing pool that accrues monthly based on an established formula and, to the extent funds are available in the profit sharing pool at the end of the year, such funds are distributed to eligible Employees in the form of a discretionary bonus in March of each year. I believe continuation of the Incentive Compensation Program is appropriate to maintain a competitive and consistent compensation structure, reward Employees for their individual contributions and the Debtor's overall profitability, and engender Employee loyalty by satisfying their reasonable compensation expectations.  In 2017, the Incentive Compensation Program pool was $90,000.00.  Payments under the Incentive Compensation Program were made to all Employees in amounts beginning at $2,000.00 for shop and office Employees, with higher amounts distributed to foremen, production mangers, and the general manager.  The largest amount distributed under the Incentive Compensation Program for 2017 to a single individual was $9,000.00.  As of the Petition Date, the Incentive Compensation Program pool has accrued $0.00 for the current fiscal year.

56.    The Debtor provides Employees with paid time off benefits, including vacation, holidays, personal days, and sick days ("Paid Time Off").  The amount of Paid Time Off and available to a particular Employee is generally determined by the Employee's position and length of employment.  The Debtor seeks to allow Employees who have accrued Paid Time

Off as of the Petition Date to utilize those vacation days or personal days postpetition without disruption and to continue honoring company-paid holidays for eligible Employees.

57. The Debtor is required to provide workers' compensation insurance. The Debtor's worker's compensation insurance program covers an injury or illness sustained in the course of employment. Compensation benefits also may be available if the injury or illness requires an employee to be off work more than seven (7) days. The premiums on account of the Debtor's worker's compensation insurance program are pre-paid at the beginning of each month, based on the Debtor's historical payroll, in the approximate aggregate amount of $2,300.00. Following completion of the policy year, the premiums are audited against actual hours worked and claims made, and the reconciled amount may result in an additional payment or refund.

58. It is critical that the Debtor be permitted to continue to receive coverage under the workers' compensation program and to pay any reconciled balances and premiums, because alternative arrangements for workers' compensation coverage almost certainly would be more costly, and the failure to provide coverage might subject the Debtor to severe penalties, including being unable to participate as an employer in the affected state. In addition, failure to pay workers' compensation claims might result in Employee attempts to compel payment through litigation or similar means and jeopardize the Debtor's ability to conduct business.

C.    **Shippers Motion**

59. Through the Shippers Motion, the Debtor seeks authorization to pay prepetition claims of common carriers, movers, shippers, freight forwarders, and third-party import, export, and customs brokers and prepetition claims related to customs duties in the ordinary course of its business.

60.     In the ordinary course of its business, the Debtor relies upon numerous vendors that provide a continuous flow of raw materials, supplies, and other goods (collectively, the "Goods") that are components of, or that are necessary to manufacture, the Debtor's customized products.  The Debtor stocks Goods for assembly into a finished product when a customer order is received.  As a result, at any given time, the Debtor may have Goods on-hand only to manufacture products that have been ordered, and new shipments of Goods must be received for the Debtor to continue to meet customer demand from new orders.

61.     In the ordinary course of business, the Debtor relies upon a network of reputable common carriers, movers, shippers, and freight forwarders (collectively, "Shippers") that transport Goods, including casters, wheels, wooden dollies, and truck parts, that are integral to the Debtor's products.  The Shippers are critical to the timely delivery of Goods to the Debtor and to the Debtor's manufacturing process, as well as to the delivery of the Debtor's finished products to customers.

62.     Because the Debtor depends on the timely delivery of Goods and the Shippers may have physical custody over Goods, it is essential for the Debtor to incentivize the Shippers to continue performing timely services and providing Goods to the Debtor.  For example, if the Debtor is unable to obtain certain Goods that are necessary to the Debtor's manufacturing process, including casters, wheels, wooden dollies, and truck parts, the Debtor will be unable to meet its customer commitments or otherwise be forced to seek out the same or similar Goods in the marketplace, on an emergency basis, subject to unknown costs and availability from limited sources.  Any transition to alternate suppliers would likely result in increased expenses, and could delay the shipment of, or limit the Debtor's ability to provide, its products to customers.

63.    The Debtor expects that, as of the Petition Date, certain of the Shippers will have outstanding invoices or have accrued but unbilled charges for Goods that were delivered or are in transit to the Debtor as of to the Petition Date (the "Shipping Charges").  As a result, I understand from conferring with the Debtor's counsel that certain Shippers could argue that they are entitled to possessory liens for transportation and storage, as applicable, on Goods in their possession and may refuse to deliver or release such Goods before their claims have been satisfied and their liens redeemed.  Indeed, even if the Shippers did not have valid liens, their possession (and retention) of Goods could severely disrupt the Debtor's operations.

64.    The value of Goods in the Shippers' possession and the potential injury to the Debtor if Goods are not released are likely to exceed the amount of the Shipping Charges. To preserve the value of the Debtor's estate, I believe that it is necessary and essential to make payments on account of certain Shipping Charges.

65.    The Debtor also purchases and imports certain Goods directly from foreign vendors.  As a result, the Debtor is required to pay certain foreign duties, customs duties, and similar expenses (the "Customs Duties") related to Goods purchased from outside of and imported into the United States.  In most instances, the Debtor pays the obligations upon arrival of product into the domestic port.  The average monthly payment for Customs Duties fluctuates significantly depending on the Debtor's import volume.

66.    The Debtor's purchase of imported Goods is vital to the operation of its business.  To maintain an uninterrupted supply of imported Goods, the Debtor must pay certain Customs Duties to the United States Customs and Border Protection Agency (the "U.S. Customs Service").  In this process, the Debtor frequently utilizes services of third-party import, export, and customs brokers (the "Customs Brokers").  The Debtor is working with the Customers

Brokers on an active basis to import Goods from other countries and resolve any disputes with customs officials.  The Customs Brokers pay the Customs Duties on behalf of the Debtor and are reimbursed by the Debtor in connection with the Customs Brokers' charges.  If these Customs Duties are not timely paid, the Customs Brokers will refuse to release products in their possession or transact with the Debtor altogether; in addition, I understand that the U.S. Customs Service and other similar authorities may demand liquidated damages, attempt to assess interest, attempt to impose sanctions or take other precipitous actions on account of the unpaid Customs Duties.

67.     In sum, to avoid any potential interruption or delay in the Debtor's transport system and delivery of Goods both domestically and internationally, which interruption or delay could have a material adverse impact on the Debtor's operations, I believe that it is essential that the Debtor is permitted to satisfy prepetition payment obligations to Shippers and the Customs Brokers (including obligations relating to Customs Duties).  I believe that the total amount to be paid to Shippers and the Customs Brokers of no greater than $50,000.00 in the aggregate is minimal compared to (a) the importance and necessity of their services to (i) the Debtor's' transport system and ongoing operations and (ii) maintaining the value of the Debtor's business and assets and (b) the losses the Debtor may suffer if the payments are not made.

## F.     Administrative Procedures Motion

68.     Through the Administrative Procedures Motion, the Debtor seeks authorization to establish a limited service list and related notice procedures and to serve any documents required to be served on the Claimants on the Claimants' known counsel of record in lieu of the Claimants.

69.     Counsel for the Debtor tracks Asbestos Claims against the Debtor by maintaining a database that identifies the names, but not the addresses, of the Claimants. Defense counsel's database, however, includes the addresses for the Claimants' respective counsel of record, and all communications regarding the Asbestos Claims and the various pending lawsuits are conducted through counsel.

70.     Throughout the course of this Chapter 11 Case, I understand that various notices, mailings, and other communications must be sent to parties-in-interest, including the Claimants. Currently, over 1,100 Claimants and other parties in interest may be entitled to receive notice in this Chapter 11 Case. I believe that requiring the Debtor to provide notice of all pleadings and other papers filed in this case to these parties in interest would be overly burdensome and costly to its estate.

71.     To alleviate this burden, the Debtor proposes to establish a limited master service list, as more fully described in the Administrative Procedures Motion, and to serve all notices, mailings, and other communications that are required to be served on the Claimants to the Claimants' respective counsel of record in the manner required pursuant to the applicable notice procedures in effect in this Chapter 11 Case (the "Claimants Notice Procedures").

72.     By establishing the Claimants Notice Procedures in this Chapter 11 Case, I believe that the Claimants will receive superior notice than they would if the Debtor attempts to deliver notices directly to the Claimants. The Debtor does not maintain a record of the Claimants' addresses; the only record that exists is of the names and addresses of the Claimants' counsel of record. For that reason, all communications regarding the Asbestos Claims and the various pending lawsuits historically have been conducted through counsel. Gathering the individual addresses of Claimants now would require a massive manual review of the files

maintained by various past and present asbestos litigation counsel across the nation and a time-consuming attempt to ensure that such information is still accurate (and if not, to obtain updated information).  Moreover, the Claimants are lay persons, most of whom have not been involved in a commercial bankruptcy case or seen the types of notices and pleadings that will be served in this Chapter 11 Case and likely will be unfamiliar with the actions that may be required to respond to such notices.

73.     For these reasons, I believe that the Claimants Notice Procedures will ease the Debtor's administrative burden of sending notices to more than 1,100 Claimants and result in more cost-effective notice procedures that benefit the Debtor's estate and creditors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge and belief.

Dated: _____July 31_____, 2018

_____

Robert P. Lahre
Chief Executive Officer, Secretary, and Treasurer
The Fairbanks Company