# EXHIBIT 1

Peggy Ableman

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| THE FAIRBANKS COMPANY, | Case No. 18-41768 (PWB) |
| Debtor. | |

**DECLARATION OF THE HONORABLE PEGGY L. ABLEMAN IN SUPPORT OF
THE MOTION OF THE UNITED STATES TRUSTEE TO APPOINT A LEGAL
REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS**

I, Peggy L. Ableman, declare under penalty of perjury as follows:

1.      I have been selected as one of three nominees presented by the Office of the United States Trustee to serve as the legal representative for future asbestos personal injury claimants ("Future Claimants' Representative" or "FCR") in the above-captioned proceeding ("Chapter 11 Case").

2.      I submit this declaration ("Declaration") in support of the *Motion of the United States Trustee to Appoint a Legal Representative for Future Asbestos Claimants* [Doc. No. 157] ("Motion") and, specifically, in support of my appointment as FCR.[1]  If appointed as the FCR, I will work to assist the Court in ensuring that any asbestos trust created in this Chapter 11 Case contains adequate safeguards to protect the interests of future asbestos personal injury claimants.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information provided to me by other members of McCarter & English, LLP ("McCarter") that I believe in good faith to be reliable; and/or (d) my opinion based upon my experience and knowledge.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[1] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to them as in the Motion.

4.      I am an attorney duly licensed in, and am a member in good standing of, the Bar of the State of Delaware and the United States District Court for the District of Delaware.  I presently work as special counsel at McCarter, which maintains an office for the practice of law at 405 N. King St., 8th Fl., Wilmington, DE  19801.  If selected, I would likely seek approval, under Sections 105(a), 327 and 1103 of Title 11 of the United States Code ("Bankruptcy Code"), to retain McCarter as counsel to the Future Claimants' Representative in this proceeding.

**THE HONORABLE PEGGY L. ABLEMAN'S PROFESSIONAL QUALIFICATIONS**

5.      My professional qualifications to serve as the Future Claimants' Representative are accurately set forth in my curriculum vitae, attached hereto as Exhibit 1.

6.      During my distinguished career serving as a trial judge for nearly thirty (30) years, I had the pleasure of being solely responsible for more than 500 cases involving asbestos litigants world-wide.  Since leaving the bench, I have written, presented and testified extensively regarding the harm caused by a lack of transparency in the asbestos trust claim.  To supplement my curriculum vitae, copies of some of the articles that I have authored on the need for greater transparency in the administration of asbestos trust claims, as well as transcripts of my testimony in support of the FACT ACT before both Judiciary Committees of the United States House of Representatives and the United States Senate, are attached as Exhibit 2.

**THE HONORABLE PEGGY L. ABLEMAN IS A DISINTERESTED PERSON**

7.      The Office of the United States' Trustee ("United States Trustee") provided me with a list ("List") of names of individuals or institutions interested in the Chapter 11 Case (collectively, "Interested Parties") in the following categories:[2]

        a.      Debtor;

---

[2] A copy of the list of Interested Parties is attached as Exhibit 3.

b.      Debtor's Officers, Directors and Equity Holders;

c.      Insurance Entities;

d.      Debtor's Professionals;

e.      Attorneys for Committee of Asbestos Claimants Members and Their Attorneys;

f.      Committee of Asbestos Claimants Members and Their Attorneys;

g.      Ten Law Firms Representing the Largest Number of Asbestos Claimants;

h.      Creditors with Scheduled Non-Asbestos Claims;

i.      Named Creditors with Asbestos Claims;

j.      Office of the United States Trustee and Staff;

k.      Northern District of Georgia Bankruptcy Judges; and

l.      Other Entities.

8.      I have reviewed the List of Interested Parties. To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, I do not hold or represent an interest adverse to the Debtor or its estate, and I am a "disinterested person," as defined in Section 101(14) of the Bankruptcy Code and as required by Section 327(a) of the Bankruptcy Code, in that, except as set forth in this Declaration:

a.      I have no connection with the Debtor, its creditors, the United States Trustee, any person employed in the office of the United States Trustee or any other party with an actual or potential interest in this Chapter 11 Case or their respective attorneys or accountants;

b.      I am not a creditor, equity security holder or insider of the Debtor;

c.      I am not and was not, within two years of July 31, 2018 ("Petition Date"), a director, officer or employee of the Debtor; and

d.      I do not have an interest materially adverse to the Debtor, its estate or any class of creditors or equity security holders by reason of any direct or indirect relationship to, connection with or interest in the Debtor, or for any other reason.

9.      In response to an inquiry from the Executive Office of the United States Trustee, on January 9, 2019, I submitted Exhibits 1 and 2 to this Declaration to Nan Roberts

3

Eitel.  I also participated in an interview with certain employees of the Office of the United

States Trustee on January 14, 2019.  Other than communications with the Office of the

United States' Trustee regarding its consideration of my nomination to serve as the Future

Claimants' Representative in this Chapter 11 Case, I have no connection to the Debtor, its

creditors, the United States Trustee, any person employed in the office of the United States

Trustee or any other party with an actual or potential interest in this Chapter 11 Case or their

respective attorneys or accountants.   Accordingly, I believe that I am a "disinterested

person," as defined in section 101(14) of the bankruptcy Code and as required by section

327(a) of the Bankruptcy Code.

10.    No agreement or understanding exists between me and any other person for

the sharing of compensation received or to be received for services rendered by me in

connection with this proceeding.

11.    I have not received compensation in this case, nor has an agreement been

made as to compensation to be paid.  I am willing to agree to charge a rate of $465.00 per

hour for my incurred time, subject to periodic adjustment, plus reimbursement of actual and

necessary out-of-pocket expenses.  If selected as the Future Claimants' Representative, I will

review any order entered by this Court establishing procedures for interim compensation and

reimbursement of expenses of professionals, and I agree to comply with the provisions

thereof.

### SERVICES TO BE PROVIDED BY
### THE HONORABLE PEGGY L. ABLEMAN

12.    I understand that my service as the Future Claimants' Representative in

connection with the Debtor's Chapter 11 Case, subject to approval by the Court, would be on

the following terms:

      a.    Standing — The Future Claimants' Representative shall have standing
under section 1109(b) of the Bankruptcy Code to be heard as a party-
in-interest in all matters relating to the Debtor's Chapter 11 Case and

4

shall have such powers and duties of a committee, as set forth in 11 U.S.C. § 1103, as appropriate for a Future Claimants' Representative;

b.    <u>Engagement of Professionals</u> — The Future Claimants' Representative may, with prior approval from the Court pursuant to sections 105(a), 327 and 1103 of the Bankruptcy Code and consistent with the treatment afforded other professionals in this Chapter 11 Case, retain attorneys and other professionals;

c.    <u>Compensation</u> — The Future Claimants' Representative shall apply for compensation in accordance with the Bankruptcy Code, the Local Rules, and any order entered by the Court establishing procedures for interim compensation and reimbursement of expenses of professionals. Subject to Court approval, I shall be compensated at my hourly rate of $465.00, subject to periodic adjustment, plus reimbursement of reasonable, actual and necessary expenses.  I agree to look first to the balance in the Administrative Fund established by Liberty Mutual Insurance Company for payment of my fees and expenses incurred in connection with this Chapter 11 Case, but I am not waiving any right to payment from the Debtor's other funds in the event that the Administrative Fund is insufficient or otherwise unavailable for any reason.

d.    <u>Indemnification</u> — The Debtor shall indemnify, defend and hold harmless the Future Claimants' Representative from and against any losses, claims, damages, or liabilities (or action in respect thereof) to which the Future Claimants' Representative may become subject as a result of or in connection with his rendering services hereunder, unless and until it is finally judicially determined that such losses, claims, damages or liabilities were caused by fraud or willful misconduct on the part of the Future Claimants' Representative in performing his obligations.  The foregoing entitlement of the Future Claimants' Representative shall include, without limitation, the right to be indemnified against any liability related to or resulting from any information provided by the Future Claimants' Representative that is inaccurate in any respect as a result of misrepresentation, omission, failure to update, or otherwise, unless the Future Claimants' Representative actually knew of such inaccuracy at the time of the misrepresentation, omission, failure to update, or other occurrence in such action or proceeding, whether such action is concluded, ongoing, or threatened; and the right to be indemnified for any expenses, including reasonable attorney's fees, that the Future Claimants' Representative may incur in enforcing this indemnification provision. In the event that full indemnification is not available to the Future Claimants' Representative as a matter of law, then, to the extent permitted by applicable law, his aggregate liability shall be limited to the total fees collected for the services rendered and, in any event, shall be limited by a final adjudication of his relative degree of fault and benefit received;

e.   <u>Right to Receive Notices</u> — The Future Claimants' Representative and any professionals retained by him and approved by the Court shall have the right to receive all notices and pleadings that are required to be served upon any statutory committee and its counsel pursuant to applicable law or an order of the Court.

**AS TO BE SET FORTH IN A SEPARATE APPLICATION, THE FIRM
<u>MCCARTER & ENGLISH, LLP WOULD ALSO BE A DISINTERESTED PERSON</u>**

13.    Even though I work as special counsel at McCarter and anticipate seeking approval from the Court to retain McCarter in these proceedings, I am not beholden to McCarter.  My objective, if selected, is to place the interests of the future claimants' above those of the attorneys and other administrators who have benefited from certain asbestos trusts in the past.  None of the statements in this Declaration should be construed to undermine my objective.

14.    In the interest of full disclosure and transparency, given my current intention to seek approval under the applicable sections of the Bankruptcy Code to retain McCarter to represent me in these proceedings, in preparation for my nomination as Future Claimants' Representative, I caused the following actions to be performed in order to ascertain McCarter's connections to the Interested Parties.  If a final conflict check reveals an actual conflict of interest that would disqualify McCarter from representing me in these proceedings, I obviously would seek to retain a separate firm as my counsel.

a.   McCarter ran a preliminary comparison of each of the Interested Parties on the List to the names that McCarter has compiled into a master client database from its conflicts clearance and billing records, comprised of the names of the entities for which any attorney's time charges have been billed since the database was first created (the "<u>Client Database</u>"). The Client Database includes the name of each current or former client, and the names of the McCarter personnel who are or were responsible for current or former matters for such client.

b.   Any matches between the Client Database and the Interested Parties were identified (the "<u>Client Match List</u>"), together with the names of the respective McCarter personnel responsible for current or former matters for the entities on the Client Match List.

6

c.    The Client Match List was then reviewed and obvious name coincidences, client affiliates and individuals or entities that were adverse to McCarter's clients either in this matter or another matter but were not otherwise on the Client Match List, were deleted. The remaining individuals and entities for which McCarter has performed services were compiled for purposes of this declaration (the "Final Client Match List"). The Final Client Match List consists of two current clients, The Hartford Insurance Company and Hartford Fire Insurance Company and no former clients.[3]

15.    In reviewing the Final Client Match List, the names of individuals and entities for which McCarter had performed services were investigated. With respect to parties listed on the Final Client Match List, on information and belief, McCarter has not in the past, does not now, and will not in the future, represent any such parties in connection with this Chapter 11 Case.

16.    Based on my review of the Final Client Match List, and to the best of my knowledge, to date, McCarter: (a) does not have any connection with the Debtor, its affiliates, its creditors or any other parties in interest, or its respective attorneys or accountants, except as otherwise disclosed herein; and (b) does not hold or represent any interest adverse to the Debtor or its estate with respect to the matters as to which McCarter may be employed. On the basis of the above, I believe both myself and the firm of McCarter to be a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code. Obviously, if I am selected, McCarter will run a final conflict check and submit its own affidavit to supplement the preliminary comparison of the Interested Parties to the Client Database that was performed for purposes of this Declaration.

17.    Other than as set forth herein, through diligent inquiry, I have ascertained no connection, as such term is utilized in Section 101(14) of the Bankruptcy Code, between McCarter and: (a) the United States Trustee or any person employed by the Office of the United States Trustee; (b) any attorneys, accountants, financial consultants, investment

---

[3] McCarter does not represent the Current Clients in any matters or interests that are connected to or adverse to the Debtor's estate. Moreover, McCarter was founded in 1845. For purposes of this Declaration, an Interested Party is considered a Former Client if it was represented by McCarter in the past two years.

bankers or other professionals retained by the Debtors; or (c) other Interested Parties in the Debtor's Chapter 11 Case.  Additionally, I am not, nor is McCarter, an insider of the Debtor.

18.    As part of its practice, McCarter appears in cases, proceedings and transactions involving many different attorneys, accountants, financial consultants and investment bankers, some of which now or may in the future represent claimants and other parties in interest in chapter 11 cases throughout this nation but, to the best of my knowledge after reasonable inquiry, McCarter has not represented and, if I am selected and if McCarter is approved to represent me, it will not represent any such parties in relation to this Chapter 11 Case.

19.    No agreement or understanding exists between myself and any other person, other than as permitted by section 504 of the Bankruptcy Code, to share compensation received for services rendered in connection with this Chapter 11 Case.  If I ultimately seek approval of McCarter to represent me in these proceedings, McCarter will submit an affidavit that affirms it will not share or agree to share any compensation received for services rendered in connection with this Chapter 11 Case with any other person other than as permitted by section 504 of the Bankruptcy Code.

## SPECIFIC DISCLOSURES RELATED TO MCCARTER'S FINAL MATCH LIST

20.    If I am selected to serve as the Future Claimants' Representative and if I choose to seek approval to employ McCarter as my counsel, any potential conflicts of interest will be fully reported and disclosed in an application to retain McCarter to represent the FCR.  As preliminarily identified in the Final Client Match List, McCarter represents or has represented certain Interested Parties in matters unrelated to this Chapter 11 Case.  On information and belief, none of the representations described herein are adverse to the interests of the Debtor's estate.  Accordingly, I do not believe that McCarter's current and

8

prior representations described herein preclude McCarter from being a disinterested person under the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: January 17, 2019                    */s/ Peggy L. Ableman*
                                                    Peggy L. Ableman

ME1 29044578v.3

# EXHIBIT 1







# Peggy L. Ableman
## Special Counsel

T: 302.984.6356          Renaissance Centre
F: 302.450.4252          405 N. King St., 8th Fl.
pableman@mccarter.com    Wilmington, DE 19801

Judge Ableman brings to her practice nearly 30 years of experience as a state trial judge, first on the Delaware Family Court, and ultimately as a Judge on the Superior Court of the State of Delaware. At the time of her appointment to the Family Court, she was only the second woman to serve as a member of that state's judiciary. During her tenure on the Superior Court, Judge Ableman presided over the asbestos litigation docket for nearly two years, a docket comprised of more than 500 cases involving litigants from all over the world. She issued many detailed written opinions, in an area of the law where written decisions on commonly-recurring summary judgment issues had previously been the exception rather than the rule. She was frequently invited to speak at national asbestos litigation conferences. Judge Ableman has also authored hundreds, if not thousands, of judicial opinions addressing civil, criminal, and appellate matters and she has played a significant role in shaping Delaware law for the past three decades.

Before taking the Bench, Judge Ableman served as the first female Assistant United States Attorney for the District for Delaware from 1979 to 1983. In 1995, Judge Ableman was the first recipient of the Chief Justice's Award for Outstanding Judicial Service. In 2013, she was awarded the Judicial Achievement Award by the Institute for Legal Reform of the United States of America Chamber of Commerce.

Judge Ableman is a past president of the Richard S. Rodney Inn of Court. She is a past member of the Governor's Child Protection Accountability Commission. She chaired and authored reports for two child death review investigations, one of which resulted in sweeping improvements to the child welfare system in Delaware. She served on the Bench-Bar-Media Committee of the Supreme Court, and was its chair in 2010 and 2011. Judge Ableman was an adjunct professor at the Villanova School of Law from 2013-2014. She is a member of the National Association of Women Judges, the American Bar Association and the Delaware Bar Association.

Judge Ableman was appointed by Chief Justice Leo Strine of the Delaware Supreme Court to serve as co-chair of the Delaware Jurisdiction Improvement Committee. Judge Ableman has also been re-appointed by the Chief Justice of the Delaware Supreme Court to serve a second three-year term on the Preliminary Investigation Committee of the Court on the Judiciary.

Judge Ableman received her B.A. with distinction from Simmons College in Boston, Massachusetts and her J.D. from the Emory University School of Law where she was Notes and Comments Editor of the *Emory Law Journal.* She was admitted to the Delaware Bar in 1975.

**PRACTICE**
Products Liability, Mass Torts and Consumer Class Actions

**EDUCATION**
J.D., Emory University School of Law

B.A., Simmons College, *with distinction*

Notes and Comments Editor, *Emory Law Journal*

**BAR ADMISSIONS**
Delaware
Georgia

**MEMBERSHIPS & AFFILIATIONS**
American Bar Association

Bench-Bar-Media Committee of the Supreme Court

Delaware Bar Association

Delaware Center for Justice, Board of Directors

Governor's Child Protection Accountability Commission, Past President

National Association of Women Judges

Richard S. Rodney Inn of Court

---

**NEWS**

02/15/18          Pro Bono Lawyer Spotlight: Peggy Ableman, Special Counsel

05/23/17          Peggy Ableman quoted in Release on Transparency Bill That Would End "Double-Dipping" in Asbestos Litigation

12/18/16          David Kott, Edward Fanning, Zane Riester and Peggy Ableman mentioned in the American Tort Reform Foundation's 2016 edition of "Judicial Hellholes"

| | |
|---|---|
| 08/04/16 | Peggy Ableman profiled and interviewed in "Answering Phones Made Her a People Person," which appeared in Delaware Business Times |
| 02/08/16 | Peggy Ableman quoted in "Markell Chooses Slights As His Chancery Court Nominee," which appeared in Delaware Online |
| 01/11/16 | Peggy Ableman testified before Pennsylvania General Assembly |
| 01/11/16 | Peggy Ableman quoted in "Authors Say Public Release Of Garlock Data Confirms 'Widespread Pattern' Of Evidentiary Abuse Against Defendant Crane Co," which appeared on LegalNewsline.com |
| 07/23/14 | Peggy Ableman interviewed on-air and in print in "Asbestos Claimants Fire Back As Charlotte Bankruptcy Case Draws National Attention," on Charlotte NPR affiliate KFAE 90.7 |
| 06/09/14 | Peggy Ableman quoted in "Skadden Atty To Boost Litigation Prowess Of Del. High Court," which appeared in Law360 |
| 12/10/13 | Peggy Ableman was quoted in Law360, "High Court Exposes Insurers To More Asbestos Claims" |
| 07/25/13 | Peggy Ableman selected as the recipient of the 2013 U.S. Chamber Institute for Legal Reform Judicial Leadership Achievement Award |
| 03/14/13 | Peggy Ableman Testifies in Asbestos Claims Case featured in Wall Street Journal, Bloomberg News, Law360 among others |
| 02/26/13 | Mike Kelly quoted in Thomson Reuters, "Ex-Judge to do Product Liability, Pharma Work for McCarter & English" |
| 02/25/13 | Former Delaware Superior Court Judge, Peggy L. Ableman, Joins McCarter & English as Special Counsel |

**SPEAKING**

| | |
|---|---|
| 06/07/17 | Restoring New York's Justice System: Truth, Fairness, and Transparency in Asbestos Litigation<br>Peggy L. Ableman<br>City & State NY |
| 01/12/17 | The Continuing Fallout Surrounding Bankruptcy Trust Transparency, Plus the Effect of the RICO Actions<br>Peggy L. Ableman<br>American Conference Institute's 22nd National Advanced Forum on Asbestos Claims & Litigation |
| 11/10/16 | Unraveling a Lawsuit<br>Peggy L. Ableman<br>DRI Asbestos Medicine Conference |
| 06/30/15 | Business as Usual in a Judicial Hellhole?<br>Peggy L. Ableman<br>Asbestos Litigation |
| 06/02/15 | Asbestos Litigation: Lasting Perversions of Common Law<br>Peggy L. Ableman<br>9th Civil Justice Symposium for Judges |
| 11/07/14 | Ethical Considerations in the Aftermath of the Garlock Bankruptcy Court Decision<br>Peggy L. Ableman<br>2014 DRI Asbestos Medicine Seminar |

**PUBLICATIONS**

| | |
|---|---|
| 03/13/17 | Commentary: "Me Thinks the Lawyers Doth Protest Too Much": A Response to "The Irony of Tort Reform"<br>Peggy L. Ableman<br>LexisNexis |
| 11/04/15 | A Look Behind The Curtain: Public Release Of Garlock Bankruptcy Discovery Confirms Widespread Pattern Of Evidentiary Abuse Against Crane Co.<br>Peggy L. Ableman |

Mealey's Litigation Report: Asbestos

04/23/15    The Consolidation Effect: New York City Asbestos Verdicts, Due Process and Judicial Efficiency
            Peggy L. Ableman
            Mealey's Asbestos Bankruptcy Report

04/08/15    The Time Has Come for Courts to Respond to the Manipulation of Exposure Evidence in Asbestos Cases:
            A Call for the Adoption of Uniform Case Management Orders Across the Country
            Peggy L. Ableman
            Mealey's Litigation Report: Asbestos

09/29/14    Why Transparency Is Imperative in Litigating Asbestos Liability Claims
            Peggy L. Ableman
            Washington Legal Foundation

06/30/14    The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases
            Peggy L. Ableman
            American Journal of Trial Advocacy

06/24/13    Secret Pursuit Of Asbestos Bankruptcy Claims Must End
            Peggy L. Ableman
            Law360

Copyright © 2019 McCarter & English, LLP. All Rights Reserved



# EXHIBIT 2

# The *Garlock* Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases

*Peggy L. Ableman*[†]

### Abstract

*As a Delaware Superior Court Judge formerly assigned to the asbestos docket, this author learned firsthand about the difficulties inherent in accounting for bankruptcy trust recoveries in asbestos personal injury lawsuits and the abusive practices facilitated by the lack of any coordination between the two compensation systems. The recent bankruptcy court decision in* In re Garlock *reveals just how widespread the tactics of strategic non-disclosure and trust submission timing have become. This Article explores the need for coordination between the bankruptcy trust and the civil tort systems and calls upon trial judges to institute procedures to identify the scope and real-world impact of fraudulent asbestos claiming upon the integrity of the judicial process.*

## Introduction

Before my retirement as a trial judge on the Superior Court of the State of Delaware, I was assigned to our state's growing asbestos litigation docket.[1] In that capacity, the circumstances of one particular asbestos wrongful death case over which I was to preside[2] unexpectedly thrust me at the center of one of the most controversial issues that has ever dominated asbestos litigation—the lack of any nexus, interface, or transparency between the two systems that currently exist for providing compensation to victims of asbestos exposure. Plaintiffs today can seek relief in two

---

[†] B.A. (1972), Simmons College; J.D. (1975), Emory University School of Law. Peggy L. Ableman is a former Delaware Superior Court Judge who is now Special Counsel in the law firm of McCarter & English, LLP, in its Wilmington, Delaware office. She has nearly thirty years' experience as a state trial judge and has provided testimony before the United States House of Representatives, the Wisconsin State Judiciary Committee, the Pennsylvania House Judiciary Committee, and the American Bar Association Task Force on Asbestos Litigation on this topic.

[1] *See* Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 REV. LITIG. 501, 541 (2009) (discussing the increase in filings in Delaware due to liberal *forum non conveniens* law).

[2] *See generally In re* Asbestos Litig., No. 09C-11-217-ASB, 2011 WL 5395554 (Del. Super. Ct. Sept. 28, 2011).

ways: through the filing of a tort action against solvent manufacturers of asbestos-containing products and by filing claims with any of more than sixty asbestos bankruptcy trusts that have been established by the asbestos thermal insulation manufacturers who once played a central role in the asbestos industry, and more recently, by suppliers of encapsulated asbestos products.[3] As these manufacturers and suppliers have seen their assets exhausted by the sheer number and magnitude of the judgments against them, they have been forced to file bankruptcy. The trusts established under section 524(g) of the Bankruptcy Code[4] have become part of the overall framework and a significant source of compensation for asbestos personal injury plaintiffs, representing a $30 billion-plus total fund.[5] The gap between the trust and tort systems and the extent to which plaintiffs or their attorneys have taken advantage of it, has been the subject of both federal and state legislative reform efforts,[6] as well as countless scholarly publications and articles.[7]

---

[3] *See* LLOYD DIXON ET AL., ASBESTOS BANKRUPTCY TRUSTS 25 (2010), *available at* http://www.rand.org/content/dam/rand/pubs/technical_reports/2010/RAND_TR872.pdf.

[4] 11 U.S.C. § 524(g) (2012).

[5] Marc C. Scarcella et al., *The Philadelphia Story: Asbestos Litigation, Bankruptcy Trusts and Changes in Exposure Allegations from 1991-2010*, MEALEY'S ASBESTOS BANKR. REP., Oct. 2012, at 1, *available at* http://www.bateswhite.com/media/publication/11_media.617.pdf.

[6] OHIO REV. CODE ANN. §§ 2307.951-2307.954 (2013); OKLA. STAT. tit. 76, §§ 81-89 (2013); Furthering Asbestos Claim Transparency (FACT) Act of 2013, H.R. 982, 113th Cong. (2013) [hereinafter FACT Act]; H.B. 153, 98th Gen. Assem., Reg. Sess. (Ill. 2013); H.B. 481, 2013 Leg., Reg. Sess. (La. 2013); H.B. 529, 128th Leg., Reg. Sess. (Miss. 2013); H.B. 1150, Reg. Sess. 2013-2014 (Pa. 2013); H.B. 2545, 83d Leg., Reg. Sess. (Tex. 2013); S.B. 19, 2013-2014 Leg., Reg. Sess. (Wis. 2013); A.B. 19, 2013-2014 Leg., Reg. Sess. (Wis. 2013).

[7] *Compare* S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 WIDENER L.J. 299 (2013); William P. Shelley et al., *The Need for Transparency Between the Tort System and Section 524(g) Asbestos Trusts*, 17 J. BANKR. L. & PRAC. 257 (2008); LLOYD DIXON & GEOFFREY McGOVERN, ASBESTOS BANKRUPTCY TRUSTS AND TORT COMPENSATION (2011), *available at* http://www.rand.org/content/dam/rand/pubs/monographs/2011/RAND_MG1104 .sum.pdf; John B. Manning, *Impact of Bankruptcies on Asbestos Litigation*, ASBESTOS MED., Nov. 2009; Victor E. Schwartz, *A Letter to the Nation's Trial Judges: Asbestos Litigation, Major Progress Made Over the Past Decade and Hurdles You Can Vault in the Next*, 36 AM. J. TRIAL ADVOC. 1 (2012); *with* Elihu Inselbuch et al., *The Effrontery of the Asbestos Trust Transparency Legislative Efforts*, MEALEY'S LITIG. REP.: ASBESTOS, Feb. 2013, *available at* http://www.capdale.com/files/8122_ASB 022013cm.pdf.

## *In re* Asbestos Litigation

In order to assure that defendants in the tort system have access to information contained in the trust submissions and to prevent litigants from advancing two different fact patterns to maximize recovery from both sources, there is a growing trend toward requiring plaintiffs in civil lawsuits to disclose trust submissions. Many state trial courts, including Delaware, require full disclosure of trust claims as part of their case management orders.[8]  The problem, I discovered, is that there exists no foolproof mechanism to enforce this requirement.[9]  Hence, on the morning I was scheduled to commence a two-week asbestos trial, I learned that the plaintiff or his attorneys, or both, not only failed to disclose a significant number of trust submissions, but was also able to withhold a substantial body of exposure evidence that had been presented to the trusts but not to the defendants in the litigation.[10]

Having wasted valuable judicial and administrative resources and with a pre-selected jury waiting to serve, I had no choice but to continue the

---

[8] Delaware, Illinois, California, New York, Pennsylvania, West Virginia, and Texas require pretrial disclosure of trust claims that have been filed. *See* Standing Order No. 1 at ¶7(k), *In re* Asbestos Litig., 911 A.2d 1176 (Del. Super. Ct. 2006) (No. 77C-ASB-2), *available at* http://www.defenselitigationinsider.com/files/2013/11/New-SO-1.pdf; DIXON & MCGOVERN, *supra* note 7, at 17-18. Montgomery County, Pennsylvania and New York City require the filing of trust claims before trial. *See id.*  Ohio requires the submission of all anticipated trust claims prior to trial with procedures available to defendants to stay the trial to require a plaintiff to submit additional bankruptcy trust claims. OHIO REV. CODE ANN. § 2307.952 (2006). Oklahoma's statute requires the disclosure of claims forms materials within 90 days of the commencement of a case. OKLA. STAT. tit. 76, § 83 (2012).

[9] *See* Marc C. Scarcella & Peter R. Kelso, *Asbestos Bankruptcy Trusts: A 2012 Overview of Trust Assets, Compensation & Governance*, MEALEY'S ASBESTOS BANKR. REP., June 2012, at 1, *available at* http://www.bateswhite.com/media/publication/17_media.580.pdf.

[10] Just prior to opening statements before the jury, I was advised that the plaintiff had filed claims with a number of bankruptcy trusts, which information was directly contrary to the representations made by plaintiff's counsel at the pretrial conference and the sworn disclosure required under the court's case management order.  The remaining defendant in the case, Foster Wheeler, had been led to believe that the decedent's only exposure was the result of laundering her husband's clothing. In fact, she had been exposed through her own occupational activities to the products of at least twenty additional insolvent defendants who were never previously mentioned and had, therefore, never been considered in assessing liability among all co-defendants. *In re* Asbestos Litig., No. 09C-11-217-ASB, 2011 WL 5395554 (Del. Super. Ct. Sept. 28, 2011).

trial, which ultimately led to a dismissal of the case.[11] My reaction to the deceptive behavior caught the attention of those who were actively seeking greater transparency between the two compensation systems. As a result, upon my retirement, I was frequently asked to testify about my experience, unquestionably because the case presents a quintessential example of the abusive practices that members of the asbestos defense bar are actively seeking to curb.

My efforts to encourage reform by recounting the unfortunate saga of my aborted trial were always resisted by members of the plaintiffs' bar, who consistently and vigorously maintained that the case was an aberration, that there had been no fraud established in the trust-claiming process, or that any proposed reforms were a "solution in search of a problem."[12] A typical response to my description of the case was as follows:

> Are there lawyers who may misbehave? I'm sure there are. I'm sure there are some. In 50 years of practice, I haven't seen many, but I am sure there are some that misbehave either as plaintiffs or defendants.
>
> But Judge Ableman will catch them. That is the proof that when abuse occurs, the court system, the state court system around the country is perfectly able to find the abuse.[13]

In fact, one representative of the trusts and an outspoken opponent of any legislation to require greater openness between the two compensation systems has even stated categorically: "These laws [FACT Act and state legislative reforms] are not designed—nor intended—to address fraud in the trust system. Indeed, there is not a scintilla of evidence of any such problem."[14]

---

[11] Transcript of Pretrial Hearing at 13, *In re* Asbestos Litigation, No. 09C-11-217-ASB, 2011 WL 5395554 (Del. Super. Ct. Sept. 28, 2011) (No. 444).

[12] *Furthering Asbestos Claim Transparency (FACT) Act of 2013: Hearing on H.R. 982 Before the Subcomm. on Regulatory Reform, Commercial and Antitrust Law of the H. Comm. on the Judiciary*, 113th Cong. 99 (2013) [hereinafter 2013 FACT Hearing] (statement of Rep. Steve Cohen), *available at* http://www.gpo.gov/fdsys/pkg/CHRG-113hhrg79879/html/CHRG-113hhrg79879.htm.

[13] *Id.* at 54 (statement of Elihu Inselbuch, Esq.).

[14] Inselbuch et al., *supra* note 7, at 9.

# The Impact of *In re Garlock*

Until recently, the defense bar pointed to only a smattering of reported instances of the type of deception that my case so clearly illustrated.[15] In contrast, opponents of reform continued to assert that systemic fraud did not exist—or at least had not been established—and the few examples that I or others had identified were rare or anecdotal.[16]  In short, the rejoinder has always been that reforms to achieve transparency were wholly unnecessary.[17] Ironically, because information contained in trust submissions was not readily available, the opponents of transparency legislation were able to continue to scoff against those who advocated reform without fear of being discredited by anything but the few examples of deception that judges had occasionally been able to uncover. In essence, the secrecy in the trust-claiming system became its own obstacle to reform.

The debate raged on at all levels, and perhaps continues today, but the decision of the United States Bankruptcy Court for the Western District of North Carolina in gasket-manufacturer Garlock Sealing Technologies, Inc.'s estimation proceeding is certain to have silenced to some extent the zealousness with which plaintiffs and their attorneys have resisted transparency reforms.[18]  The *Garlock* opinion represents a stunning expose' of the breadth of the practice of withholding exposure evidence concerning the products of bankrupt entities.

As is evident from the scope and detail of the opinion, the court in *Garlock* embarked on an extensive effort to understand fully the history of asbestos litigation in the United States, the scientific evidence relating to asbestos and asbestos-related disease, including epidemiology and industrial hygiene expert testimony, the social science relating to asbestos

---

[15] *See, e.g.*, Kananian v. Lorillard Tobacco Co., No. CV 442750 (Ohio Ct. C.P., Cuyahoga County 2007); Dionne Searcey & Rob Barry, *As Asbestos Claims Rise, Abuse Concerns Follow Suit*, WALL ST. J., Mar. 11, 2013, at A1, *available at* http://online.wsj.com/news/articles/SB10001424127887323864304578318611662911912.

[16] Inselbuch et al., *supra* note 7, at 2, 6, 7; 2013 FACT Hearing, *supra* note 12, at 55, 162, 165 (response to questions for the record).

[17] Inselbuch et al., *supra* note 7, at 7-10; 2013 FACT Hearing, *supra* note 12 (written submission of Elihu Inselbuch).

[18] *In re* Garlock Sealing Techs., LLC, 504 B.R. 71 (W.D.N.C. Bankr. 2014).

litigation practices, and its evolution into the dual compensation system that exists today.[19] In undertaking this estimation effort, the court deviated from the usual practice of projecting the number of claims a trust anticipates receiving, and then determining the historic settlement value of those claims, so as to approximate what the trust's solvent predecessor would have paid to settle lawsuits.[20] In so doing, Judge Hodges unearthed what can best be described as a stunning pattern of fraud and misrepresentation that should provide new and powerful support for the defense bar's crusade for greater openness.[21]

Specifically, in order to estimate Garlock's liability for present and future mesothelioma claims relating to its asbestos-containing products, the Bankruptcy Judge authorized additional investigation to determine the legitimacy of using Garlock's settlement history as an accurate measure of its future liability. The evidence he found as a result of delving into the facts of only fifteen out of hundreds of settled cases resulted in the court's conclusion that "[i]t was a regular practice by many plaintiffs' firms to delay filing Trust claims for their clients so that remaining tort system defendants would not have that information."[22] That finding also led to the court's scathing criticism "that the last ten years of [Garlock's] participation in the tort system was infected by the manipulation of exposure evidence by plaintiffs and their lawyers."[23]

In its exhaustive historical review of the shifting nature of asbestos litigation since the early 2000s, when the large thermal insulation defendants were no longer subject to suit as a result of their bankruptcies, the court described in detail how the plaintiffs' attention turned to more peripheral defendants like Garlock, who were not producing the more toxic thermal insulation products, but manufacturing items like gaskets, some asbestos-containing.[24] Not surprisingly, from about 2000 to 2005, as more and more of the "big dusties" sought bankruptcy protection, the settlements demanded of the solvent entities increased correspondingly.[25]

---

[19] *Id.* at 75-87.

[20] *Id.* at 94-97.

[21] *Id.* at 84-87.

[22] *Id.* at 84.

[23] *Id.* at 82.

[24] *Id.* at 73, 83-84.

[25] *Id.*

And, as insulation manufacturers exited the tort system for bankruptcy protection, the court found that the evidence of the exposure to the products of these same bankrupt insulation companies disappeared as well, through the deliberate efforts by some plaintiffs and their lawyers to withhold such evidence until after the conclusion of the tort litigation.[26]

In the fifteen randomly selected cases where the court permitted Garlock to engage in full discovery, the court found that exposure evidence had been withheld in *each* of them.[27] The discovery revealed, on average, that plaintiffs disclosed only two exposures to bankrupt companies' products in the tort cases. These same plaintiffs, however, made claims on average against nineteen such companies' trusts, but only *after* reaching a settlement with Garlock.[28] Since this calculated withholding of evidence served to distort the level of responsibility on the part of Garlock and others, the court could not avoid reaching this disturbing judgment:

> These fifteen cases are just a minute portion of the thousands that were resolved by Garlock in the tort system. . . . But, the fact that *each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive. . . . It appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentations that has been shown is sufficiently persuasive.[29]

The widespread fraud brought to light by Judge Hodges in his foray into a deeper understanding of asbestos litigation does not come as a great surprise to those who have sought reforms. But, the court's findings as to the relative level of responsibility of Garlock and similar end users of encapsulated asbestos products should be equally troubling to many of the defendants still in the tort system, who have spent the last decade or so forced to settle the same type of cases, which, prior to the emergence of bankruptcy trusts, had summarily been dismissed or settled for well below their projected transaction costs.[30]

---

[26] *Id.*

[27] *Id.* at 85-86.

[28] *Id.* at 85-87.

[29] *In re Garlock Sealing Techs.*, 504 B.R. at 85-86.

[30] *Id.* at 73, 83.

Garlock's story is typical of many of the remaining solvent co-defendants in the asbestos tort system who began being sued with increasing frequency beginning in the early 1980s, despite the fact that the products they sold exposed people to lower doses of a relatively less potent chrysotile asbestos and almost always in the context in which they were exposed to much higher levels of more potent amphibole asbestos from manufacturers who were no longer viable defendants in the tort system.[31] These more remote defendants increasingly became lead defendants in the tort system, resulting in elevated shares of liability, notwithstanding that they, like Garlock, consistently maintained that their products did not cause asbestos disease.[32] Judge Hodges' conclusions regarding the lower levels of toxicity of chrysotile asbestos, and those of Garlock's products, are significant because these are the factual findings of an experienced judge, rather than the determination of a jury.

It remains to be seen, after the court's troubling findings in the *Garlock* case, whether bankruptcy judges in the future will be reluctant to determine trust values by assessing settlement history alone. It is also too early to predict the impact of this decision on ongoing settlement practices of solvent defendants or to know whether the revelations in *Garlock* will have a chilling effect on future fraudulent practices. Notwithstanding the uncertain impact of the *Garlock* case, judges should view the decision as a wake-up call to acknowledge the very real possibility that asbestos lawsuits on their own dockets may be similarly compromised by the withholding of the same information in the court cases that is used to gain recoveries from the trusts.

While these transparency loopholes exist, trial judges can and should take steps to eliminate the opportunity for lawyers to game the system through strategies such as withholding trust claims until the tort case is concluded, or utilizing professionals not involved in the state court litigation to be wholly responsible for the submission of bankruptcy trust claims. I fell into the trap of relying upon the integrity of the parties or their lawyers to abide by the case management order requiring full disclosure. At the time, I was not aware of the methods routinely employed by plaintiffs to avoid disclosure of all of their exposure sources and of the evidence supporting them.

---

[31] *Id.* at 75, 78, 82.

[32] *Id.* at 75, 79, 82-83, 87.

# Advice to Trial Judges

So long as the present system allows plaintiffs to leave out critical facts that later form the basis for recovery from bankruptcy trusts, judges need to send a strong message to the asbestos bar that full disclosure of all facts is mandatory from the very inception of the litigation, since even the settlement strategies of these defendants are profoundly affected by the factual circumstances of a particular plaintiff's *overall* exposure. Trial judges should also express a willingness to reopen cases post-trial if it is later discovered that relevant evidence was withheld, and they should make it known that they are not adverse to using the inherent power of the courts to sanction this type of fraudulent activity, including that of lawyers who deliberately, or out of neglect, fail to verify if any submissions have been made.

Even if the bankruptcy trusts are content to overlook inconsistencies, state courts should be unwilling to ignore instances of fraudulent activity, if for no other reason than to show respect for the truth-seeking function of the courts. Given the protracted pace at which legislative reforms can be accomplished, it is incumbent upon the civil justice system, and the individuals who are responsible for its administration, to refuse to tolerate a process where litigants may advance one set of facts under penalty of perjury in one forum, and a contradictory set in another. As the court aptly noted in *Garlock*, "while it is not suppression of evidence for a plaintiff to be unable to identify exposures, it is suppression of evidence for a plaintiff to be unable to identify exposure in the tort case, but then later (and in some cases previously) to be able to identify it in Trust claims."[33]

Importantly, trial judges who preside over asbestos cases also need to avoid the tendency to treat denials of summary judgment motions as non-dispositive rulings. As Judge Hodges' careful scrutiny and analysis of Garlock's settlement strategies revealed, the transactional costs associated with pretrial discovery, motion practice, preparation, and trial of these cases are so enormous that a defendant who does not prevail on summary judgment is generally limited to negotiating a reduced amount to pay in settlement of the claim, no matter how weak the

---

[33] *Id.* at 86.

evidence of actual exposure.[34]  Trial in these circumstances is almost
always cost prohibitive. Judges should therefore be mindful that a denial
of summary judgment does not, in reality, leave the parties free to prove
their case at trial.

# Conclusion

The pattern of misrepresentation described in detail in the *Garlock*
opinion should serve to suppress somewhat the outcry from plaintiffs'
lawyers that "there is no fraud."  To continue to suggest that it is fair to
maintain secrecy in the trust-claiming process, or that reform is unneces-
sary, is belied by the results of Judge Hodges' limited excursion into the
factual circumstances of just a few of the cases in which Garlock was
demonstrably prejudiced.  We are now past the time when these cases
can be referred to as mere anomalies or when we can view Garlock as
the sole asbestos defendant which has been prejudiced by these practices.
While the limited legislative measures to eliminate fraudulent claims may
discourage some strategic nondisclosure and some manipulation of trust
submission timing, it will be up to trial judges to fill the enforcement gaps
not only by case management orders, but by leaning strongly on the
attorneys to act ethically, honestly, and responsibly. And, there is always
the additional risk that some defendants may find out about delayed after-
the-fact filings, and then plaintiffs who may be manipulating trust claims
and litigation settlements will have to deal with judges from a far more
difficult perspective, as it is their credibility that will have been tarnished.

For my part, I am relieved to have been somewhat vindicated by the
*Garlock* decision and to have some support for my own suspicions
regarding just how widespread these deceptive practices have become.
In the final analysis, there is no question that the *Garlock* decision,
together with the startling findings recounted therein, should be required
reading for all judges who preside over asbestos personal injury cases.

---

[34] *Id.* at 87.

# A Case Study from a Judicial Perspective: How Fairness and Integrity in Asbestos Tort Litigation Can Be Undermined by Lack of Access to Bankruptcy Trust Claims

Peggy L. Ableman



Reprinted from

# TULANE LAW REVIEW

Volume 88, Number 6

Copyright © 2014, Tulane Law Review Association

# A Case Study from a Judicial Perspective: How Fairness and Integrity in Asbestos Tort Litigation Can Be Undermined by Lack of Access to Bankruptcy Trust Claims

## Peggy L. Ableman[*]

I.    INTRODUCTION.................................................................1185
II.   THE CURRENT ASBESTOS COMPENSATION SYSTEM.................1187
III.  A CASE STUDY—THE *MONTGOMERY* CASE............................1189
IV.   OTHER DISCOVERED INSTANCES OF FRAUDULENT
      CLAIMING......................................................................1195
V.    JUDICIAL EFFORTS TO CURB ASBESTOS BANKRUPTCY
      ABUSE BY CASE MANAGEMENT ORDERS ................................1201
VI.   LEGISLATIVE EFFORTS TO PROVIDE GREATER
      COORDINATION BETWEEN TRUSTS AND THE TORT SYSTEM .....1204
      A.   The Furthering Asbestos Claim Transparency
           (FACT) Act of 2013........................................................1204
      B.   State Legislative Initiatives To Create Transparency
           Between the Tort and Bankruptcy Trust Systems...........1206
VII.  CONCLUSION....................................................................1209

## I.   INTRODUCTION

While serving as a trial judge in the state of Delaware for twenty-nine years, I developed the habit of viewing every case, and particularly each case over which I presided at trial, as one that could always possess great potential for the unexpected or unforeseen. A seemingly garden-variety automobile accident personal injury case

*       © 2014 Peggy L. Ableman. Peggy Ableman is a former Delaware Superior Court Judge who is now Special Counsel in the law firm of McCarter & English, LLP, in its Wilmington, Delaware, office. She has nearly thirty years' experience as a state trial judge and has provided testimony before the United States House of Representatives, the Wisconsin State Judiciary Committee, the Pennsylvania House Judiciary Committee, and the American Bar Association Task Force on Asbestos Litigation on this topic. The author wishes to thank Theodore W. Annos, Esquire, of McCarter & English, LLP, for his invaluable insight and assistance in the preparation of this Article.

could easily become the vehicle for drastic amendments to the rules governing the presentation of biochemical witness testimony. An otherwise straightforward medical malpractice cause of action could trigger a movement to legislate attorney behavior. A vigorously litigated breach-of-contract case skillfully tried by competent advocates on both sides could, in the final days of trial, uncover the fraudulent withholding of highly probative and incriminating documents.

And so it was for this former trial judge when I entered the courthouse on a November morning in 2011, fully prepared and expecting to try the case of *Montgomery v. American Steel & Wire Corp.*[1] Little did I know that this case and the events that had transpired during the preceding weekend would place me squarely at the center of one of the most controversial national issues in the history of asbestos litigation. The saga began when my expectation of spending several weeks in a routine asbestos personal injury trial was foiled by the revelation that the plaintiff had failed to disclose to the Delaware Superior Court and defense counsel the existence of claims that had been submitted to a total of twenty asbestos bankruptcy trusts. Even more significant was the fact that the plaintiff had also withheld all of the factual circumstances that justified those claims.

Unwittingly, the case was to become a striking example of the lack of coordination and transparency between the tort system and the trust claims process, as well as the incentives that this situation presents for fraud and abuse. By virtue of this disconnect, the plaintiffs in *Montgomery* had been able to distort the facts to allege different theories of exposure in the tort case from those claimed in the bankruptcy court—a circumstance that resulted in cancellation of the trial, dismissal of the plaintiffs' case, substantial and irreparable prejudice to the remaining defendant, and yet another example justifying the defense bar's quest for reform.

The case has ultimately received national attention because it highlights the ease with which a plaintiff can use two different inconsistent fact patterns to receive maximum recovery from the trusts while seeking compensation for injuries against solvent companies in tort litigation. It ignited the growing clash between asbestos plaintiffs and defense attorneys. At issue is not just the potential for claiming as between a bankruptcy trust and the state court action, but inconsistent claiming among the various trusts themselves. Solvent defendants

---

1.    No. 09C-11-217-ASB (Del. Super. Ct. Nov. 7, 2011).

continue to believe that their payments in settlement are not being properly adjusted to account for compensation from the trusts and that their share of liability has substantially increased by the absence of some of the most culpable defendants from the litigation, where the focus tends to remain on the "last man standing." Also at issue is whether trust payments to current plaintiffs will result in fewer trust resources for future claimants and whether the ability to delay trust claims to avoid disclosure distorts both the discovery record and the administration of justice in asbestos lawsuits.

The case scheduled for trial before me that Monday morning is illustrative of all of the elements of this controversy. It was and remains a powerful example of why transparency between the two systems has been the focus of legislation in several states and the United States Congress,[2] has resulted in the passage of legislation in at least three states (Ohio, Oklahoma, and Wisconsin),[3] and will continue to be debated for years to come. By virtue of my experience in this case and my now-retired status, I have been in the unique position to advocate for legislative action to curb the abuses that do not appear to be limited to cases like *Montgomery*, where the fraud was exposed by chance. Instead, it appears increasingly to be a matter of systemic concern.

In this Article, I will discuss the unfortunate details of the unethical conduct that allowed the case to proceed almost to trial, as well as the various judicial and legislative measures that have been proposed or passed to eliminate this lack of transparency and to curb the incentive to profit from it. In the final analysis, my utmost concern as a former Delaware trial judge is that the very integrity of the judicial process and its truth-finding function can be so easily compromised because of the independence of these two systems.

## II. The Current Asbestos Compensation System

To appreciate the extent of the conflict created by the dual compensation systems, a bare-bones history of asbestos litigation is appropriate. Since the United States Court of Appeals for the Fifth

---

2. Furthering Asbestos Claim Transparency (FACT) Act of 2013, H.R. 982, 113th Cong. (2013); H.B. 153, 98th Gen. Assemb., Reg. Sess. (Ill. 2013); H.B. 481, 2013 Leg., Reg. Sess. (La. 2013); H.B. 529, 128th Leg., Reg. Sess. (Miss. 2013); H.B. 1150, 197th Gen. Assemb., Reg. Sess. (Pa. 2013); H.B. 2545, 83d Leg., Reg. Sess. (Tex. 2013); Assemb. B. 19, 2013-2014 Leg., Reg. Sess. (Wis. 2013).

3. Ohio Rev. Code §§ 2307.951-.954 (2014); S.B. 404, 54th Leg., 1st Sess. (Okla. 2013); Wis. Assemb. B. 19.

Circuit upheld the first damages award to a successful plaintiff for injuries resulting from exposure to asbestos insulation,[4] asbestos case filings have grown dramatically, ushering in the most protracted mass tort litigation in this country's history.[5]

Less than a decade after the original wave of mass tort case filings against asbestos manufacturers in the 1970s, Johns-Manville Corporation, formerly the largest producer of asbestos in the United States, applied for relief under Chapter 11 of the United States Bankruptcy Code (Bankruptcy Code).[6] Its filing resulted in the establishment of the Manville Trust, which it funded to channel all of its present and future personal injury asbestos liability claims. By the turn of the century, a large number of primary asbestos defendants, including U.S. Gypsum and Owens Corning, followed in Manville's footsteps.[7] As of 2012, more than sixty asbestos bankruptcy trust funds had been established or were in the process of being established.[8] With the departure of these defendants from the tort system, the focus has now shifted to the bankruptcy trusts as an alternative source of compensation for individuals who have sustained injury as a result of their exposure to asbestos. Indeed, bankruptcy trusts paid out claims in excess of $14 billion to individuals who suffered injuries from their products in the period from 2006 through 2011.[9]

Due to the massive exodus of many of the major manufacturers from the tort system to bankruptcy, the development of exposure cases against hundreds of solvent, yet more peripheral, defendants has grown as an adjunct source of compensation in addition to the trusts.[10] Indeed, today it is not at all unusual for an asbestos personal injury

---

4. Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1081, 1103 (5th Cir. 1973).

5. Lee Blanton Ziffer, *Bankruptcy Trusts and Asbestos Litigation*, ABA (June 11, 2012), http://apps.americanbar.org/litigation/committees/products/articles/spring2012-bankruptcy-trusts-asbestos-litigation.html.

6. *In re* Johns-Manville Corp., 26 B.R. 420, 422 (Bankr. S.D.N.Y. 1983).

7. Mark D. Plevin & Paul W. Kalish, *Where Are They Now? A History of the Companies That Have Sought Bankruptcy Protection Due to Asbestos Claims*, MEALEY'S ASBESTOS BANKR. REP., Aug. 2001, at 1, 1-5.

8. Victor E. Schwartz, *A Letter to the Nation's Trial Judges: Asbestos Litigation, Major Progress Made over the Past Decade and Hurdles You Can Vault in the Next*, 36 AM. J. TRIAL ADVOC. 1, 5-6 (2012).

9. Marc C. Scarcella & Peter R. Kelso, *Asbestos Bankruptcy Trusts: A 2012 Overview of Trust Assets, Compensation & Governance*, MEALEY'S ASBESTOS BANKR. REP., June 2012, at 1, 2.

10. Stephen J. Carroll et al., *Asbestos Litigation*, INST. FOR CIVIL JUSTICE, RAND, at xxiii (2005), http://www.rand.org/content/dam/rand/pubs/monographs/2005/RAND_MG162.pdf.

plaintiff to name upwards of sixty defendants[11] as new and additional sources of compensation, many of whom have had only minimal responsibility for the exposure-causing injury.[12]   These solvent defendants have now been forced to stand in the place of the larger manufacturers who have reorganized under the Bankruptcy Code. Yet while the nature of this litigation has evolved, asbestos claiming has failed to decline.[13]

The two independent methods of obtaining awards and compensation have created complicated issues concerning how these two systems can coexist without the transparency necessary to minimize fraud, assure accountability, and protect the trust assets for future claimants. Regrettably, with the growth of bankruptcy trusts and the reshaping of the tort cases to include less culpable defendants, the fair conduct of litigation in the courts can be, and has been, jeopardized.

## III.  A CASE STUDY—THE *MONTGOMERY* CASE

In April of 2009, June Montgomery was diagnosed with pleural mesothelioma.  Her son, Brian Montgomery, a longtime sheriff's deputy in Texas, retained the Texas law office of Brent Coon & Associates to pursue compensation for his mother's injuries.[14]

Brian Montgomery expressly understood that the Texas firm would assist his parents in locating suitable counsel in Florida where they resided. Ultimately, they hired a Florida law firm who chose the Delaware Superior Court as the forum for the lawsuit filed on behalf of June and Arthur Montgomery against twenty-three defendants,[15] alleging that June's disease was caused by exposure to asbestos from the products or conduct of the named defendants.[16]

---

11.    *See* Charles E. Bates et al., *The Naming Game*, MEALEY'S LITIG. REP.: ASBESTOS, Sept. 2, 2009, at 1, 1.

12.    Peter S. Murphy, *Asbestos Trust and Tort Litigation Compensation in Delaware: A Call for Transparency*, MEALEY'S LITIG. REP.: ASBESTOS, Dec. 19, 2012, at 1, 1-2.

13.    *Id.* at 2.

14.    Pretrial Hearing Transcript at 13, *In re* Asbestos Litig.: Ltd. to Montgomery, 09C-11-217 ASB (Del. Super. Ct. Nov. 7, 2011).

15.    All defendants with the exception of Foster Wheeler had either settled with the plaintiff or been dismissed.  Defendant Foster Wheeler Energy Corp.'s Brief in Support of Motion To Dismiss Pursuant to Civil Rule 37 at 1-2, *In re Asbestos Litig.:  Ltd. to Montgomery*, No. 09C-11-217 ASB (Dec. 7, 2011) [hereinafter Brief in Support of Motion To Dismiss].

16.    Brian Montgomery, the son and personal representative of the estate, actually testified at his deposition that no other law firms were involved.  In fact, Delaware counsel was required for filing in Delaware, and Virginia counsel was retained to perform the videotaped trial examination of the plaintiffs' proffered expert, Jacques Legier, M.D.  Both

Ironically, asbestos suits in Delaware are governed by a standing order that establishes mandatory disclosure requirements for all bankruptcy trust claims.[17] Despite the obligations in this order, as well as specific interrogatories that had been propounded to the plaintiffs requesting trust claim information, throughout the pendency of this case and up until the weekend before trial, at no time did the plaintiffs identify exposure caused by any of the twenty entities to whom bankruptcy trust claims had been submitted while the litigation was pending. In fact, at a pretrial conference held just before the weekend, the plaintiffs' counsel assured the court that no disclosure was required because no such claims had been filed. The plaintiffs continued to maintain that Mrs. Montgomery was exposed to asbestos solely through her laundering of her husband's work clothing throughout *his* career, as opposed to any work she herself had performed with or around products outside of her home.

Mrs. Montgomery died on April 3, 2010, and her son, Brian, was substituted for the plaintiff as personal representative of the estate by an amended complaint that was filed on November 5, 2010.[18] The allegations of exposure to asbestos, however, remained largely unchanged from the original complaint.[19]

Arthur Montgomery was deposed on June 8, 2011. Although he had spent his entire career working as an electrician, with and around a wide variety of products and materials, at multiple locations throughout Florida, the impression garnered from his sworn testimony and other pleadings filed in the tort case was that the bulk of his work around asbestos occurred only during a short period of time at the Port Everglades Power Plant.[20]

During discovery, the plaintiffs specifically denied submitting claims to Owens Corning, U.S. Gypsum, Armstrong World Industries, Babcock & Wilcox, Plibrico, and ASARCO, even though their own state-of-the-art expert, Dr. Barry Castleman, specifically addressed the conduct of these entities in his book, *Asbestos: Medical and Legal*

---

Delaware and Florida attorneys for the plaintiff had filed a motion to admit Gary DiMuzio of Patten, Wornom, Hatten & Diamonstein in Newport News, Virginia, *pro hac vice*, and this motion was granted on September 1, 2011. Indeed, by the time of trial, the Montgomerys had counsel from at least four law firms. *Id.* at 2.

17.    Standing Order No. 1 at 4, *In re* Asbestos Litig., No. 77C-ASB-2 (Del. Super. Ct. Apr. 29, 2011).

18.    Second Amended Complaint at 3, *In re Asbestos Litig.: Ltd. to Montgomery*, No. 09C-11-217 ASB (Nov. 5, 2010).

19.    *Compare id. with* Complaint, *In re Asbestos Litig.: Ltd. to Montgomery*, No. 09C-11-217 ASB (Nov. 25, 2009).

20.    *In re Asbestos Litig.: Ltd. to Montgomery*, No. 09C-11-217 ASB.

*Aspects.*[21]   The plaintiffs' proffered causation expert, Dr. Jacques Legier, likewise did not mention Mrs. Montgomery's exposures to any of the products manufactured by the entities that established the bankruptcy trusts to which the plaintiffs made claims.[22]

The impression that the plaintiffs intended to create from the complaint, answers to written discovery, Arthur Montgomery's sworn deposition testimony, and trial counsel's claimed unknowing representations to the court was that the bulk of Mrs. Montgomery's the plaintiff's exposure to asbestos occurred when Mr. Montgomery worked as an electrician during a short stint at the Port Everglades Power Plant, where defendant Foster Wheeler's boilers were located. Because the plaintiffs wanted to keep the focus on the one defendant remaining by the time of trial, disclosure of the bankruptcy claims would have contradicted this portrayal.   Indeed, in response to an interrogatory asking the plaintiffs to identify all entities who were not named as defendants but with whose asbestos-containing products Mrs. Montgomery came into contact, the plaintiffs identified no additional entities,[23] an assertion that was contrary to the information that had been presented to the bankruptcy trusts.[24]

Under Florida law, jurors are permitted to allocate fault to parties not present at trial, including bankrupt entities.[25]   Although the defendant in the *Montgomery* case had filed a motion in advance of trial requesting that the court require disclosure of all pretrial settlements, including any funds received from bankruptcy trusts, the plaintiffs' trial counsel, ostensibly unaware of the Texas lawyers' bankruptcy claiming on behalf of his own clients, emphatically assured

---

21.   BARRY I. CASTLEMAN, ASBESTOS: MEDICAL AND LEGAL ASPECTS (5th ed. 2005).

22.   *See* Levin, Papantonio, Thomas, Mitchell, Echsner, Rafferty & Proctor, Plaintif[f]s' Master Disclosure of Controlled Expert Witnesses at 10-13, *In re Asbestos Litig.*, No. 77C-ASB-2 (Del. Super. Ct. June 22, 2010).

23.   Plaintiffs' Answers to Interrogatories Directed to Plaintiff by All Defendants & Response to Request for Production at 7, *In re Asbestos Litig.: Ltd. to Montgomery*, No. N09C-11-217 ASB (Dec. 23, 2009).

24.   *See* Brief in Support of Motion To Dismiss, *supra* note 15, at 10-25 (discussing Keene Creditors' Trust; Celotex Asbestos Settlement Trust; Manville Personal Injury Settlement Trust; DII Industries, LLC Asbestos PI Trust; Armstrong World Industries Asbestos Trust; U.S. Gypsum Asbestos Personal Injury Settlement Trust; Owens Corning/Fibreboard Asbestos Personal Injury Trust; Plibrico Asbestos Trust; G-I Holdings Inc., Asbestos Personal Injury Settlement Trust; ARTRA Asbestos Trust; H.K. Porter Asbestos Trust; ASARCO Asbestos Personal Injury Settlement Trust; Porter Hayden Bodily Injury Trust; and ABB Lummus Global Inc. 524(g) Asbestos PI Trust).

25.   *See* FLA. STAT. § 768.81(3) (2013).

the court at the pretrial conference that no bankruptcy trust claims had been made and no monies had been received.[26]

Over the weekend before the trial was to commence, the plaintiffs' trial counsel learned that his clients had, in fact, received two bankruptcy settlements of which he claimed to have been previously unaware. While this disclosure was directly inconsistent with counsel's prior representations to the court and to opposing counsel at the pretrial conference, the court was inclined to believe trial counsel because he had at least displayed enough integrity to notify the court of the prior misrepresentation, whereas a less scrupulous attorney might not have been so forthright.[27]

By late afternoon of the day before trial, defense counsel learned that a total of twenty bankruptcy claims had been submitted to various trusts and that significant sums of money had already been received by the Montgomerys.[28] The net effect of the withholding of all of the bankruptcy trust information, and the obvious goal of the plaintiffs in doing so, was that the defendants had been led to believe that Mrs. Montgomery's mesothelioma was solely the result of exposure to take-home fibers on her husband's clothing. Only at this late stage in the litigation did it become clear that at least one of the plaintiffs' attorneys had been alleging exposure through Mrs. Montgomery's own employment.[29] Rather than the disease resulting solely from Mr. Montgomery's exposure during the short period he had been employed at the Port Everglades Power Plant, the majority of his wife's contact with asbestos had been through her own employment. In essence, the representations to the bankruptcy trusts painted a much broader picture of exposure than either the plaintiffs or their attorneys had acknowledged during the entire course of the litigation in Delaware.[30]

It was not until the morning trial was to begin, with a jury already selected and waiting to serve, that the court first learned of the plaintiffs' withholding of the trust claim information. Needless to say, this circumstance critically affected the entire course of the litigation,

---

26. The first pretrial conference held on November 3, 2011, was transcribed; however, at the time of publication, a copy of the hearing transcript was not available from the court.

27. Pretrial Hearing Transcript, *supra* note 14, at 9-10.

28. Letter from Brian L. Kasprzak, Counsel for Foster Wheeler Entergy Corp., to Hon. Peggy L. Ableman, Del. Superior Court, New Castle Cnty. 3 (Nov. 6, 2011) (on file with author).

29. Transcript of Motions Hearing at 40-41, *In re* Asbestos Litig.: Ltd. to Montgomery, No. 09C-11-217 ASB (Del. Super. Ct. Jan. 30, 2012).

30. *Id.*

including the extensive discovery process that had been conducted without all the relevant information, the settlement strategies of all of the other defendants who had resolved their claims prior to trial, and the trial preparation of the sole remaining defendant.

Indeed, even the court had not been privy to the whole truth. In its order denying defendant Foster Wheeler's Motion for Summary Judgment, the court began by stating simply:

> Contrary to the assertions contained in the summary judgment motion before the Court, the record includes admissible evidence from which a jury could conclude that decedent June Montgomery was exposed to asbestos from fibers on her husband, Arthur Montgomery's clothing that he wore home from work and which she laundered daily. This exposure would have occurred during Arthur Montgomery's employment as an electrician at the Port Everglades Power Plant in Broward County, Florida.[31]

While the remainder of the order discusses some of the other employers for whom Arthur Montgomery worked as an electrician, it is significant that nowhere is there any mention of any other direct sources of exposure. Even in signed pleadings filed with the court, Mrs. Montgomery's work history, which included years of employment in and around asbestos products, was not disclosed.[32]

The Delaware Superior Court had already devoted a huge amount of time and resources to this case and to preparation for trial, all without full knowledge of all of the relevant facts. Understandably upset and regretful of the waste of the court's time and limited resources, I called counsel to a chambers conference room to express my dissatisfaction and to learn more about the information that had been withheld. At this point, I was at a loss to remedy the unfairness that had been created by this circumstance in a way that would enable the case to go forward to trial. I noted that the nondisclosure of such critical information went to the very heart of the defense:

---

31.   Denial of Defendant Foster Wheeler Energy Corporation's Corp.'s Motion for Summary Judgment at 1, *In re Asbestos Litig.: Ltd. to Montgomery*, No. 09C-11-217 ASB (Sept. 30, 2011).

32.   It does not excuse the plaintiff's lack of candor to suggest that the court's decision on summary judgment did not focus on any other products because, in reality, that is not necessarily so. Had the entire picture of Mrs. Montgomery's exposure to asbestos been known, the maximum ten-month period that Mr. Montgomery worked around Foster Wheeler's boilers during his marriage to Mrs. Montgomery would have likely been considered by the court to have been de minimus, in light of both Mr. and Mrs. Montgomery's entire work histories.

[T]his isn't something I could possibly fix after the trial is over. This deals with the verdict sheet. It deals with the way they present their defense. It deals with what information they have. It deals with how they cross-examine the witnesses. They have not been able to do any cross-examination or any discovery on the other aspects of exposure that are listed in this letter because they were not aware that there were these claims that were made. I just think that it's in such bad faith that I don't know that I can possibly remedy it any other way.[33]

Because Foster Wheeler was the sole remaining defendant in the case by the time of trial,[34] the plaintiffs had been prepared to litigate the case before a jury as though Foster Wheeler had predominant responsibility for Mrs. Montgomery's exposure.[35] Literally on the eve of trial, twenty new entities surfaced that had neither been named nor disclosed. Had these claims been timely disclosed by the plaintiffs, Foster Wheeler undoubtedly would have taken steps during discovery toward developing defenses to explore these other exposures at the depositions of Arthur Montgomery and of the plaintiffs' experts. In all likelihood, Foster Wheeler would have also retained its own experts to address these other exposures. Yet it was never given that opportunity.

Although my inclination was to dismiss the case with prejudice right then and there,[36] I decided instead to order briefing with a particular focus on a feasible remedy for the time and expense that the defendant had already incurred in discovery and trial preparation, recognizing that it would be necessary to repeat these processes in the future.[37] After a hearing before another superior court judge, the parties presumably realized the futility of starting anew, and the case was ultimately dismissed.[38] During the hearing, the plaintiffs' attorney assured the court that he personally had no knowledge of the existence of any trust claims.[39] From the court's perspective, though, it was difficult to believe that his law firm was unaware that there would be another firm in Texas submitting bankruptcy claims, and it was

---

33. Pretrial Hearing Transcript, *supra* note 14, at 4-5.

34. The Montgomerys originally sued a total of twenty-three defendants, twenty-two of whom had either settled, been voluntarily dismissed, or were successful on motions for summary judgment.

35. Although other defendants who settled would have been listed on the verdict sheet, more culpable entities that had established bankruptcy trusts would not have been mentioned had the trust claims not been belatedly discovered.

36. Pretrial Hearing Transcript, *supra* note 14, at 3, 7-8.

37. *See id.* at 27-34.

38. Order, *In re* Asbestos Litig.: Ltd. to Montgomery, No. N09C-11-217 ASB (Del. Super. Ct. Apr. 1, 2013).

39. Transcript of Motions Hearing, *supra* note 29, at 22-25.

difficult to excuse the plaintiffs' attorney's failure to make any inquiries of his clients. Indeed, it was ultimately discovered that trust claim forms had been filed by Brent Coon & Associates the day after Mrs. Montgomery died, which included her date of death, suggesting that someone in the Florida firm or the plaintiffs' family had communicated with the Texas counsel.[40]

The extreme lateness of the disclosure and the fact that it was made so soon after the plaintiffs' counsel's contrary assurances suggest that the violation was at least reckless, if not deliberate, especially considering the fact that the Montgomery family was represented by four law firms, all of which have extensive asbestos-related litigation experience.[41] The trial attorneys, at best, never bothered to check to see whether trust claims had been made or settlements received,[42] and the Texas trust claim counsel apparently makes it his practice not to communicate this information to litigating counsel.[43] He also is careful to insulate himself from the reach of the disciplinary powers of the state court by not entering his appearance in the tort case.

## IV. OTHER DISCOVERED INSTANCES OF FRAUDULENT CLAIMING

Had the *Montgomery* case been an aberration or only an isolated example of counsel taking advantage of the absence of any interface between the tort and trust systems as some plaintiffs' attorneys maintain,[44] the lack of transparency would hardly warrant any scholarly discussion of the issue. Nor would there be such serious efforts by state legislatures and Congress to remedy the abuse.[45] But this author's experience in the *Montgomery* case, while perhaps more illustrative of the problem than most, is not extraordinary. Examples of inconsistencies between information provided to trusts and allegations made in civil tort cases have been identified in other jurisdictions. Even in Delaware, they continue to be exposed.

Another well-known example where such fraud was uncovered in a tort case was the 2007 Ohio case of *Kananian v. Lorillard Tobacco*

---

40.     Brief in Support of Motion To Dismiss, *supra* note 15, at 8-9.

41.     *See* Second Amended Complaint, *supra* note 18; Letter from Brian Kasprzak to Hon. Peggy L. Ableman, *supra* note 28.

42.     Transcript of Motions Hearing, *supra* note 29, at 22-26.

43.     *See* Dionne Searcey & Rob Barry, *As Asbestos Claims Rise, So Do Worries About Fraud*, WALL. ST. J., Mar. 11, 2013, at A1.

44.     *See* Elihu Inselbuch et al., *The Effrontery of the Asbestos Trust Transparency Legislation Efforts*, MEALEY'S LITIG. REP.: ASBESTOS, Feb. 20, 2013, at 1, 7.

45.     *See id.* at 6-7.

*Co.*[46]   In the *Kananian* case, the plaintiff alleged that he had developed mesothelioma solely from smoking asbestos-filtered cigarettes and not as a result of his employment at a naval shipyard.   In fact, he claimed that he had only passed through a shipyard while being deployed elsewhere by the United States Navy.   Notwithstanding this assertion, he had contemporaneously filed claims against multiple asbestos trusts, alleging exposure to marine products while working as a shipyard laborer, and he had received substantial monies from these trusts.[47]   Describing the inconsistency between his tort and trust claims as a "fiction,"[48] the court barred the plaintiff's California-based law firm and one of its attorneys from litigating as *pro hac vice* counsel in Ohio as a result of this and other instances of dishonesty.[49]   That case also drew national attention for the same reasons because it highlighted the problem of inconsistent and potentially fraudulent claiming.   But these cases are by no means rare.   Rather, the *Kananian* and *Montgomery* cases are illustrative of what appears to be a growing number of plaintiffs' attorneys' schemes to circumvent the disclosure requirements in order to obtain significant recoveries from both the tort and trust systems.

During hearings before the Committee on the Judiciary of the United States House of Representatives on the proposed Furthering Asbestos Claim Transparency (FACT) Act of 2012,[50] conducted in May 2012, testimony was given citing additional examples of fraud, abuse, and inconsistent claiming that were identified in Louisiana, New York, Oklahoma, Maryland, Ohio, and Virginia, in addition to Delaware.[51]   Another instance of fraud was reported in a recent *Wall Street Journal* article.[52]

While one would expect the increased attention and publicity focusing on the abuse in the trust-claiming process to have had a chilling effect on this practice, it does not seem to have diminished. The absence of transparency continues to create a loophole that allows claimants to present contradictory theories of exposure and to manipulate causation evidence to fit the specific defendants named in

---

46.    No. CV 442750 (Ct. Com. Pl. Cuyahoga Cnty., Ohio, Jan. 18, 2007).

47.    Order & Opinion at 5-9, *Kananian*, No. CV 442750.

48.    *Id.* at 5.

49.    *Id.* at 19.

50.    *Furthering Asbestos Claim Transparency (FACT) Act of 2012:  Hearing on H.R. 4369 Before the Subcomm. on Courts, Commercial & Admin. Law of the H. Comm. on the Judiciary*, 112th Cong. (2012).

51.    *Id.* at 9 (statement of Leigh Ann Schell).

52.    Searcey & Barry, *supra* note 43.

the complaint or who are left standing at trial. Even in the small state of Delaware, where the *Montgomery* case was filed and where the circumstances of that case are widely known to asbestos litigation counsel, allegations of inconsistent exposure patterns continue to surface.

For example, in October 2013, in the Delaware case of *Mitchell v. 84 Lumber Co.*,[53] counsel for defendant Pneumo Abex, LLC (Abex), filed a motion for sanctions against the plaintiff for failing to disclose in answers to interrogatories and at Mitchell's depositions that claims had been filed with numerous asbestos trusts.[54] In fact, at his deposition conducted in November 2012, Mitchell expressly denied that *any* claim had been filed on his behalf to an asbestos bankruptcy trust.[55] A week before the plaintiff passed away in August 2013, defendant Abex had propounded requests for admission seeking plaintiffs' admission to submitting claims forms to various asbestos bankruptcy trusts.[56] On September 20, 2013, almost a year after the plaintiff had denied making any such claims, Abex finally learned that the plaintiff had submitted claims forms to twenty-four different trusts.[57] After Abex requested copies of these forms and inspected them, it learned that the majority of the claims forms had been submitted in June and July of 2012, not by the litigation counsel in Delaware, but by The David Law Firm, which was not counsel of record and had never entered its appearance in Delaware.[58] Abex argued that it believes that The David Law Firm is a clearinghouse firm that is in the business of selling plaintiffs' claims to counsel of record.[59] In its motion, Abex referred to the *Montgomery* case as another example of employing one law firm to pursue the tort litigation while a separate firm or lawyer independently files claims with bankruptcy trusts.[60]

It appears that the practice of using different law firms to pursue these separate sources of recovery, without further communication between the two, is becoming increasingly popular in Delaware. It is obviously devised to accomplish the receipt of maximum recovery for

---

53.    Defendant Pneumo Abex LLC's Motion for Sanctions Pursuant to D.R.C.P. 37 & 16(f), Mitchell v. 84 Lumber Co., No. N12C-07-235 ASB (Del. Super. Ct. Oct. 15, 2013).

54.    *Id.* at 1.

55.    *Id.* at 1-2.

56.    *Id.* at 2.

57.    *Id.*

58.    *Id.*

59.    *Id.*

60.    *See id.* at 3.

plaintiffs and their counsel by inflating the scope of the tort defendants' responsibility for exposure while at the same time insulating out-of-state counsel from any disciplinary action by the courts for ethical violations. It is plainly and simply a fraudulent practice. Even standard case management orders requiring disclosure have thus far been unable to address this abuse successfully because there is no mechanism available for verification. There are additional Delaware cases where the same scheme has been discovered, and it is likely to continue as long as the lack of transparency provides incentives for claimants to take inconsistent positions.[61]

Given that a number of cases have already been identified—just in Delaware—where court rules expressly require disclosure, it is reasonable to conclude that the practice is far more widespread than just the few cases where plaintiffs have been exposed. This is not a "solution in search of a problem" as plaintiffs' attorneys have suggested.[62]

Lest there be any lingering uncertainty about the prevalence of this practice and how widespread this type of fraud has become, the recent decision by the United States Bankruptcy Court for the Western District of North Carolina in the case of *In re Garlock Sealing Technologies, LLC*,[63] should settle the debate. In an exhaustive opinion in the Garlock estimation proceeding, the bankruptcy court concluded that the practice of withholding exposure evidence concerning the products of bankrupt entities had risen to such a level that it was "sufficiently widespread" to justify disregarding defendant Garlock Sealing Technologies' (Garlock) prior settlement history as a basis upon which to measure Garlock's aggregate liability for present and future mesothelioma claims.[64]

In an effort to determine a reasonable and reliable estimate of Garlock's liability for present and future mesothelioma claims relating

---

61. *See In re* Asbestos Litig.: Ltd. to Keith v. Volkswagen Grp. of Am., No. N12C-08-036 ASB (Del. Super. Ct. Oct 9, 2013); *In re* Asbestos Litig.: Ltd. to Grenier, No. 05C-11-257 ASB (Del. Super. Ct. July 31, 2007); Cooper Industries Inc.'s Motion To Dismiss Pursuant to Rule 37 at 1, *In re* Asbestos Litig.: Ltd. to Maloney, No. N10C-04-169 ASB (Del. Super. Ct. Nov. 6, 2012).

62. *See Furthering Asbestos Claim Transparency (FACT) Act of 2013: Hearing on H.R. 982 Before the Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary*, 113th Cong. (2013) [hereinafter *2013 FACT Act Hearing*] (statement of Elihu Inselbuch); Sean McLernon, *Lawmakers, Attys Feud over Costs of Asbestos Disclosure Bill*, Law360 (Mar. 13, 2013, 8:10 PM), http://www.law360.com/articles/423361/lawmakers-attys-feud-over-costs-of-asbestos-disclosure-bill.html.

63. 504 B.R. 71 (Bankr. W.D.N.C. 2014).

64. *Id.* at 87.

to its asbestos-containing products, the bankruptcy judge authorized additional investigation to determine the legitimacy of using Garlock's settlement history as an accurate measure of its future liability. The conclusions that he reached as a result of delving into only fifteen out of hundreds of settled cases caused the court to render scathing criticism when it noted that "the last ten years of its [Garlock's] participation in the tort system was infected by the manipulation of exposure evidence by plaintiffs and their lawyers"[65] and that "it was a regular practice by many plaintiffs' firms to delay filing trust claims for their clients so that the remaining tort system defendants would not have that information."[66]

The court described in detail the evolving nature of asbestos litigation since the early 2000s, when the large thermal insulation defendants were no longer able to be sued in tort as a result of their bankruptcy filings. During that period, the focus of plaintiffs' attention turned to more peripheral defendants, including Garlock, a manufacturer of gaskets, some asbestos-containing. The settlements demanded of these solvent entities began to increase correspondingly.[67]

During what is referred to as the "second wave"—the period from 2000 to 2005—when a number of major asbestos defendants filed bankruptcy cases and exited the tort system, the impact on Garlock was even more pronounced because these bankruptcies completely "wiped out insulation manufacturers as co-defendants in the tort system."[68] Coincidentally, the evidence of exposure to the products of these same bankrupt insulation companies also disappeared through the deliberate efforts by some plaintiffs and their lawyers to withhold such evidence until after the conclusion of the tort litigation.

In the fifteen settled cases in which the court permitted Garlock to have full discovery, the court found that exposure evidence was withheld in each and every one of them.[69] In fact, the discovery revealed that, on average, plaintiffs disclosed only about two exposures to bankrupt companies' products in the tort cases. Yet these same plaintiffs, on average, made claims against nineteen such companies' trusts after reaching a settlement with Garlock. Since this explicit

---

65.   *Id.* at 82.
66.   *Id.* at 84.
67.   *Id.* at 73.
68.   *Id.* at 83.
69.   *Id.* at 85.

withholding of exposure evidence served to distort the level of responsibility on the part of Garlock, the court was forced to conclude:

> These fifteen cases are just a minute portion of the thousands that were resolved by Garlock in the tort system. . . . But, the fact that *each and every one of them* contains such demonstrable misrepresentation is surprising and persuasive. More important is the fact that the pattern exposed in those cases appears to have been sufficiently widespread to have a significant impact on Garlock's settlement practices and results. . . . The limited discovery allowed by the court demonstrated that almost *half* of those cases involved misrepresentation of exposure evidence. It appears certain that more extensive discovery would show more extensive abuse. But that is not necessary because the startling pattern of misrepresentation that has been shown is sufficiently persuasive.[70]

If reported incidences of this type of misrepresentation had been difficult to identify prior to the *Garlock* decision, were thought to be anecdotal, or had often been referred to as aberrations, those characterizations no longer applied given the scope of the oppor-tunistic practice that was uncovered in *Garlock*. The insight gained by the *Garlock* court from its introspective assessment of these fifteen cases corroborates this author's suspicions in a far more poignant way than the few Delaware or other state cases previously described can ever demonstrate.

The "pattern of misrepresentation" recounted in detail in the *Garlock* opinion has, in turn, spawned other litigation that is likely to expose additional instances of the withholding of exposure evidence in the tort cases. In early January 2014, Garlock filed under seal a Racketeer Influenced and Corrupt Organizations (RICO) case in bankruptcy court alleging fraud and conspiracy against four prominent asbestos law firms for concealing evidence about their clients' exposure to asbestos products in order to escalate their demands against Garlock when it was still solvent.[71] As the court explained in its estimation opinion:

> [W]hile it is not suppression of evidence for a plaintiff to be unable to identify exposures, it is suppression of evidence for a plaintiff to be

---

70. *Id.* at 85-86.

71. *See, e.g.*, Complaint (Filed Under Seal), Garlock Sealing Techs. LLC v. Shein Law Ctr., LTD (*In re* Garlock Sealing Techs. LLC), No. 10-BK-31607 (Bankr. W.D.N.C. Jan. 9, 2014). The adversary proceeding numbers for the remaining suits against the firms are 14-03036, 14-03037, and 14-03038. A fifth law firm had been sued earlier by Garlock in June 2012, based upon the same behavior. Garlock Sealing Techs. LLC v. Chandler (*In re* Garlock Sealing Techs. LLC), No. 10-BK-31607, 2012 WL 2191230 (Bankr. W.D.N.C. June 4, 2012).

unable to identify exposure in the tort case, but then later (and in some cases previously) to be able to identify it in Trust claims.[72]

It is one thing to draw conclusions from the evidence of fraud this author has experienced firsthand or from examples of similar misrepresentation in other individual cases. But the *Garlock* decision strikingly substantiates the extent to which this fraud has adversely affected all asbestos litigation and Garlock in particular:

> Garlock considered its potential liability from an adverse verdict in evaluating cases—certainly the major cases it faced. But, for Garlock, the expense of preparing, trying and winning an asbestos injury case far exceeded the $75,000 average settlement paid to claimants. The overwhelming majority of cases Garlock settled were done in groups of large numbers of claims without real analysis of the "liability" to any individual claimant. Garlock has consistently maintained that its products did not cause asbestos disease. But, it recognized that factors such as an inability to establish its defenses, a sympathetic plaintiff, a sympathetic jury, a particularly effective plaintiff's lawyer or some combination of these could result in a large adverse verdict in such "driver" cases. But, the overwhelming majority of cases were settled in groups without regard to liability and virtually entirely for cost avoidance.[73]

To suggest that it is fair to maintain secrecy in the trust-claiming process is belied by the results of the North Carolina court's limited excursion into the real factual circumstances of just a few of the cases where Garlock was demonstrably prejudiced. It would strain one's credulity to believe that these cases are mere anomalies or that Garlock is the sole asbestos defendant who has been prejudiced by this practice.

Because the trusts' current confidentiality provisions make cross-referencing of the information and data sharing virtually impossible, the opportunity for fraud and abuse will continue to exist, and the feeder law firms that specialize solely in asbestos trust claiming and not litigation will continue to thrive and prosper.

## V.    JUDICIAL EFFORTS TO CURB ASBESTOS BANKRUPTCY ABUSE BY CASE MANAGEMENT ORDERS

A number of courts have taken steps to remedy the problem by requiring claim forms submitted to bankruptcy trusts to be disclosed in

---

72.    *In re Garlock Sealing Techs., LLC,* 504 B.R. at 86.
73.    *Id.* at 87.

asbestos cases,[74] although, as has been demonstrated in Delaware, a court's case management order does not always deter a disingenuous attorney or prevent the division of legal representation that facilitates fraudulent claiming.

Delaware's case management order, which was in effect at the time of the *Montgomery* case, provides for such disclosure:

> Immediately upon the filing of an asbestos action, plaintiff or plaintiff's counsel is to serve a paper or electronic copy of the complaint with the date of filing clearly noted on the first page thereof upon Defense Coordinating Counsel. Within 30 days after filing the complaint plaintiff shall file responses to the form interrogatories and requests for production approved and mandated by this Order (Exhibit "A") and shall serve Defense Coordinating Counsel with electronic or paper copies thereof along with electronic or paper copies of all documents and materials produced therewith. Plaintiff shall file an electronic notice to all other parties indicating that such materials have been sent to Defense Coordinating Counsel. Until completion of trial, plaintiff shall supplement its responses as additional information or documents are received. Also within 30 days of the filing of an asbestos action, plaintiff shall serve upon the Defense Coordinating Counsel the following:
>
> . . . .
>
> (l) Copies of all claim forms and related materials related to any claims made by plaintiff to any insurance carrier, employer, governmental agency, trust, entity or person related to or in any way involved with asbestos claims, or other agency, entity, or person wherein plaintiff directly or indirectly asserts, suggests, advocates, or requests investigation into potential entitlement to compensation or benefits of any type as a result of exposure to and/or injury related to asbestos. This shall include, but is not limited to, copies of all materials related to applications for Social Security benefits, worker's compensation benefits, military service benefits, disability benefits, and claims made to trusts for bankrupt asbestos litigation defendants.[75]

Several other jurisdictions have established standing case management orders governing all asbestos cases filed within a state or a county.[76] These orders mandate disclosure of materials related to bankruptcy

---

74. Schwartz, *supra* note 8, at 17-18 & n.86.
75. Standing Order No. 1, *supra* note 17, at 4-5.
76. Schwartz, *supra* note 8, at 18-20 & nn.87, 90-91.

trust filings. Some contain sanctions for noncompliance[77] or set-off provisions allowing credits for trust recoveries against defendants' judgments.[78] New York City and Montgomery County, Pennsylvania, for example, require all claims to be filed pretrial.[79]

Recently, West Virginia adopted a case management order applicable to all personal injury litigation resulting from asbestos exposure. It requires a plaintiff to provide to all parties no later than 120 days prior to trial "a statement of any and all existing claims that may exist against asbestos trusts," including when a claim was "or will be" made and whether there has been a request for delay or deferral.[80] The plaintiffs or plaintiffs' counsel must also submit an affidavit certifying that the statement is based upon a good faith investigation of all potential claims against asbestos trusts. The order further provides:

> As to any claims already asserted against asbestos trusts, the claimant shall produce final executed proofs of claim together with any supporting materials used to support such claim against the asbestos trusts, all trust claims and claims material, and all documents or information relevant or related to such claims asserted against the asbestos trusts, including but not limited to, work histories, depositions, and the testimony of the claimant and others as well as medical documentation.[81]

The multidistrict litigation in Pennsylvania, other counties in New York, San Francisco, Baltimore, and Harris County, Texas, all have held that claims forms submitted to bankruptcy trusts and the factual information to support these claims are all discoverable in civil litigation.[82]

Notwithstanding the individual states' efforts through management orders to require transparency, the lack of any reasonable means to verify the information given to the court—or to discover relevant information *not* provided—allows inconsistent claiming to continue unchecked by those plaintiffs and their attorneys who still find it immensely profitable to circumvent the court rules with only a

---

77.   2010 Asbestos Case Management Order with Attached Exhibits at 27, *In re* Asbestos Pers. Injury Litig., No. 03-C-9600 (W. Va. Cir. Ct. Kanawha Cnty. May 14, 2010) [hereinafter 2010 Asbestos Case Management Order].

78.   *Id.* at 28-29.

79.   *See* Amended Case Management Order at 48, *In re* N.Y.C. Asbestos Litig., No. 40000/88 (N.Y. Sup. Ct. May 26, 2011); Order at 1-2, Thibeault v. Allis Chalmers Corp. Prod. Liab. Trust, No. 07-27545 (Pa. Ct. Com. Pl. Montgomery Cnty. Feb. 22, 2010).

80.   2010 Asbestos Case Management Order, *supra* note 77, at 26.

81.   *Id.* at 26-27.

82.   Schwartz, *supra* note 8, at 18-19 & n.86.

minimal chance of being detected. The *Montgomery* case is just such an example,[83] as is *Kananian*[84] and as is *In re Asbestos Litigation: Limited to Grenier*.[85]   These cases only represent instances of inconsistent claiming that have come to light, but they suggest a growing pattern of abuse. If these practices were not commonplace and profitable, there would be no reason to utilize separate lawyers to pursue the trust payments, a practice that cannot reasonably be expected to be limited to one Texas lawyer or The David Law Firm. And, unquestionably, Judge Hodges' recent exploration into the facts behind only a sampling of the personal injury settlements that Garlock paid to plaintiffs in asbestos cases suggests that abuse is far more commonplace, although the extent of it has yet to be revealed.

## VI.  LEGISLATIVE EFFORTS TO PROVIDE GREATER COORDINATION BETWEEN TRUSTS AND THE TORT SYSTEM

While federal legislation is aimed at providing access to individual trust data and claims and facilitating fair and appropriate compensation to plaintiffs by a rational allocation of funds, the individual state laws that have been enacted or proposed focus on a distinct but related problem resulting from the fact that many Bankruptcy Code § 524(g) trust distribution plans (TDPs) allow claimants to delay indefinitely submitting claims to bankruptcy trusts until they recover from all solvent defendants in the tort litigation.[86] As a result, state laws are a necessary adjunct to the federal approach to the problem. These statutory proposals generally seek to require early submission of trust claims so they may be identified and their factual support disclosed before the trial is held.

### A.    The Furthering Asbestos Claim Transparency (FACT) Act of 2013

Asbestos bankruptcy trust transparency is at the heart of H.R. 982, the proposed federal legislation titled "Furthering Asbestos Claim Transparency (FACT) Act of 2013."[87]  The FACT Act is a proposal to amend § 524(g) of the Bankruptcy Code, which establishes the framework for asbestos defendants to discharge asbestos liabilities

---

83.    Pretrial Hearing Transcript, *supra* note 14.

84.    Case No. CV 442750 (Ct. Com. Pl. Cuyahoga Cnty., Ohio, Jan. 18, 2007).

85.    No. 05C-11-257 ASB, slip op. at 9-11 (Del. Super. Ct. July 31, 2007).

86.    Ziffer, *supra* note 5.

87.    H.R. 982, 113th Cong. (2013).

through bankruptcy and thereby enables the debtors to avoid potentially destructive future mass tort liability.[88]  The bill is intended to eliminate much of the secrecy surrounding the trust claims by requiring each asbestos trust established under § 524(g) to file quarterly public reports with the court and the United States Trustee Program for the respective region identifying claimants' names, the amount paid to each claimant, and the basis for each payment, that is, the place, activity, and source of exposure.[89]  The bill addresses privacy concerns of plaintiffs' attorneys by specifically disallowing the publication of social security numbers or confidential patient records.[90]  The FACT Act further requires the trusts to provide this information to parties engaged in asbestos litigation upon request.[91]

The Act was the subject of hearings before the United States House of Representatives Judiciary Committee's Subcommittee on Regulatory Reform, Commercial, and Antitrust Law last year.[92]  It was passed by the House by a vote of 221 to 199 on November 13, 2013.[93]  Although it is intended to deter inconsistent or fraudulent trust claiming and provide an effective level of public accountability, it has faced fierce opposition from plaintiffs' counsel and the trusts themselves, which is hardly surprising given the advantages that secrecy has provided to plaintiffs and their attorneys.[94]  The FACT Act is also expected to encounter vigorous resistance in the United States Senate.[95]

Because the majority of the TDPs require claims to be treated as confidential settlement negotiations,[96] tort litigants are presently subject to lengthy and expensive discovery disputes just to gain access to basic exposure information that would have been readily available if the bankrupt companies were still solvent.  The FACT Act will ensure that the information necessary to complete a claimant's exposure history will be publicly available to parties in litigation.

---

88.  *Id.*

89.  *Id.*

90.  *Id.*

91.  *Id.*

92.  *2013 FACT Act Hearing, supra* note 62.

93.  *See Final Vote Results for Roll Call 579*, OFFICE OF THE CLERK, http://clerk. house.gov/evs/2013/roll579.xml (last visited May 5, 2014).

94.  *See 2013 FACT Act Hearing, supra* note 62.

95.  Pete Kasperowicz, *House Votes for Increased Transparency on Asbestos Claims*, THE HILL (Nov. 13, 2013, 5:28 PM), http://www.thehill.com/blogs/floor-action/votes/190186-house-votes-for-increased-transparency-on-asbestos-claims.

96.  S. Todd Brown, *How Long Is Forever This Time?  The Broken Promise of Bankruptcy Trusts*, 61 BUFF. L. REV. 537, 558 (2013).

The question of whether the FACT Act will impose costly or onerous administrative burdens on the trusts has been a matter of contention between supporters and detractors of the legislation,[97] but there is no question that forcing the sun to shine upon the trusts will at least serve to curb the temptation to file fraudulent claims. And, contrary to the oft-expressed concern of plaintiffs, attorneys, and trustees that the FACT Act will unduly infringe upon the privacy interests of victims, personal identifying data and confidential medical records are specifically exempted from disclosure.[98] These safeguards are intended to eliminate plaintiffs' objections to the release of "highly private, individual claimant data."[99] Moreover, because the courts provide no such protection to tort victims engaged in litigation, it is difficult to understand or accept the emphasis upon claimants' privacy interests that the bill's opponents continue to assert.

Passage of the FACT Act or similar federal legislation in the Senate will go a long way toward making highly relevant, nonconfidential information available to companies that are defendants in asbestos tort litigation. It will also remove the incentives to allege inconsistent exposure histories and illuminate for solvent defendants assertions of exposure to other's products or premises.

## B.    *State Legislative Initiatives To Create Transparency Between the Tort and Bankruptcy Trust Systems*

Although federal legislation is necessary to create greater transparency between the tort and trust systems, it is unable to control state procedural rules regarding the sequencing of the claiming process as it relates to the corresponding case in litigation. The lack of relevant information regarding exposure history is often not a function of the secrecy of the trusts themselves. Rather, it is the carefully calculated timing of the trust claim submissions to occur only *after* the tort litigation is concluded that prevents the full picture of a tort claimant's history from being revealed. After all, court-ordered disclosure of trust claims is of little value if they have not been filed. While the FACT Act will create far greater transparency and have a deterrent effect on all but the most unscrupulous attorneys, it will be up to the individual courts and state legislatures to address this additional loophole related

---

97.    *2013 FACT Act Hearing, supra* note 62, at 18-43, 53-91 (statements of S. Todd Brown, Elihu Inselbuch, and Marc Scarcella).

98.    *See* Furthering Asbestos Claim Transparency (FACT) Act of 2013, H.R. 982, 113th Cong. (2013).

99.    Inselbuch et al., *supra* note 44, at 8.

to timing. Because this requires a piecemeal approach on a state-by-state basis to enact laws that will mandate the filing of trust claims before, rather than after, the litigation is concluded, the individual state legislative initiatives to accomplish this result will undoubtedly become the future battlefield where these interests will collide for many years to come.

In general, state laws that have been enacted or proposed approach the transparency problem differently. They address the widespread practice of the submission of trust claims only after the lawsuit has concluded. This strategic timing of the bankruptcy trust filings requires individual state legislation because court orders generally do not mandate deadlines for trust claim filings.

In Ohio, the legislature recently passed a law to address the lack of transparency.[100] While ostensibly intended to provide openness, it is actually intended to modify the procedure in Ohio asbestos cases so as to require submission of all anticipated trust claims prior to trial, rather than address the question of public disclosure. The Ohio Act mandates that plaintiffs alleging personal injury from asbestos submit a sworn statement "identifying all existing asbestos trust claims" as well as "all trust claims material pertaining to each identified asbestos trust claim" within thirty days of the commencement of discovery or submission of the trust claim.[101] To eliminate the practice of delayed claiming, the statute authorizes a defendant to seek a stay of the state court tort action for the purpose of requiring a plaintiff to submit additional claims to bankruptcy trusts.[102] This law became effective in March 2013.[103]

The Oklahoma Personal Injury Trust Fund Transparency Act was signed by that state's governor on May 7, 2013,[104] and was codified in the Oklahoma Statutes at sections 81 to 89 of Title 76.[105] While the timing of some of its features differs from the Ohio Act,[106] it is otherwise similar to Ohio's law but broader in that it extends to all personal injury trusts, not just those involving asbestos claims.

---

100. *See* OHIO REV. CODE §§ 2307.951-.954 (2014).
101. *Id.* § 2307.952(A)(1)(a).
102. *See id.* § 2307.953(A).
103. *Id.* §§ 2307.951-.954.
104. S.B. 404, 54th Leg., 1st Sess. (Okla. 2013).
105. OKLA. STAT. tit. 76, §§ 81-89 (2013).
106. The Oklahoma Act requires the disclosure of claim forms and materials within ninety days of the commencement of a case in comparison to the Ohio law that mandates initial disclosure within thirty days of the commencement of discovery.

The Oklahoma Act also contains a provision requiring plaintiffs to file trust claims.[107] If the defendant has a good faith belief that a plaintiff may make a successful claim against other trusts, a defendant can seek a stay of the proceedings no later than ninety days prior to the trial date. Additional procedures for objections to the stay and a determination by the court whether there is a good faith basis are also set forth in the law.[108] The Oklahoma statute also provides a means of calculating the value of a trust claim prior to resolution by the trust and allowing for setoffs of judgments against solvent defendants.[109]

Wisconsin is the most recent state to have enacted legislation to eliminate the problems created by the dual compensation system. Assembly Bill 19 was passed in May 2013[110] and was signed into law on March 27, 2014. The bill is similar to that adopted in Ohio in that it requires a plaintiff who has filed a tort action to disclose within thirty days after filing the action whether he or she has filed *or anticipates filing* a claim against a personal injury trust, including those established under Bankruptcy Code § 524(g).[111] The bill then requires the court to stay the immediate proceedings until the plaintiff produces a final executed proof of claim.[112] It also allows a defendant to identify a personal injury trust not named by the plaintiff but against whom the defendant believes the plaintiff has a legitimate claim.[113] If the court finds that there is a good faith basis for the plaintiff to file a claim against a personal injury trust, the bill requires the court to order that the plaintiff file such a trust claim and to stay the proceedings until a final executed proof of claim is submitted.[114]

The bill also allows any party to use documents, records, or other discovery materials that a plaintiff is required to produce to prove alternative causation of or to allocate liability for the plaintiff's injury.[115] A defendant is also entitled to seek discovery from any

---

107. *Cf.* OHIO REV. CODE § 2307.952.

108. *See* OKLA. STAT. tit. 76, § 86.

109. *See id.* tit. 76, §§ 87-88.

110. *Assembly Bill 19,* WIS. LEGISLATIVE DOCUMENTS, https://docs.legis.wisconsin. gov/2013/proposals/ab19 (last visited May 5, 2014).

111. *Compare* OHIO REV. CODE §§ 2307.951-.954 (requiring a plaintiff to identify all existing asbestos trust claims within thirty days of the commencement of discovery), *with* Assemb. B. 19, 2013-2014 Leg., Reg. Sess. (Wis. 2013) (requiring a plaintiff to identify all personal injury claims they have filed or anticipate filing against a personal injury trust within thirty days of filing an action).

112. Wis. Assemb. B. 19, at 4-6.

113. *Id.* at 5-6.

114. *Id.* at 3-6.

115. *Id.* at 4.

personal injury trust against which the plaintiff has filed or anticipates filing an action.[116] In addition to other provisions for setoffs, the law requires the court to enter into the record a list that identifies each personal injury claim a plaintiff has made against a personal injury trust.[117]

## VII. CONCLUSION

The courts in which asbestos cases are litigated have a genuine interest in identifying and eliminating practices that undermine the integrity of the judicial process. Yet the trusts themselves have implemented procedures that prohibit the sharing of information that is necessary to prevent these abuses from undermining the truth-seeking process. Sixty-five percent of the asbestos trusts now include confidentiality procedures in their distribution plans that prevent production of claims information.[118]

Although bankruptcy remains a viable option for otherwise healthy companies seeking relief from the debilitating effect of having to defend countless lawsuits, the trust mechanism established by § 524(g) has also had the undesirable effect of increasing the liability share of those solvent defendants that remain in the tort system. Indeed, there has been no other credible explanation for the phenomenon regarding liability of peripheral defendants that has taken place since the trusts were created. After the primary asbestos insulation manufacturers, who had previously been responsible in tort for the lion's share of the liability, went bankrupt, the payments by the peripheral defendants increased, even though the extent of their responsibility for exposure remained unchanged.[119] And as plaintiffs reach out to more fringe levels of defendants, it becomes increasingly difficult to know what other exposures have taken place. It is the trust submissions that will provide an efficient means of identifying these other exposures.

When this mass tort litigation first began approximately forty years ago, the claimants or plaintiffs were largely insulators who worked directly with thermal insulation containing asbestos. These individuals could easily identify the source of their exposure and the manufacturers of the products they installed. We are now several

---

116. *Id.*

117. *Id.* at 6.

118. U.S. Gov't Accountability Office, GAO-11-819, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts 28 (2011).

119. *See* Carroll et al., *supra* note 10, at xxiii; Murphy, *supra* note 12, at 1-2.

decades removed from having a universe of plaintiffs who have a reason to know the products to which they were exposed or how it contributed to their illness. What matters to those solvent defendants who remain in the tort system is not the *amount* that a trust may pay to a particular claimant but the factual assertions of exposure to other defendants' products or premises, because these essentially constitute admissions by a plaintiff that are highly critical pieces of evidence. It is this information that is essential to the fact-finding process and required for a jury to reach a fair verdict.

From my perspective as a former Delaware state trial court judge, reintegrating the trusts and their evidentiary processes into the tort system has far broader policy implications for how our justice system works. It is difficult to feel confident that a trial is conducted fairly when obstacles exist to ascertaining all of the pertinent facts. Because asbestos litigation continues to keep pace with bankruptcy trust claiming, the integrity of the judicial process remains vulnerable to fraud and deception, as it was in the *Montgomery* case, by the withholding of information that is essential to a search for the truth.

# Conversations With...

**Washington Legal Foundation**
*Advocate for Freedom and Justice®*
2009 Massachusetts Avenue, NW
Washington, DC 20036
202.588.0302 wlf.org

Autumn 2014

# Why Transparency Is Imperative in Litigating Asbestos Liability Claims

**The Honorable Dick Thornburgh**
**The Honorable Peggy L. Ableman**

In this edition of Washington Legal Foundation's CONVERSATIONS WITH, former Attorney General of the United States and Pennsylvania Governor Dick Thornburgh discusses the need for increased transparency in the asbestos litigation process with former Delaware Superior Court Judge Peggy L. Ableman. Judge Ableman draws upon her nearly thirty years of experience as a state trial judge and her work as Special Counsel to the law firm McCarter & English LLP to explain how some lawyers' manipulation of the asbestos bankruptcy claims process undermines judicial integrity and courts' ability to make injured plaintiffs whole. The conversation will also focus on recent judicial actions that have exposed plaintiffs' fraudulent withholding of evidence, ongoing state and federal legislative efforts to require greater transparency in asbestos bankruptcy trusts, and what more judges can do to help.

**Governor Thornburgh:** Since asbestos bankruptcy trusts are central to this conversation, can you explain what these entities are and why they were created?

**Judge Ableman:** Now entering its fourth decade, asbestos litigation is the nation's longest running mass tort, with filings against asbestos manufacturers beginning in the early 1970s. Originally, and for many years, companies that manufactured asbestos-containing thermal insulation were among the principal targets of tort litigation. Their products were "friable" and far more toxic than chrysotile asbestos. As many of these manufacturers and suppliers sustained crushing losses, and saw their assets exhausted due to the sheer magnitude and volume of judgments against them, they were forced to file bankruptcy.

By the end of 2011, at least 96 companies with asbestos-related liabilities had declared bankruptcy. Through the bankruptcy process, entities that played a significant role in causing asbestos-related disease have been able to channel their asbestos liabilities into trusts pursuant to § 524(g) of the Bankruptcy Code, thereby insulating themselves from such claims in perpetuity. More than 60 trusts have been established to collectively form a $36.8 billion privately-funded asbestos personal injury compensation system that operates parallel to, but wholly independent from, the civil tort system.

**Governor Thornburgh:** If those manufacturers and suppliers with the most direct connection to asbestos are the ones funding the trusts, why are so many lawsuits still being filed in state and federal courts?

**Judge Ableman:** Interestingly, plaintiffs' attorneys recognized early on that the trust payments would be unlikely to provide the windfall compensation that a jury verdict from a sympathetic jury would be inclined to award, especially to victims of the deadliest of asbestos-related diseases, mesothelioma.

The bankruptcies of most of the major raw material providers and product



**Dick Thornburgh**
K&L Gates LLP



**Peggy L. Ableman**
McCarter & English LLP

*"If courts and defendants cannot access the data contained in the bankruptcy trust claim forms, a plaintiff can present conflicting exposure evidence or inconsistent fact patterns to a court and one or more trusts so as to maximize recovery from both systems."*

manufacturers thus created an incentive for plaintiffs' lawyers to find "peripheral defendants" or "downstream users." These defendants are consumers of asbestos-containing products who incorporated the products into their manufactured goods, recommended use in conjunction with their products (furnaces or water heaters), owned premises where asbestos was present, or who acquired companies that previously manufactured asbestos-containing products.

The number of trusts grew rapidly over the years, and the ability of plaintiffs to recover from multiple trusts increased. Trust outlays have increased as well. Indeed, for the first time ever, it is estimated that trust recoveries may fully compensate asbestos victims.

Deterrence objectives are no longer served by asbestos tort litigation. The defendants who engaged in wrongdoing many years ago have disappeared from the scene. Indeed, asbestos itself disappeared from the marketplace nearly forty years ago. Plaintiffs' attorneys, ever resourceful, have discovered a large and expanding group of companies that had some role in using an asbestos component, selling or distributing such a product, or acquiring a company that brought with it some asbestos liability.

**Governor Thornburgh:** Alleged victims of asbestos exposure may file claims with one or numerous bankruptcy trusts and simultaneously sue solvent, "peripheral" defendants. Why are the claims filed with the trusts so important to those civil liability defendants?

**Judge Ableman:** Because of the dual compensation system that exists today, it is important for courts and defense counsel to be aware of *all* claimed sources of a particular plaintiff's exposure to asbestos. If courts and defendants cannot access the data contained in the bankruptcy trust claim forms, a plaintiff can present conflicting exposure evidence or inconsistent fact patterns to a court and one

or more trusts so as to maximize recovery from both systems.

Trust data can provide evidence of where a plaintiff worked, his years of employment, years of exposure, smoking history, diagnosis data, and specific product references. All of this is relevant information that can easily be withheld from counsel and the court in litigation, but should be available in the tort case to depict an individual's entire exposure history, medical causation, and liability picture. For solvent defendants still in the asbestos tort system, transparency of trust information forces plaintiffs and their attorneys to play by the rules and disclose all exposures and recoveries.

Fraud on the trusts hurts legitimate claimants by depleting resources available to pay their claims in full. Solvent defendants in tort cases have a need for reliable information regarding all exposures during a plaintiff's lifetime in order to ensure that defendants are held responsible only for their fair share of liability through proper allocation of fault.

**Governor Thornburgh:** Why are defendants often unable to discover information about claims filed with asbestos trusts?

**Judge Ableman:** One of the major problems with the dual compensation system is that there are no failsafe means to cross-check if a plaintiff involved in litigation against solvent defendants has filed inconsistent claims with a trust. While many states have adopted case management orders that require full disclosure of trust claims made, defendants contend that plaintiffs do not, in fact, provide these materials in discovery. Setting aside the possibility that some lawyers choose to disregard applicable discovery orders, other attorneys or professionals who do not enter their appearance in the state court litigation are often responsible for handling the bankruptcy trust claim submissions. Those trial counsel who oversee the litigation may neglect to verify if any trust submissions have been made.

© 2014 Washington Legal Foundation

Many plaintiffs' attorneys have found that the way to avoid sanctions for disregarding discovery orders is by simply deferring trust submissions until after the state court litigation has concluded. After all, if nothing has been filed, there is nothing to disclose. In fact, some of these lawyers may not even investigate trust-related disclosure to any significant degree until the state court proceedings are concluded, and in the absence of such investigation, they can avoid an enforceable obligation to disclose these potential trust submissions.

Defendants are unlikely to find most trusts to be cooperative when they attempt to investigate plaintiffs' trust submissions. Although federal law does not bar discovery of trust information, the mechanisms available in discovery are insufficient to ensure that the information is, in fact, disclosed. Plaintiffs often argue that the trusts are akin to settling defendants, so that all communications should be subject to the settlement privilege.

While some trusts previously disseminated their claim information freely, most bankruptcy trusts today treat claim submissions and payments as confidential. Since 2006, new trusts include trust distribution procedures (TDP) language requiring the trusts to treat claim submissions, discussions, and payments as confidential "settlement negotiations," and some of the older trusts have amended their TDPs to include similar provisions. These provisions obligate trustees to take all necessary steps to resist disclosure unless authorized by the claimant or required under applicable law.

**Governor Thornburgh:** While on the bench in Delaware, you saw firsthand the negative impact this lack of transparency can have on litigants and the integrity of the judicial process. Can you talk about that?

**Judge Ableman:** Toward the end of my judicial tenure, I was scheduled to preside over an asbestos trial that, as circumstances

unfolded, gave me an up-close understanding of and insight into the potential for unfairness associated with a system that permits a plaintiff's bankruptcy trust claims and payments to remain undisclosed to the defendants who have been sued by that same plaintiff in state court tort litigation. In essence, absent good-faith compliance with court mandates for full disclosure, there is no foolproof mechanism to eliminate fraud. Even in Delaware, where there is a Standing Order requiring full disclosure of all trust claims, deception can still occur, resulting in irreversible prejudice to one or more defendants.

The original plaintiff in the case, who was diagnosed with mesothelioma, retained Texas counsel through her son. That attorney, in turn, was to assist the plaintiff in finding counsel in Florida where plaintiff resided. Florida counsel ultimately filed the case in the Superior Court in New Castle County, Delaware, naming 23 defendants who were allegedly responsible for plaintiff's exposure to asbestos from her use of, or proximity to, their products. By the time of trial, however, all but one defendant had settled, leaving Foster Wheeler as the sole defendant remaining for trial.

Despite the Standing Order, and specific interrogatories that had been directed to the plaintiff for this information, at no time did she identify exposure from the products of any of the 20 entities to whom bankruptcy claims had been submitted on her behalf. Instead, the plaintiff consistently asserted that she was exposed to asbestos solely through her laundering of her husband's work clothes, as opposed to any work she personally performed.

Although plaintiff's husband had spent his entire career as an electrician working around a wide variety of products and materials at multiple locations throughout Florida, the distinct impression left by the plaintiff was that the bulk of her husband's work with asbestos occurred primarily during a short period of

*"Fraud on the trusts hurts legitimate claimants by depleting resources available to pay their claims in full."*

*"Even in Delaware, where there is a Standing Order requiring full disclosure of all trust claims, deception can still occur, resulting in irreversible prejudice to one or more defendants."*

time at the Everglades Power Plant where—coincidentally—Foster Wheeler's boilers were located. Even as late as the pretrial conference just days before trial, plaintiff's counsel reported that absolutely no bankruptcy trust claims had been submitted and no monies had been received. That was the state of the record as of the weekend before the trial was to commence.

**Governor Thornburgh:** When and how did the plaintiff's other asbestos injury claims come to your attention?

**Judge Ableman:** Over the weekend before trial, plaintiff's counsel met the plaintiff's son from Texas (who was now her legal representative due to her death) for the first time when he arrived for trial. According to plaintiff's counsel, he first learned on Saturday night that the family had received two bankruptcy settlements from another law firm that had filed those claims on his behalf. Plaintiff's trial counsel claimed to have been completely unaware of these filings previously.

Plaintiff's counsel forwarded this information to defense counsel, who was understandably upset by the revelations as they were directly inconsistent with counsel's unequivocal representations at the pretrial conference. In fact, by late afternoon the following day (the day before trial was to begin) counsel for defendant was advised for the first time that a total of *20* bankruptcy trust claims had been submitted. Essentially then, at that late stage in the litigation, defense counsel was faced with the realization that he had prepared his case knowing even less than half of the truth and that the facts of the case were far different from what he had been led to believe. Counsel for Foster Wheeler had been told that plaintiff's claimed exposure was solely the result of take-home fibers on her husband's work clothing, not from plaintiff's own employment where she had worked in and around the very products that provided the basis for her bankruptcy trust claim submissions. The representations to

the bankruptcy trusts had painted a much broader picture of her exposure to asbestos than either the plaintiff or her attorneys had acknowledged during the entire course of the litigation in Delaware. Plaintiff's failure to disclose or produce the trust claims precluded Foster Wheeler from investigating her exposure to asbestos from any of these additional entities or additional products, as they had not been developed in the Delaware case. That failure was manifestly prejudicial to defendant Foster Wheeler.

The court, of course, was the last to know the truth. After all of the resources and time that had been expended by the court to ready the case for trial, and with a jury that had been selected a week earlier waiting in the wings, the court had no choice but to continue the trial. Ultimately, the case was dismissed.

**Governor Thornburgh:** What were you able to do in reaction to these new developments? Was there any recourse available to the other defendants who settled based on incomplete information?

**Judge Ableman:** I recognized immediately that the trial could not possibly go forward as scheduled. And my initial reaction to the plaintiff or her attorneys' behavior was that it was so egregious, and the misrepresentations so fundamental, that I should dismiss the case with prejudice right then and there. Ultimately, I decided not to let my emotional response guide my decision-making. I explained to plaintiff's counsel that he had essentially created a situation where the defense had to begin its trial preparation anew since the facts now known presented a far different scenario from the one for which defense counsel had prepared. I asked for briefing on the question of whether dismissal was appropriate under the circumstances, and I explained that, in the event I decided ultimately not to dismiss the case, all of the expenses associated with the defendant's discovery and trial preparation the second time around would have to be borne by the plaintiff.

© 2014 Washington Legal Foundation

Probably the most unfortunate consequence of the misrepresentations and withholding of evidence in that case was that 22 other defendants had already settled the claims against them. Those co-defendants made their respective determinations regarding what settlement amounts would be "fair" based on insufficient data and an incomplete picture of the plaintiff's total exposure. Such a complete picture may have also led some defendants to remain in the case, rather than settle.

Undoubtedly, those defendants could have found some resourceful way to reopen the proceedings to adjust for the fraud, but that too is costly, and experience tells us that it is rarely done.

**Governor Thornburgh:** In the case you described, the trust submission information was potentially available but undisclosed. Are changes to federal bankruptcy law necessary to increase asbestos trusts' transparency?

**Judge Ableman:** Bankruptcy law does not seek to provide co-defendants with the information they may need to defend themselves in tort litigation. It is generally understood that any right of access to this information is a matter governed by state discovery rules, and the TDPs that govern the bankruptcy trusts' administration treat claims submissions and payments as confidential. The court overseeing the discovery—the state trial court, not the bankruptcy court—generally has exclusive jurisdiction over any discovery disputes.

Although federal law does not bar discovery of trust information, plaintiffs frequently argue that trusts are akin to settling defendants whose communications are thus privileged. Of course, by timing the trust submissions to occur after the tort case is resolved, plaintiffs can avoid any issues regarding discovery entirely by insuring that there is nothing to discover.

A bill introduced in Congress in 2013, the FACT Act, would impose obligations on the trusts to file quarterly reports to the bankruptcy court concerning each claim received, including the name and asserted exposure history of the claimant, as well as the basis for any payments made. While this will not solve the problem created by strategically timing the filing of trust claims until after the tort case is concluded, the prospect of public disclosure and openness may ultimately serve to curb the temptation on the part of some to "play fast and loose" with the truth and may have the effect of forcing plaintiffs to play by the rules.

**Governor Thornburgh:** What can be done at the state level that cannot be achieved through changes to the federal Bankruptcy Code?

**Judge Ableman:** The FACT Act, if enacted, will impose quarterly reporting obligations on the trusts. As I noted before, this will not solve the problem of strategic nondisclosure and trust submission timing, although it may discourage this practice to some extent.

Several states have passed legislation to create greater transparency between the trusts and the civil litigation. Ohio, Oklahoma, and Wisconsin have adopted statutes that require plaintiffs to file their trust claims before trial and to produce copies of those forms, thereby eliminating the incentive to delay trust claim submissions.

The primary purpose for state-level legislation is to fill the gaps in the current system that deny defendants access to the information to which they are entitled in discovery. If the information necessary to construct a complete picture of a plaintiff's exposure is within the sole possession of the plaintiff, and there is no disadvantage to concealing this information at trial, defendants—and juries—will have only a manufactured reality concerning plaintiff's exposure history that may bear little relationship to the underlying truth. The structure of the state statutes works not only

*"The representations to the bankruptcy trusts had painted a much broader picture of her exposure to asbestos than either the plaintiff or her attorneys had acknowledged during the entire course of the litigation in Delaware."*

*"Although federal law does not bar discovery of trust information, plaintiffs frequently argue that trusts are akin to settling defendants whose communications are thus privileged."*

to encourage the disclosure of trust forms but also to ensure that the information is shared in a timely manner.

**Governor Thornburgh:** Such calculated delays in seeking compensation from bankruptcy trusts came to light this year in a federal court case in North Carolina, *In re Garlock*. What is the factual situation in that case?

**Judge Ableman:** The *Garlock* case made national headlines recently and has had a tremendous impact on the asbestos litigation scene. It provides previously inaccessible, but long suspected, support for bankruptcy transparency as an essential component of the defense of every asbestos-related personal injury case in the tort system. In an exhaustive opinion, a federal bankruptcy judge in North Carolina concluded that the practice of withholding exposure evidence concerning the products of bankrupt entities was sufficiently widespread to justify disregarding Garlock's previous settlement history entirely as a basis upon which to measure Garlock's aggregate liability for current and future mesothelioma claims.

Garlock, a gasket and packing manufacturer, had been a relatively small player in the asbestos tort system. It had been successful in settling cases until the early 2000s, by which time the remaining solvent thermal insulation companies filed for bankruptcy and could no longer be sued. This circumstance caused the focus of plaintiffs' attention to turn to the remaining solvent defendants in the tort system. Not coincidentally, at the same time, evidence of exposure to other products began to disappear. As a result, Garlock had been forced to pay higher amounts to settle its cases and sustained a few big verdicts after trial. Garlock continued to settle cases until its insurance was exhausted, at which time it filed for bankruptcy in North Carolina to establish a § 524(g) trust.

Following a trial that lasted several weeks, Bankruptcy Court Judge George Hodges found

that Garlock's settlements of mesothelioma claims in the tort system were "infected by the manipulation of exposure evidence by plaintiffs and their lawyers." As a result, the court estimated Garlock's pending and future mesothelioma claims to be $125 million, about one billion dollars less than had been requested by plaintiffs' committees.

As is evident from the scope and detail of the opinion, Judge Hodges embarked on an extensive effort to understand fully the history of asbestos litigation in the United States, the scientific evidence relating to asbestos, and the evolution of the dual compensation system that exists today.

As part of the future liability estimation process, the court allowed the parties to conduct wide-ranging discovery, including an extensive review of fifteen randomly selected cases out of hundreds that had settled.

**Governor Thornburgh:** What did Judge Hodges discover in his investigation of those fifteen cases?

**Judge Ableman:** The court held that, in those fifteen cases, "Garlock demonstrated that exposure evidence was withheld in each and every one of them." In fact, the discovery revealed that plaintiffs disclosed on average only two exposures to bankrupt companies' products but then, only *after* reaching a settlement with Garlock, those same plaintiffs on average made claims against nineteen bankruptcy trusts. This calculated withholding of evidence was described as "surprising and persuasive." The court found further extensive discovery to be unnecessary because "the startling pattern of misrepresentation that has been shown is sufficiently persuasive."

An understanding of the specifics of the *Garlock* opinion is essential for all attorneys and judges involved in asbestos litigation because it brings to light one of the most troubling problems that has plagued this litigation—the lack of transparency across

© 2014 Washington Legal Foundation

the bankruptcy and tort systems—and the ease with which attorneys have been able to capitalize on this gap, so as to taint the truth-seeking function of the courts.

The decision represents a thoughtful and timely assessment, not only of Garlock's role in the tort system, but also of the overall status of asbestos litigation in general. For defendants who are solvent and are still susceptible to lawsuits in the tort system, the need for bankruptcy trust information is essential, and defense counsel should press hard for enforcement of case management orders that require disclosure. If plaintiffs routinely fail to comply with these orders, these deficiencies should be addressed with the court, and the Garlock decision should be used by counsel to educate the court about the need for full disclosure. In light of that decision, defense counsel have no excuse not to push for bankruptcy trust discovery. Likewise, it will now be hard for judges to turn a deaf ear to defendants' requests for critical case information from plaintiffs' bankruptcy claim submissions.

Governor Thornburgh: Have states other than those you mentioned previously taken action to address this strategic delay in submitting claims to bankruptcy trusts?

Judge Ableman: Other states, such as Pennsylvania, are in the process of considering legislation similar to that adopted in Ohio, Oklahoma, and Wisconsin, but the legislative process is often cumbersome and slow. In light of that reality, the trend is now for individual jurisdictions that have large asbestos-related dockets to include in their Case Management Orders provisions that mirror some of the key elements of the legislation.

Unfortunately, even in states where standing Case Management Orders require full disclosure of trust claims information, some counsel continue to employ methods to avoid production. In Delaware, where the Standing Order had been in effect for several years at the time that I encountered the problem, I was not aware of the ingenuity of plaintiffs' counsel in devising methods to withhold information without strictly running afoul of ethical standards. I suspect that judges who are new to the asbestos docket, or those who have not encountered the issue, as I had not, may still rely on the integrity of parties and their lawyers in assuming that their orders will not be subject to manipulation. At the very least, defense attorneys in these cases should aggressively insist upon obtaining all information about a plaintiff's claimed exposures so as to uncover the total picture of the cause of plaintiff's disease.

Governor Thornburgh: With federal bankruptcy law reform uncertain and the pace of change in the states expected to be slow, what can state and federal judges do in civil asbestos cases to deter and punish withholding of such vital information as trust claims?

Judge Ableman: First and foremost, state and federal judges should be aware of the intricacies of the dual compensation system and the lack of coordination between the bankruptcy trusts and the tort system. To the extent that they are not, defense attorneys should undertake to educate the court about the potential for their own cases to be tainted by fraudulent activity. Courts should be aware of the importance of mandatory full disclosure, and they should demand it from the very inception of the litigation. They should send a strong message to counsel that they will not ignore violations of these mandates and are prepared to sanction lawyers who fail to comply. They should also require that plaintiffs verify that no other attorney is involved in obtaining compensation from trusts. In the end, courts must lean strongly on the attorneys to act ethically, honestly and responsibly and send a message that the tactics I have just described will not be tolerated.

Governor Thornburgh: Judge Ableman, thank you for participating in this discussion.

*"If the information necessary to construct a complete picture of a plaintiff's exposure is within the sole possession of the plaintiff, and there is no disadvantage to concealing this information at trial, defendants—and juries—will have only a manufactured reality concerning plaintiff's exposure history that may bear little relationship to the underlying truth."*

WLF's CONVERSATIONS WITH provides a forum for leading experts from business, government, academia, and the legal profession to discuss current legal policy issues. In these conversations our participants give frank thoughts on a wide range of important contemporary subjects.

WLF is a national, non-profit, public interest law and policy center. We publish timely legal studies, engage in innovative litigation, and communicate directly to the public. To receive information about WLF publications, contact Glenn Lammi, Chief Counsel, Legal Studies Division.

————————————————

The Honorable Dick Thornburgh is a former Attorney General of the United States, two-term Governor of Pennsylvania, and Undersecretary-General of the United Nations. He is currently Of Counsel to the law firm K&L Gates LLP and Chairman of Washington Legal Foundation's Legal Policy Advisory Board.

The Honorable Peggy L. Ableman is Special Counsel to the law firm McCarter & English LLP in its Wilmington, Delaware office. Prior to joining the firm, she served for nearly thirty years as a state trial judge in Delaware. During her tenure on the Superior Court, Judge Ableman presided over the asbestos litigation docket for nearly two years, a docket comprised of more than 500 cases. Before taking the bench, Judge Ableman served as the first female Assistant United States Attorney for the District of Delaware from 1979 to 1983.

© 2014 Washington Legal Foundation
www.wlf.org

MEALEY'S® LITIGATION REPORT

# Asbestos

## "ME THINKS THE LAWYERS DOTH PROTEST TOO MUCH" A Response To "The Irony Of Tort Reform"

*by*
*Peggy Ableman*

*McCarter & English, LLP*
*Wilmington, Delaware*

**A commentary article
reprinted from the
March 22, 2017 issue of
Mealey's Litigation
Report: Asbestos**


LexisNexis®

# Commentary

## "ME THINKS THE LAWYERS DOTH PROTEST TOO MUCH" A Response To "The Irony Of Tort Reform"

By
Peggy Ableman

*[Editor's Note: A former Delaware Superior Court Judge, Peggy Ableman is Special Counsel in McCarter & English, LLP in Wilmington, Delaware. She has nearly thirty years of experience as a state trial judge and has testified before the U.S. Senate, U.S. House of Representatives, Wisconsin Senate and Pennsylvania House Judiciary Committees, and Task Force on Asbestos Litigation and Bankruptcy Trusts of the American Bar Association's Tort Trial and Insurance Practice Section. Any commentary or opinions do not reflect the opinions of McCarter English, LLP or LexisNexis® Mealey Publications™. Copyright © 2017 by Peggy Ableman. Responses are welcome.]*

### Introduction

Faced with ever-increasing instances of inconsistencies in trust claiming in asbestos tort litigation, plaintiffs and their attorneys have once again solicited the assistance of one of their longstanding advocates, Elihu Inselbuch, Esquire, together with his colleague, Andrew J. Sackett, Esquire, to put forth a defense. Both are counsel for existing asbestos claimants in bankruptcy as well as for the Trust Advisory Committees ("TACs") associated with several asbestos trusts. In their recent article "The Continuing Irony of Tort Reform,"[1] they take great pains to try to refute and undermine the express findings of judges, economists and defense attorneys, as well as the raw data itself, in an effort to legitimize plaintiffs' widespread practice of obtaining compensation for injuries from exposure to the products of bankrupt companies without admitting to these exposures in tort litigation against solvent defendants.

The impact of these trusts on civil litigation has been the subject of dozens of reports and articles as well as

legal decisions that have largely been critical of plaintiffs and their counsel, and have dubbed their practices deceptive, fraudulent, in contravention of the rules of discovery, and even in outright defiance of court orders.[2] As these legal publications and news reports ramp up their exposés of fraud and deceit in asbestos litigation, the need for plaintiffs' attorneys to redirect the criticism away from themselves and back to the asbestos product manufacturers, has resulted in Inselbuch's recent publication, a general description of tort law and the well-defined roles traditionally assigned to litigating. The article speaks unfavorably of tort reform, describes defendants' support for legislative reform as a concerted effort to reduce their liability for their "own decades-long outrageous and lethal misbehavior,"[3] and criticizes articles written and researched by attorneys (including myself) and economists, wherein the claiming practices of plaintiffs and their attorneys, as documented in the *Garlock* data base,[4] have been painstakingly analyzed and exposed. Inselbuch and Sackett claim that these defense-funded articles rely on a "gross misrepresentation of the historical context surrounding asbestos exposures, the operation of the asbestos bankruptcy trusts, and the tort system itself."[5]

While Inselbuch's knowledge and understanding of the origins of tort law may be extensive, the historical tort constructs of the common law bear little relevance to the asbestos litigation landscape as it exists today, and many of those procedures are ill-equipped to accommodate either the unique operations of the dual system for compensating asbestos plaintiffs or the extraordinary financial incentives that motivate plaintiffs' attorneys. Indeed, the

lack of transparency between the two systems is downplayed in the authors' description of defendants' efforts (which they describe as a concerted effort by defendants to avoid their traditional responsibility to meet their burdens of proof at trial) to bring needed change to an unprecedented system, teeming with fraud and abuse.[6]

## Asbestos Litigation Has Dramatically Changed Through the Last Five Decades

Although the history of tort law provides an interesting backdrop to Inselbuch's defense of plaintiffs' practices, it fails to account for the realities of this litigation in today's world. Indisputably, the asbestos litigation landscape of the early 1970s and 1980s no longer exists. It is no longer comprised predominantly of cases filed by injured naval shipyard workers and insulators against manufacturers of highly toxic amphibole asbestos insulation that produced airborne fibers.[7] It is also not against manufacturers of raw thermal insulation that was not protected or encapsulated by plastic or other blanket-type material. Those defendants—such as Johns Manville—are no longer subject to suit in our courts because they have obtained the protections of the federal bankruptcy system.

Indeed, the asbestos dockets of yesteryear, upon which Inselbuch's arguments are based, are a far cry from the lawsuits that fill the dockets of the most favorable plaintiff-friendly jurisdictions today. No longer are these cases filed against a handful of formerly predominant insulation manufacturers.[8] Instead, the average number of defendants sued by plaintiffs today for damages caused by their products can be upwards of fifty to 100 manufacturers of various types of asbestos-containing products that, for the most part, are fully encapsulated such that fibers do not float through the air when the product is disturbed, rattled, or moved.[9] Then too, the asbestos-containing products manufactured by defendants in today's lawsuits do not contain amphibole asbestos that scientists have properly categorized as far more toxic than the chrysotile-containing products of today's defendants.[10] In many instances, the still solvent manufacturers of asbestos-containing products that comprise the vast majority of the defendants named in today's lawsuits may not even have had any meaningful contact with the plaintiff, and in reality have no responsibility whatsoever for a plaintiff's disease.[11] Yet, they are sued, not because asbestos fibers from their products were inhaled by plaintiffs – indeed

the levels of exposure are de minimis at most – but because they now fill the gaps left by so many bankrupt thermal insulation manufacturers.[12] And unlike the tort cases of decades ago, the asbestos lawsuits filed today are recruited by national feeder firms who are willing to pay exorbitant sums for advertisements aimed at capturing every single diseased worker.[13] In short, the enormity of the verdicts and settlements of the twenty-first century have made asbestos litigation less a professional endeavor than a big business conducted by lawyers with an eye focused more on the windfall sums available as fees than the integrity of the judicial system.

## Existing Statutes And Judicial Precedents Of The Last Century Are Not Equipped To Fairly Account For The Billions Of Dollars Available Outside The Civil Justice System

Inselbuch relies on a dated perspective of allocation of fault that is no longer appropriate in this twenty-first century lawsuit climate.[14] He generally condemns the tort reformers for their part in the elimination of the rule of joint and several liability.[15] But the authors' tort history ignores the fact that asbestos defendants are not true joint tortfeasors, either in law or in fact.

At common law, the original meaning of a "joint tort" was that of vicarious liability for concerted action.[16] All persons who acted in concert to commit a trespass, for example, in pursuit of a common design were held liable for the entire result. In such a case there was a common purpose with mutual aid in carrying it out. In other words, there was a joint enterprise so that "all coming to do an unlawful act, and of one party, the act of one is the act of all. . .being present."[17] Each was therefore liable for the entire damage done.

Since there could be no joinder in the absence of concerted action, concurrent but independent wrongdoers were not confused with joint tortfeasors. Under the more liberal American rules of joinder, however, as a matter of judiciary economy, defendants whose negligence concurred to produce a single result were allowed to be joined in one action.[18] By careless usage, they have been called joint tortfeasors when in reality they are not.[19]

One direct result of this concept of joinder has been to impose liability for the entire damages upon any one defendant, by the rigid enforcement of the common

law rule that a verdict for one must be returned against all those who are found liable in the joint action. This rule, which developed in cases of concerted action, was reasonable where the act of one was considered the act of all and where there existed no rational basis to permit the jury to apportion damages.[20] But it produced unfair results when joinder was permitted only as a matter of convenience — as in asbestos cases — and especially where it is clear that *not all* of those who are necessary parties to the complete determination of the issues involved are liable for the same damages.[21] This type of loss allocation was profoundly unfair to defendants.[22]

Recognizing the unfairness of allocating the entire amount of damages to a far less culpable defendant, legislatures have in recent years widely altered the doctrine of joint and several liability in most jurisdictions (and abolished it altogether in a few states) due to the rise of comparative fault and apportionment.[23] In asbestos cases, in particular, the rapid spread of apportionment has been a welcome response to the vast disparity of the universe of products and defendants, the soaring amounts of damage awards, and the perceived inequity in making any one defendant liable for more than its own share of responsibility for an injury. In short, asbestos litigation, like other tort litigation, has evolved in such a way that it is punitive and unjust to apply the principles of joint and several liability to the solvent defendants in today's personal injury lawsuits.

## Trusts Are Not Equivalent to Settled Defendants in the Tort System

Inselbuch's arguments are also influenced by his overriding view that tort reform is unnecessary,[24] a view shared by the vast majority of plaintiffs' tort lawyers, many of whom have amassed enormous wealth as a result of the contingency fee system and the seven-figure verdicts that are common in this civil litigation. In tandem with his theme that tort reform is uncalled for and lamentable, Inselbuch insists that "asbestos trusts are not affecting the tort system"[25] and that the trusts are functionally equivalent to settled defendants in any other tort case.[26] Using this comparison, the authors justify the confidentiality of trust practices and payouts and assert that all communications should be subject to the settlement privilege.[27] Plaintiffs' lawyers routinely characterize the trusts as private entities that have assumed the liabilities of their pre-bankruptcy predecessors, and they argue that disclosure obligations

should be the same as for settling defendants in the tort system.[28] By assuming that the asbestos trust payments are tantamount to settlements, the plaintiffs can continue to resist disclosure of the information sought by defendants. This equivalency concept, which is fundamental to the authors' opposition to legislative transparency reform, clearly misses the mark.

The trust claims, and the payments resulting therefrom, are *not* the same as settlements with co-defendants and should not be treated as such. In a traditional tort suit the settlement privilege exists to prevent statements made in connection with negotiations from being used at trial, in order to promote free and frank discussions without the prospect that such admissions can be used against a party at trial.[29] But that privilege is neither necessary nor appropriate where the amounts of most trust payments are fixed by schedule and where the claim forms more closely resemble a complaint than a bargained-for agreement.[30] In this context, disclosure of claim forms cannot interfere with open discussions any more than filing a complaint can affect settlement in a tort case. A standard application made online by a plaintiff to a bankruptcy trust bears no resemblance to the negotiation process that results in an agreement. A plaintiff simply files and shortly thereafter receives cash.[31] In fact, federal and state courts have routinely held that claims submitted to asbestos bankruptcy trusts are discoverable with respect to work history, job duties, evidence of asbestos exposure, and medical history[32] — the very information that defendants are seeking. While some courts have drawn a distinction between claim submissions and settlement offers in individual review cases, this data is not as critical to defendants.[33]

There exists another significant consideration that is glossed over by the authors in their defense of the settlement privilege for trust claims. Absent the privilege, it is far more difficult for a plaintiff to deny or disclaim exposure to a trust's predecessor's products in the tort case. Despite plaintiffs' insistence that exposure can and should be proven in other ways, there is no substitute for a victim's testimony identifying a particular product. Juries are profoundly influenced by an asbestos plaintiff's testimony (even if by deposition). No matter how thorough and sophisticated a defendant's presentation of conflicting evidence, outright denials of product exposure are difficult to overcome. The testimony of a plaintiff who rejects even the possibility of exposure

to a particular product, or who forgets or does not identify a product, can be persuasive and powerful. When actual proof of exposure does not come directly from the plaintiff, but has to be established by undermining the plaintiff's credibility, or by extraneous or circumstantial means, the fact-finding function of the jury is compromised.

Inselbuch contends that the defendants' legislative reform efforts that eliminate confidentiality are destroying this "longstanding rule of evidence"[34] and "upend[ing] it"[35] in a way that introduces a significant and intended disparity in the treatment of trusts to other settling parties, resulting in what he terms "an arbitrary and discriminatory result."[36] But Inselbuch nowhere explains how the rationale for the privilege is even remotely applicable to a trust payout for which neither negotiations nor discussions are required. Nor does he define what he means by an arbitrary and discriminatory result. It seems his fear is that if juries hear about the totality of a plaintiff's exposures to asbestos they will reach fair results and apportion fault to the historically most culpable companies.

## Plaintiffs' Insistence That their Claiming Practices Are Within the Letter Of The Law Does Not Pass The Smell Test

The authors of the *The Irony of Tort Reform* article criticize a few examples of cases mentioned in several defense articles. These cases were singled out to illustrate the disappearance of exposure evidence following an asbestos manufacturer's bankruptcy filing. The "Irony" authors take great pains to explain in detail how it is that plaintiffs and their counsel were honest and above board in those cases.[37] To do so, the authors explain how a plaintiff legitimately could not be expected to have remembered the identities of the manufacturers of thermal insulation, or even have known them in the first place. They bristle at the "suppression of evidence" label used to describe their claiming behavior.[38] Accepting Inselbuch's version and rationalization of the process may, at first blush, explain the inconsistencies, at least technically, but his justification would not pass muster under even the most lenient legal standard.

The authors explain that plaintiffs cannot recall or identify the manufacturers of the insulation materials to which they may have been exposed because the nature of the products was such that a label or imprint of the manufacturer did not usually appear on the material

itself.[39] In contrast, items such as gaskets, brakes, clutches and joint compound frequently contained logos or imprints, or were packaged in containers identifying their source. In light of these differences, the ability to remember these other non-insulation products enables plaintiffs to name them in lawsuits, while they are not as easily able to identify thermal insulation companies such as Johns Manville.[40] And, plaintiffs' counsel maintain that they do *not* need the plaintiffs to positively identify exposure to a bankruptcy trust product because the trust claim forms do not require it.[41] Trust claims, instead, typically rely on presumptive exposure criteria such as lists of manufacturing sites where the trusts concede their products were in use.[42] In many cases, all that is required is an attestation that a plaintiff worked at a particular site in a certain occupation at a specified time period. No specific product identification is required.[43]

While all of that may be true, what does it say about an individual, aided by experienced counsel, who is willing to accept large payments from a company that is ostensibly compensating him, while at the same time that individual — at least for purposes of the tort litigation — asserts that the same company was not liable for his injuries? Such claiming behavior is nonetheless suspect and it is particularly egregious in the face of heightened measures by these attorneys to guard confidentiality and increase secrecy in the trusts. If the "suppression of evidence" description of this conduct is offensive, or if the label truly does not fit, it is not because plaintiffs have no way of knowing the thermal insulation products to which they were exposed. Aided by counsel, their memories can be jogged to name these suppliers in the same way that counsel is now able to caution or "coach" them to avoid any mention of these same bankrupt company's wares.[44] The evidence necessary to prove exposures is just as readily available to a plaintiff's lawyer as it is to the defendants. It is far more expedient, however, for plaintiffs' counsel to encourage their clients' selective *lack* of memory than it is to assist them in actually recalling the names of these products.[45] And, not surprisingly, these products were readily remembered and identified by plaintiffs when their manufacturers were still solvent.

## Defendants Are Not Using Trust Claim Forms As Substitutes for Proof at Trial

Inselbuch repeatedly asserts that, by supporting these legislative reforms, defendants are seeking to redefine

the plaintiff's trust claims as evidence of exposure that would be sufficient to meet the evidentiary standards imposed in the courtroom.[46] The authors therefore view the defendants' quest for greater transparency of trust activity as motivated, not by a need for basic relevant information, but by a desire to use the trust claims in lieu of sustaining their burden of proof at trial, in an effort to reduce their own liability.[47]

This argument would make more sense if the courts themselves would allow defendants in asbestos cases to prove the bankrupt's responsibility simply by introducing the trust claims and allowing a jury to apportion fault accordingly. But courts across the board have held that the threshold showing for trust claims is far less exacting that what is required for establishing tort liability,[48] and they realize that none of the trusts require the standard of proof imposed by a court in a civil trial.[49]

These legislative reform efforts upon which defendants have embarked are *not* intended to provide an easy way around building a case for contribution against former manufacturers who are now bankrupt. Nor do the defendants even suggest that a trust claim alone is admissible evidence of exposure sufficient to meet their burden of proof in a tort case. What they do recognize — and accurately so — is that these trust documents include clearly relevant information about a plaintiff's asserted exposures, work history, and medical condition, all of which are directly at issue in the litigation.[50] These factual statements, or admissions by a party, should therefore be discoverable. In that way, defendants will have the ability to impeach the credibility of a plaintiff who has no memory or recollection of a particular product, or who testifies that he never knew the name of the manufacturers in the first place, but willingly files for and accepts payments from a trust that stands in that insolvent manufacturer's place to compensate victims who have been injured by exposure to its products.

The authors' suggestion that the state laws are shifting defendants' responsibilities by requiring plaintiffs to do the defendants' work for them, and assist them to build a case against other manufacturers in order to avoid their own responsibility, ignores the realities of the trial process. None of these statutes, either those enacted or those proposed, dictate how much weight a jury should give to various types of

evidence nor do they eliminate the duty of a defendant to prove its case.[51]

Notwithstanding the authors' distorted viewpoint of defendants' motives, the primary objective of all of these legislative transparency reforms is to restore honesty and integrity to asbestos tort litigation by eliminating the incentives to tailor the plaintiffs' memories—and their testimony—to maximize recoveries from the solvent defendants in the personal injury cases. If there is a possibility that these deceptive practices will be exposed, along with the attorneys who engage in them, the legislation is not, as the authors claim, unnecessary tort reform but fundamental to the proper functioning of our trial courts. In fact, these laws may ultimately be the only real deterrent to illegitimate claims. To be sure, the incentive to deny exposure diminishes greatly when the possibility of impeachment at trial is ever present.

From the defendants' perspective, the ultimate goal of state legislation is to provide juries with access to information that would ordinarily be produced in discovery, were it not for the trust procedures that scrupulously guard the secrecy of trust claims information and make access so difficult.[52] This information is essential for defendants to have the full and complete picture of all of a plaintiff's exposures and sources. In that way, a jury will then have a plaintiff's total exposure history, not just the bits and pieces that plaintiffs choose to reveal.

## Contrary to the Authors' Judgment, Much Has Changed in This Litigation

The authors' blanket pronouncement that "nothing about [defendants'] legal position has changed"[53] is a brazen misstatement that is particularly troubling in the face of overwhelming evidence and studies characterizing this litigation as transformative and identifying the reasons for its susceptibility to change during the past five decades or so.[54]

To the contrary, asbestos litigation has been in a constant state of evolution for years. It began with suits involving individuals with significant occupational exposures to friable insulation in factories, his now morphed into cases involving individuals with only minimal or random exposures to non-friable consumer products, and more recently it is targeting the owners of residential settings or work premises. During the time frame that the trust system emerged as a significant

source of plaintiff compensation, substantially all of the trusts became more secretive concerning the claim level information necessary to study their operations in detail. Through modifications to the TAC's, the trusts now include provisions designed to prevent tort defendants from accessing exposure evidence.[55] Trusts generally do not coordinate with other trusts and their procedures are designed to provide ease of payments without the need for exacting proof.

In the same period, plaintiffs' testimony about the types and brands of products they remember working around has evolved to fit the changing circumstances.[56] In the immediate aftermath of the bankruptcy wave of the early 2000's, plaintiffs and their witnesses stopped identifying exposures to asbestos-containing thermal insulation and refractory products of top-tier companies, and typically began to name solvent entities who were formerly peripheral defendants, if at all, and who generally often produced low-dose chrysotile products.[57] These peripheral defendants are also the same companies that may have had no means of access to decades-old documents that would allow them to refute claims that their products were present at a particular site.

## Plaintiffs Have Complete Control Over Whether Trial Delays Result from Statutory Reform

Finally, Inselbuch complains that trust claim disclosure laws are unfair to plaintiffs because they build into their procedures opportunities for defendants to *delay* the trials and their ultimate recovery of damages. The statutes do generally include a provision giving courts the authority to issue a stay if a defendant shows that one or more trust claims have been deliberately delayed in order to conceal mention of that trust's predecessor as a possible source of exposure.[58] Inselbuch characterizes this practice as an opportunity for defendants to "effectively delay trials while they argue about required trust filings."[59]

The short answer to this argument is that these statutes will never result in unnecessary trial delays if plaintiffs play by the rules and timely file all of their trust claims. The provision is only built into the laws as a mechanism for judges to use as a deterrent to anyone who refuses to provide the disclosures. And while Inselbuch blithely suggests that a plaintiff "may have legitimate reasons not to pursue a trust claim until after the trial of his or her tort case,"[60] none of those "reasons" are identified, probably because they are more often than not

associated with providing counsel with some measure of legitimacy in the tort case, while also disavowing any exposure to a trust predecessor's products. Since it is inconceivable that any plaintiff would wish to delay the receipt of funds from a trust (particularly since trust payments typically go down over time) the authors' "reasons" remain a mystery. Ultimately, a plaintiff who files all of his expected trust claims early in the case, will never have to worry about delay.

## The Shortfall In Plaintiffs Recovery of Damages Is Not Attributable to the Solvent Defendants

The authors assert that the designed effect of the state laws that are being enacted or introduced is to make more of the burden of the asset insufficiencies fall on plaintiffs rather than on the remaining tortfeasors.[61] Aside from the very real disparities between the insulation manufacturers of past decades and the low dose peripheral manufacturers of today, this argument overlooks the curious phenomenon that these "remaining tortfeasors" have only surfaced as lead defendants in the last two decades after the wave of bankruptcy filings. In fact, many of today's lead defendants enjoyed years or decades of success in the tort system, with cases against them either dismissed or settled at amounts far less than their transaction costs. These same companies have increasingly become major targets in the cases of today. They are sued as replacements for the manufacturers who are now in bankruptcy. All of this is being accomplished by plaintiffs' attorneys so as to keep this highly lucrative lawsuit enterprise alive.

As more companies seek bankruptcy protection, the remaining defendants come under greater financial pressure and the funds available for compensation are depleted to a point where they are closer to exhaustion.[62] But the responsibility for this asset shortfall is not the fault of the solvent defendants nor of the states who have enacted legislation reform.

The prospect (or reality) that trust claimants are able to obtain payments from this multi-trust thirty billion dollar enterprise, with funds available just for the asking—without oversight or exacting management—will ultimately deplete resources available to pay legitimate claims in the future. The trusts have already had to reduce considerably the percentages of their payouts.[63] As they now exist, trusts encourage the advancement of individual self-interests ahead of collective long-term demands.[64] As bankruptcies continue to mount and

unchecked payouts continue to exceed projections, it is the future claimants who will be most deprived. And some of today's claimants have already experienced reductions, not because of tort reform, but as a result of the unfettered claiming practices of the past where "first come, first served" was the order of the day.[65] This depletion of trust assets is creating a "shortfall" over which the solvent defendants have no control.[66] Instead, the dissipation of these funds can be attributed to questionable claims of the plaintiffs and their attorneys, who have no real incentive to protect future claimants.[67]

What is also frequently missing from all of these discussions about the dwindling amounts of compensation that plaintiffs receive, and also absent from Inselbuch's lengthy paper, is any mention of just how much of the total recovery—both from tort litigation and from trust payouts—is actually distributed to the injured victims, after their attorneys have first taken their share. Most attorneys are reluctant to acknowledge publicly the extent of the contingent fee share that they recover, even though this litigation is now virtually risk-free and managed with assembly-line precision. In the final analysis, it may well be that the amount of money that the plaintiffs ultimately receive from those companies that have "sickened and maimed" them actually pales in comparison to the windfall amounts that end up in the coffers of their attorneys. This considerable component of what Inselbuch terms a "shortfall" can in no way be attributable to the defendants.

## Conclusion

Laws that seek to regulate the timing of trust claims and enhance transparency between the bankruptcy trusts and the tort litigation systems are not intended to shift defense burdens nor are they a means for defendants to avoid legal liability. They are designed to restore honesty, openness, and integrity to the asbestos compensation framework that has for too long been susceptible to manipulation and duplicity.

The disappearance of evidence of exposure from bankrupt entities has placed more of the burden on those less or only nominally culpable — and nothing is more inherently unfair than forcing a party to pay more than its fair share. Defendants agree that plaintiffs should receive fair recovery from those who are responsible, but not from stand-ins that are sued to ensure the longevity of this litigation.

In the current environment, the tort and trust systems exist as parallel sources for personal injury awards that do not intersect or share data. The trusts are protected by provisions that require them to treat claim submissions and payments as confidential settlements, which facilitates gamesmanship and distrust. It is relatively easy, then, for plaintiffs and their counsel to assert one factual scenario in one forum and an inconsistent or contradictory one in another. While the trusts and their advisory committees may be comfortable with ignoring these inconsistencies, the justice system in this country cannot afford to tolerate such practices when they threaten the integrity of our courts and erode public confidence in our judicial system.

---

## Endnotes

1. Elihu Inselbuch & Andrew J. Sackett, *The Continuing Irony of Tort Reform*, 31-15 Mealey's Litig. Rep.: Asbestos 19 (2016).

2. *In re Garlock Sealing Techs., LLC*, 504 B.R. 71, 86-87 (Bankr. W.D.N.C. 2014); *Kananian* v. *Lorillard Tobacco Co.*, No. CV 442750 (Ohio Ct. C.P. Cuyahoga Cnty 2007); *Warfield v. A.C. & S, Inc.*, No. 240600460 Consolidated Case No. 2409000163, Jan. 11, 2011 (Mesothelioma Trial Group M112); U.S. Chamber Inst. for Legal Reform, *The Waiting Game: Delay and Non-Disclosure of Asbestos Trust Claims* (Dec. 2015); Thomas M. Wilson, *Institutionalized Fraud in Asbestos Bank. Trusts.* 29 Mealey's Litig. Rep.: Asbestos at 7; Victor E. Schwartz & Cary Silverman *The Case in Favor of Civil Justice Reform*, 65 Emory L.J. Online 2065, 2079 (2016); Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 Tul. L. Rev. 1071 (2014); Peggy Ableman et al., *A Look Behind the Curtain: Public Release of Garlock Bankruptcy Discovery Confirms Widespread Pattern of Evidentiary Abuse Against Crane Co.*, 30:19 Mealey's Litig. Rep.: Asbestos 1, 1.

3. *The Continuing Irony of Tort Reform, supra* at 2.

4. The broad data underlying Judge Hodge's conclusion in the *Garlock* bankruptcy case, *In re Garlock Sealing Technologies, LLC, supra*, wherein the court concluded that Garlock's pre-bankruptcy litigation history was "infected by the manipulation of exposure evidence by the plaintiffs and their lawyers." The robust data

compiled in the *Garlock* bankruptcy included historical case files, plaintiff law firm disclosures, asbestos trust discovery and prior bankruptcy voting ballots. These data were made available to the public in February and May of 2016.

5.   *The Continuing Irony of Tort Reform, supra* at 2.

6.   *Id.* at 1-3.

7.   Editorial, *Lawyers Torch the Economy*, Wall St. J., Apr. 6, 2011, at A14; *see also* Patrick M. Hanlon & Anne Smetak, *Asbestos Changes*, 62 N.Y.U. Ann. Surv. Am. L. 525, 556 (2007) ("The surge of bankruptcies in 2000-2002. . .triggered higher settlement demands on other established defendants, including those attempting to ward off bankruptcy, as well as a search for new recruits to fill the gap in the ranks of defendants through joint and several liability."); Stephen J. Carroll et al., *Asbestos Litigation xxiii* (RAND Corp. 2005) ("When increasing asbestos claims rates encouraged scores of defendants to file Chapter 11 petitions. . .the resulting stays in litigation. . .drove plaintiff attorneys to press peripheral non-bankrupt defendants to shoulder a larger share of the value of asbestos claims and to widen their search for other corporations that might be held liable for the costs of asbestos exposure and disease."); Susan Warren, *Asbestos Suits Target Makers of Wine, Cars, Soups, Soaps*, Wall St. J., Apr. 12, 2000, at B1 (quoting New York attorney James Early, whose firm specializes in asbestos litigation).

8.   S. Todd Brown, *Bankruptcy Trusts, Transparency, and the Future of Asbestos Compensation* 23 Widener L.J. 299, 319 (2013).

9.   Charles Bates et al., *The Naming Game*, 24:15 Mealey's Litig. Rep.: Asbestos 1, 4 (Sept. 2, 2009); *see* Congressional Budget Office, The Economics of U.S. Tort Liability: A Primer 8 (Oct. 2003).

10.  *See, e.g., In re Asbestos Litig.*, 911 A.2d 1176, 1181 (Del. Super. May 9, 2006) ("[I]t is generally accepted in the scientific community and among government regulators that amphibole fibers are more carcinogenic than serpentine (chrysotile) fibers."), *cert. denied*, 2006 WL 1579782 (Del. Super. June 7, 2006), *appeal refused*, 906 A.2d. 806 (Del. Super. June 13, 2006); *Bartel v. John Crane, Inc.* 316 F. Supp. 2d. 603, 605

(N.D. Ohio 2004) ("while there is debate in the medical community over whether chrysotile asbestos is carcinogenic, it is generally accepted that it takes a far greater exposure to chrysotile fibers than to amphibole fibers to cause mesothelioma."), *aff'd sub nom. Lindstrom v. A.C. Prod. Liab. Trust*, 424 F.3d 488 (6th Cir. 2005).

11.  *See* Victor E. Schwartz & Leah Lorber, *A Letter to the Nation's Trial Judges: How the Focus on Efficiency Is Hurting You and Innocent Victims in Asbestos Liability Cases*, 24 Am. J. Trial Advoc. 247, 261-62 (2000); *Joint E. & S. Dists. Asbestos Litig.*, 129 B.R. 710, 747–48 (E. & S.D.N.Y. 1991) (stating that "[a] newer generation of peripheral defendants are becoming ensnarled in the litigation" as plaintiffs' lawyer seek "to expand the number of those with assets available to pay for asbestos injuries" – even though "[t]he extent of liability, possible defenses and value of the claims against these new defendants is unknown"); *see also* Commentary, Sara Warner, *Asbestos Documentary Spotlights Need for New Victims' Voice*, Huffington Post, http://www.huffingtonpost.com/2016/12/20.

12.  *See, e.g.,* Mark Behrens, *Disconnects and Double-Dipping: The Case for Asbestos Bankruptcy Trust Transparency in Virginia*, U.S. Chamber of Commerce Inst. for Legal Reform, Dec. 2016.

13.  *See* Barry Schwartz, *Mesothelioma, Asbestos, Annuity: Googles' Most Expensive Keywords,* Search Engine Land (Nov. 9, 2012); *see also,* Charles Bates et al., *The Naming Game,* 24:15 Mealey's Litig. Rep.: Asbestos 1,4 (Sept. 2, 2009); New Media Strategies, *The Plaintiffs' Bar Goes Digital : An Analysis of the Digital Marketing Efforts of the Plaintiffs' Attorney and Litigation Firms* at 3 (Jan. 2012); *see also* March 13, 2013 FACT Act Hearing, Testimony of Marc Scarcella, pp. 12-13 ("The efficient manner in which trusts. . .pay claims has produced over $14 billion in payments between 2006-2011. Not surprisingly, this level of compensation has incentivized an increased level of claimant solicitation through focused advertising campaigns that utilize television commercials and internet marketing to potential claimants.").

14.  *The Continuing Irony of Tort Reform, supra* at 2, 3.

15.  *Id.* at 3.

16. W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS §46 (5th ed. 1984).

17. *Sir John Heydon's Case*: 1613, 11 Co. Rep. 5, 77 Eng. Rep. 1150.

18. WILLIAM L. PROSSER, LAW OF TORTS 298 (4th ed. 1978).

19. *Id.*

20. *Id.*

21. *Id.*

22. *Id.*

23. Schwartz & Silverman, *supra*, at 2074 ("These states include Alabama, Delaware, Pennsylvania, District of Columbia, Maine, Maryland, Massachusetts, Rhode Island, North Carolina and Virginia"); *see also "Joint and Several Liability Reform" Am. Tort Reform Ass'n., www.atra.org/issues/joint-and-several.liability.rule. reform.*

24. *The Continuing Irony of Tort Reform, supra* at 2, 3.

25. *Id.* at 3.

26. *Id.* at 1.

27. *Id.* at 3-5.

28. *Id.*

29. Fed. R. Evid. 408.

30. S. Todd Brown, *Bankruptcy Trusts, Transparency and the Future of Asbestos Compensation*, 23 Widener L.J. 299 (2013); *see also Ferguson v. Lorillard Tobacco Co.*, 2011 U.S. Dist. Lexis 135183, at *3 (E.D. Pa. Nov. 22, 2011); *Volkswagen of Am., Inc. v. Superior Court*, 43 Cal. Rptr. 3d 723, 730 (Cal. Ct. App. 2006).

31. Thomas M. Wilson, *Institutionalized Fraud in Asbestos Bankruptcy Trusts*, 29 Mealey's Litig. Rep.: Asbestos7:12; S. Todd Brown, *How Long is Forever This Time? The Broken Promise of Bankruptcy Trusts*, 61 Buff. L. Rev. 537 (2013).

32. *See, e.g., In re N.Y. City Asbestos Litig.*, 2012 NY. Misc. Lexis 5646 at *9; *Andrucki v. Aluminum Co. of Am.* No. 190377/10 (July 27, 2011) (Shulman, J.); *Drabczyk v. Amchem. Prods., Inc.*, No. 1583/2005 (N.Y. Sup. Ct. Erie Cnty, Jan. 18, 2008) (Lane, J.); William P. Shelly et al., *The Need for Further Transparency between the Tort Systems and Section 524 (g) Asbestos Trusts, 2014 Update*, 23 Widener L.J. 675, 705-09.

33. *Sheppard v. Liberty Mut. Ins. Co.*, 2017 WL 318470, at *3 (E.D. La. Jan. 23, 2017); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.*, 2012 WL 628493, *4 (D. Md. Feb. 24, 2012); *Ferguson v. Lorillard Tobacco, Co., Inc.*, 2011 WL 5903453, *1 (E.D. Pa. Nov. 22, 2011).

34. *The Continuing Irony of Tort Reform, supra* at 2, 5.

35. *Id.*

36. *Id.*

37. *Id.* at 6.

38. *Id.*

39. *Id.*

40. *Id.* at 6.

41. Brown, 23 Widener L.J. at 317 ("Asbestos trusts are designed to settle claims quickly.").

42. The Continuing Irony of Tort Reform *supra* at 2, 6; *see* U.S. Gov't Accountability Office, GAO-11-819, *Asbestos Injury Compensation: The Role and Administration Trusts* 3 (Sept. 2011); *see also* Lloyd Dixon & Geoffrey McGovern, *Asbestos Trusts and Tort Compensation* 2 (Rand Corp. 2011).

43. *Id.*

44. Brickman, 88 Tul. L. Rev. at 1094-1096 (discussing the litigation screening practices of a leading plaintiffs' asbestos firm, Baron & Budd, as revealed in a 20-page internal memo titled, "Preparing for Your Deposition," that served to instill false recollections in asbestos claimants).

45. *Id.*

46.  *The Continuing Irony of Tort Reform, supra* at 2, 4.

47.  *Id.*

48.  *See Symposium Asbestos Bankruptcy Trusts and Their Impact on the Tort System,* 7 J.L. Econ. & Pol'y 281, 297 (2010) (comments of Nathan Finch); *see also* Pls.' Joint Mot. For a Practice Order Regarding Settlements and Bankrp. Claims at 1, *In re Asbestos Litig.,* No. 96-9999, at 2 (R.I. Sup. Ct. Dec. 28, 2011) (emphasis in original) ("Many of the asbestos bankruptcy trusts do not require proof of exposure to a company's products. Rather, some trusts base their offer on medical diagnosis alone, while others care about an individual's occupa-tion or job location. *None of the trusts require the stan-dard of proof that is used by a court in a civil trial.*").

49.  *Id.*

50.  Brown, 23 Widener L.J. at 324-25; *Negrepont v. A.C.& S. Inc.,* No. 120894/01 (NY. Sup. Ct. Dec. 11, 2003).

51.  *See, e.g.,* Ohio Rev. Code, §§ 2307. 951 et seq.; Utah Code Ann. §§ 78b-6-2001 et seq.; Tex. Code Ann. 90.051 et seq.; Okla. Stat. Title 76, § 81 et seq.; 2015; Ariz. Rev. Stat. Ann. § 17-782; W. Va. Code §§ 55-7F-1 et. seq. ; Wis. Stat. Ann. § 802.025; Tenn. Code § 29-34-601.

52.  Brickman, 88 Tul. L. Rev. at 1100.  As of 2011, 65 percent of asbestos trusts have modified their TACs to include provisions designed to prevent tort defendants from accessing exposure evidence.

53.  *The Continuing Irony of Tort Reform, supra* at 2.

54.  *See The Need for Transparency in the Asbestos Trusts;* Testimony of Mark Behrens, before the United States Senate Judiciary Committee, Feb. 3, 2016. pp 1-5; Stephen J. Carroll et al., *Asbestos Litigation xxiii* (RAND Corp. 2005); Victor Schwartz & Mark Beh-rens *Asbestos Litigation: The Endless Search for a Solvent Bystander,* 23 Widener L.J. 59 (2013); *In Re Garlock Sealing Tech., LLC,* 504 B.R. 71, 96 (W.D.N.C. Bank. 2014); Brown, 61 Buff. L. Rev. at 545-46; Brickman, 88 Tulane L. Rev. at 1071-83.

55.  Most trust distribution procedures (DSPs) include a "confidentiality" provisions such that a valid subpoena for the trust to produce claim information must be issued by the Bankruptcy Court.  The TACs include language that authorizes claimants to assert exposure histories that are different from those alleged in the tort cases.  They also contain "sole benefit provisions" which state that evidence submitted in support of trust claims "is for the sole benefit of the PI Trusts, not third parties or defendants in the tort system." *See, e.g., Owens/Corning Fibreboard Asbestos Personal Injury Trust Distribution Procedures, supra.* The trusts' con-fidentiality and sole benefit provisions may simplify claim processing but they also create opportunities for avoiding detection when claim forms conflict with sworn representations elsewhere.

56.  *See* Lloyd Dixon & Geoffrey McGovern, *Bank-ruptcy's Effect on Product Identification in Asbestos Personal Injury Cases* (Rand Corp. 2015) (finding bankruptcy reduces the likelihood that trust related exposures will be identified by plaintiffs in interro-gatories and depositions); Marc C. Scarcella et al., *The Philadelphia Story: Asbestos Litigation, Bank-ruptcy Trusts And Changes in Exposure Allegations From 1991-2010,* 27:19 Mealey's Litig. Rep.: Asbestos 1, 11 (Nov. 7, 2012) ("The results from the study of the Philadelphia asbestos cases indicate that while exposures to thermal insulation products remain prevalent among today's plaintiff popula-tion, the identification of exposure to those pro-ducts is greatly diminished compared to the claims filed prior to the Bankruptcy Wave that had com-parable (or even identical) exposure histories.").

57.  Brown, 23 Widener L.J. at 322-24.

58.  The RAND Corporation issued a three-part report in 2015 finding that bankruptcy causes a sharp decline in the probability that a firm will be identified in answers to interrogatories and that the effect occurs over time. These changes were characterized as "substantial and statistically significant." Lloyd Dixon & Geoffrey McGovern, *Bankruptcy's Effect on Product Identifica-tion in Asbestos Personal Injury cases* (Rand Corp. 2015).

59.  *The Continuing Irony of Tort Reform, supra* at 2, 40.

60.  *Id.* at 5.

61.  *The Continuing Irony of Tort Reform, supra* at 2, 9.

62. *See* David G. Owen, *Against Priority*, 37 Sw. U.L. Rev. 557, 561 (2008):

Peripheral defendants appear now to be bearing the largest burden of damage assessments in asbestos litigation, but claims against them typically are weaker in terms of causation, apportionment, and defensive challenges to the foreseeability of risk. What all this means is that the aggregate pot of available resources in asbestos litigation appears to be increasingly insufficient to cover the many tens of thousands of new claims, piled on top of hundreds of thousands of existing claims made upon the resource pot each year. Thus, a major aspect of the asbestos problem is one of limited funds.

63. Marc Scarcella & Peter R. Kelso, *A Reorganized Mess: The Current State of the Asbestos Bankruptcy Trust System*, 14:7 Mealey's Litig. Rep.: Asbestos at 2-4, 7 (Feb. 2015) ("11 Trusts have reduced their Payment Percentages more than once since 2009, suggesting that the entire trust system is not suffering from a poor investment strategy or the lingering effects of the stock market recession, but rather higher than projected levels of claim filings and resolutions.")

64. *Id.* at 1,6.

65. *Id.* at 13.

66. *Id.* at 18-19.

67. Brown, 61 Buff. L. Rev. at 578-81. ∎

**MEALEY'S LITIGATION REPORT: ASBESTOS**
*edited by Bryan Redding*
**The Report** is produced twice monthly by



1600 John F. Kennedy Blvd., Suite 1655, Philadelphia, PA 19103, USA
Telephone: (215)564-1788 1-800-MEALEYS (1-800-632-5397)
Email: mealeyinfo@lexisnexis.com
Web site: http://www.lexisnexis.com/mealeys
ISSN 0742-4647

MEALEY'S™ LITIGATION REPORT

# Asbestos

## A Look Behind The Curtain: Public Release Of Garlock Bankruptcy Discovery Confirms Widespread Pattern Of Evidentiary Abuse Against Crane Co.

*by*
*Peggy L. Ableman*
*McCarter & English, LLP*
*Wilmington, Delaware*

*and*

*Peter R. Kelso*
*Marc C. Scarcella*
*Bates White Economic Consulting*
*Washington, DC*

A commentary article
reprinted from the
November 4, 2015 issue of
Mealey's Litigation
Report: Asbestos



LexisNexis·

# Commentary

## A Look Behind The Curtain:  Public Release Of Garlock Bankruptcy Discovery Confirms Widespread Pattern Of Evidentiary Abuse Against Crane Co.

By
**Peggy Ableman,**
**Peter Kelso and**
**Marc Scarcella**

*[Editor's Note: Peggy L. Ableman is a former Delaware Superior Court Judge and now Special Counsel at McCarter & English, LLP in Wilmington, Delaware. Peter R. Kelso, Manager, and Marc C. Scarcella, Principal, are from the Washington, DC office of Bates White Economic Consulting. The views of the authors do not reflect the opinions of McCarter & English, LLP or Bates White Economic Consulting or LexisNexis, Mealey's. Copyright © 2015 by Peggy L. Ableman, Peter R. Kelso and Marc C. Scarcella. Responses are welcome.]*

## Introduction
In February 2015, the discovery data from the Garlock Sealing Technologies LLC ("Garlock") bankruptcy case in North Carolina was released to the public. The significance of this data cannot be overstated. For the first time, any interested party has access to information regarding what claims asbestos plaintiff law firms have filed against bankruptcy trusts for a large sample of historical cases.[1] This data reveals the detailed evidence underlying the ruling by the federal judge in Garlock's bankruptcy case, who found that the long-running asbestos tort has been "infected with the manipulation of exposure evidence" by plaintiff law firms.[2] Thus, the data legitimize the concerns of defendants and insurers over the lack of trust and tort transparency.

For current asbestos defendant Crane Co. ("Crane"), the discovery data shows a similar pattern of systematic suppression of trust disclosures that was documented in the Garlock bankruptcy. Specifically, Crane engaged economic consulting company Bates White LLC to analyze the public Garlock discovery data in relation to Crane cases, from which we observed the following:

- In cases where Crane was a codefendant with Garlock, plaintiffs eventually filed an average of 18 trust claim forms.

- On average, 80% of these claim forms or related exposures were not disclosed by plaintiffs or their law firms to Crane in the underlying tort proceedings.

- Overall, nearly half of all trust claims were filed after Crane had already resolved the tort case.

Such an overall lack of consistent disclosure raises significant due process concerns and highlights the procedural ineffectiveness of current discovery protocols in jurisdictions across the country. Crane engaged former Delaware Superior Court Judge Peggy Ableman to expand upon these legal issues and offer her firsthand professional perspective on the issues of trust transparency and what is necessary for the proper adjudication of asbestos cases.

The following commentary will detail the systematic nature of the suppression of evidence against Crane. We demonstrate the suppression of evidence by comparing the underlying claimant exposure allegations against Crane in the tort system to disclosures of trust claim activity from the public Garlock discovery data.

Several exemplar cases highlight the stark contradictions between the exposure allegations made by plaintiffs and their law firms in tort cases against Crane as opposed to exposure allegations subsequently made against asbestos bankruptcy trusts. The commentary also expounds on due process concerns created by the non-disclosure of evidence and the current rules of the tort and trust compensation systems that enable this current practice of concealment by asbestos plaintiff law firms to continue.

## Garlock Analytical Database

The discovery data that was made public in Garlock's bankruptcy case includes the most robust set of asbestos claim data ever assembled.[3] In bankruptcy, Garlock sought to prove that asbestos personal-injury plaintiffs and their lawyers did not disclose in the tort system numerous exposures to the products of bankrupt companies. Garlock set out to establish this alleged suppression of evidence through discovery by obtaining filing and payment information, voting ballots, and other claim information from dozens of bankruptcy trusts and corresponding trust processing facilities. Garlock asserted that by examining the trust claim activity of the same plaintiffs that sued Garlock in the tort system it could establish the degree to which trust exposure evidence had been suppressed in tort cases it had defended. Ultimately, Garlock was granted discovery to the following data sources:

- **PIQ Data:** Approximately 4,000 responses to the mesothelioma Personal Injury Questionnaire ("PIQ") submitted by plaintiff law firms representing Garlock claimants, plus more than 30,000 supporting documents including deposition testimony, work histories, named defendants' information, and trust claim disclosures.

- **Total Recovery Data:** 845 pending mesothelioma claimants subject to the PIQ were asked to provide a Supplemental Settlement Payment Questionnaire, which included information on the total number and amount of trust payments and the total number and amount of payments received from tort defendants or other settling parties.

- **DCPF Trust Data:** Trust data from the Delaware Claims Processing Facility (DCPF) related to 9,600 mesothelioma claimants who settled with Garlock between 1999 and 2010.

- **Bankruptcy Ballots:** Voting ballots from approximately 30 bankruptcy reorganizations.

Garlock further supplemented the discovery with the following data:

- **Resolved Case Sample:** An exposure analysis on a sample of 1,000 mesothelioma cases that Garlock had resolved in the tort system prior to bankruptcy.

- **Lawsuit Naming Data:** A database of mesothelioma lawsuit defendant naming information compiled by Bates White.

- **Verdicts Data:** A database of mesothelioma verdict data compiled by Bates White.

Garlock and its estimation experts, Dr. Charles Bates and Dr. Jorge Gallardo-Garcia of Bates White, created and assembled the aforementioned information into an analytical database. According to the federal bankruptcy court, "the result was the most extensive database about asbestos claims and claimants that has been produced to date."[4]

The database was crucial to Garlock proving and quantifying the distinction between settlements and legal liability. The data documented systematic suppression of relevant exposure allegations related to reorganized companies and their successor trusts. As a result of that suppression of evidence and its high cost to defend cases, Garlock asserted it had paid more than its legal liability in the tort system. To support that allegation and quantify its impact, Garlock turned to Bates White to distinguish settlement payments made due to legal liability from payments made for other reasons such as the avoidance of litigation costs and the suppression of evidence. The robust trust discovery data facilitated the Bates White estimation of Garlock's legal liability. On Jan. 10, 2014 federal bankruptcy Judge George Hodges found that Garlock's claims history had been "infected with the manipulation of evidence" by plaintiff law firms. And, Judge Hodges accepted Dr. Bates' estimate of $125 million to fund a trust for current and future mesothelioma claimants; an estimate only 10% of the billion-dollar forecasts by the representatives of current and future asbestos claimants.

## Analysis of Plaintiff Law Firm Suppression of Evidence with Regard to Crane

In bankruptcy, Garlock was able to prove the systematic suppression of evidence in the aggregate, over a period of time, and in thousands of cases. However, these findings were for cases filed years earlier and attained only after substantial discovery battles in

federal bankruptcy court. In contrast to bankruptcy, active tort defendants, such as Crane, lack access to this type of discovery in a timely manner. The current rules allow a bankruptcy trust claim to be filed three years after diagnosis. As a result, plaintiff law firms in many instances file trust claims after the resolution of their tort claim, which deprived Garlock, and now deprives Crane, of a complete record of the claimant's exposures. Defendants contend that establishing the complete and full exposure record for a claimant is critical to their defenses regarding whether they are liable (i.e. whether their products constitute a substantial contributing factor) and, if liable, the apportionment of damages among alternative exposures. Although this problem has existed since the Johns Manville bankruptcy in 1982, it became more pronounced when numerous asbestos defendants filed for bankruptcy in the early 2000s and the successor trusts to those bankrupt companies emerged in the late 2000s with substantial funding to pay current and future asbestos claims. In fact, since 2006 emerging trusts have been funded with nearly $30 billion, and have paid more than $18 billion to claimants through 2014.[5]

Though the bankruptcy trust system has been a substantial source of plaintiff compensation since the late 2000s, the lack of trust transparency and procedural integration with the tort system has resulted in an inconsistent level of timely trust claim disclosures in underlying tort lawsuits. Now, for the first time, the Garlock discovery data gives Crane and other defendants a robust data source from which to measure the level and impact of trust non-disclosures in the years leading up to Garlock's bankruptcy filing in June 2010. As such, the following analyses measure the level of evidentiary suppression in cases filed against Crane between 2007 and 2011; a historical period that overlaps with the emergence of a prominent trust compensation system prior to Garlock's bankruptcy. The analyses apply the same methodology regarding document review and data extraction protocols that were utilized in the Garlock bankruptcy and adopted by the federal bankruptcy court.

## Crane case match to public Garlock discovery data

From 2007 through 2011, Crane resolved 1,844 mesothelioma lawsuits that could reliably be matched to the public Garlock discovery data. The following summarizes the overlap between the 1,844 matched cases and the various sources of Garlock discovery data:

- **PIQ Data:** 571 of the 1,844 cases matched to a PIQ.
- **DCPF Trust Data:** 1,078 of the 1,844 cases matched to the DCPF Trust Data.
- **Bankruptcy Ballots:** 1,275 of the 1,844 cases matched to one or more bankruptcy ballots.

The PIQ data shows that an average of 18 trust claims per plaintiff were filed in Crane cases that matched to the Garlock data as of the date of the respective Garlock discovery responses. The Garlock discovery data also provide information regarding the timing of trust claim submissions and payments relative to Crane's tort resolution.[6] According to the Garlock discovery data, when compared to the Crane resolution date, nearly half (47%) of the trust claim submissions were filed by plaintiff law firms after Crane had resolved the case in the tort system.

## Suppression of Evidence in Crane Cases

We independently quantified the magnitude of the suppression of evidence in Crane cases by comparing the data revealed to Crane in the tort system with the Garlock discovery data. We drew a random sample of 100 cases from the 571 Crane mesothelioma cases that matched to a PIQ in the Garlock bankruptcy.[7] We then reviewed those cases following the protocols developed in the Garlock bankruptcy and ultimately relied upon by Judge Hodges.

Figure 1 summarizes a data comparison between trust-related disclosures made to Crane in the tort system versus those trust disclosures revealed in the Garlock discovery data across the same sample of claims. In the table, asbestos bankruptcy trusts (named for their predecessor companies) are ordered sequentially based on the frequency of disclosure in the Garlock discovery data, which is displayed in the second column. Comparatively, the third column displays the frequency of trust disclosures provided to Crane in the underlying tort cases. Overall, only 18% (267 of the 1,548) of the Garlock discovery data disclosures were revealed to Crane in the tort system— i.e. slightly more than 80% of the trust claims were not corroborated by underlying tort disclosures. As displayed in the final column, Manville is the only trust for which plaintiffs informed Crane of their trust claims and related exposures more than 50% of the time.

**Figure 1:  Trusts with at least 50 claim disclosures in the Crane PIQ sample**

| Asbestos bankruptcy trusts | Frequency of disclosure in Garlock discovery data | Frequency of disclosure to Crane in tort system | % Disclosure to Crane in PIQ Claims |
|---|---|---|---|
| BABCOCK & WILCOX | 78 | 33 | 42% |
| US GYPSUM | 77 | 16 | 21% |
| OWENS CORNING | 76 | 27 | 36% |
| FIBREBOARD | 76 | 10 | 13% |
| ARMSTRONG WORLD INDUSTRIES | 75 | 24 | 32% |
| MANVILLE | 73 | 39 | 53% |
| EAGLE PICHER | 69 | 10 | 14% |
| COMBUSTION ENGINEERING | 68 | 13 | 19% |
| CELOTEX | 66 | 17 | 26% |
| KAISER ALUMINUM & CHEMICAL | 59 | 8 | 14% |
| NATIONAL GYPSUM | 57 | 8 | 14% |
| PLIBRICO | 55 | 6 | 11% |
| AC&S | 52 | 6 | 12% |
| RAYMARK INDUSTRIES | 51 | 2 | 4% |
| **Total for Trusts with > 50 disclosures** | **932** | **219** | **23%** |
| **Total for Sample** | **1,548** | **267** | **18%** |

Figure 2 further illustrates the overall lack of trust disclosures to Crane in the tort system as summarized in Figure 1. Specifically, Figure 2 measures the rate of disclosure for the 100 PIQ cases sampled, for which at least 10 trust claim filings were disclosed as part of the Garlock discovery (72 of the 100). The distribution in Figure 2 shows that 60% of the 72 plaintiffs (43) disclosed trust filings or related predecessor company exposures in underlying tort proceedings less than 10% of the time, and nearly 80% (57) disclosed the information less than 20% of the time.

**Figure 2:  Distribution of trust disclosures in the Crane PIQ sample**



Cases with at least 10 trust disclosures in Garlock Data

## Contradictions in Tort and Trust Exposure Allegations

Judge Hodges' ruling in Garlock cites 15 exemplar cases that highlight the contradiction of evidence lodged against Garlock in the tort system versus the exposure allegations underlying bankruptcy trust claims by those same plaintiffs.[8] Crane was a co-defendant of Garlock in 13 of those 15 cases. The aggregate statistics from the Garlock discovery data show the systematic nature of the suppression of evidence against Crane in the tort system. Below are a few examples of specific cases from the Garlock discovery data that help crystallize the nature of non-disclosure experienced by Crane in the tort system, including one case that was settled (*Moors*) and one case that went to verdict (*Brewer*).

### Gerald Moors v. A.O. Smith Water Products et al.

The case of Gerald Moors is an example of allegations of exposure to bankrupt products being suppressed. After Moors denied exposure to products associated with numerous bankrupt companies, his law firm, Belluck & Fox, subsequently filed claims against the successor trusts for these same bankrupt companies.

On Oct. 22, 2009, Belluck & Fox filed a complaint in the New York City Asbestos Litigation (NYCAL) court on behalf of Moors, naming more than 100 solvent asbestos defendants and alleging Gerald Moors' mesothelioma was caused by his exposure to asbestos products from his career as a plumber and pipe-fitter around the New York city area.[9] According to answers to interrogatories, Moors alleged he was exposed to asbestos at several times and at several locations during his career, including:

- Plumber/pipefitter aboard the General RM Blatchford
- Plumber/mechanic at Ravenswood Powerhouse and other sites in New York City
- Residential and commercial locations in Brooklyn and Queens, NY
- Lead plumber at Beth Israel Medical Center
- Asst. Operating Superintendent, Peter Cooper Village[10]
- Shade-tree mechanic work.[11]

In deposition, Moors concentrated his testimony on his exposure to asbestos containing valves, pumps and boilers.[12] Moors acknowledged that he often removed/repaired/installed asbestos thermal insulation materials during his plumbing and pipefitting duties but could not recall any specific products or manufacturers.[13] The only products of bankrupt companies he could remember were Celotex ceiling tiles and USG joint compound and tape.[14] In fact, Moors testified during deposition that he had never worked with asbestos containing products from 11 now-bankrupt companies including Combustion Engineering, H.K. Porter, Keene, Unarco (UNR), National Gypsum and Owens Corning.[15]

The trial began in NYCAL on Nov. 9, 2010. During opening statements, Moors attorneys severely downplayed any potential exposure he may have had to amosite asbestos stating that "a great majority, if not entirely, Mr. Moors' exposure involves chrysotile."[16] Moors attorneys even went as far as to convince the presiding judge in the case just prior to defense opening statements that the mention of Owens Corning's asbestos insulation product Kaylo by defense counsel would be prejudicial to Moors because Moors never affirmatively said he was exposed to the product.[17]

In contrast to the disclosures in the tort case, the Garlock discovery data tells a different story. In the court-ordered PIQ, Belluck & Fox disclosed 26 claim submissions that were filed on behalf of Moors, of which at least 14 disclosed explicit filing dates subsequent to Crane's settlement, and many of which were to trusts representing the indemnification of predecessor companies that once manufactured, installed, or distributed asbestos-containing thermal insulation products.[18] Moreover, Belluck & Fox filed claims against the bankrupt companies cited above despite Moors' sworn testimony that he did not work with the products from those (now bankrupt) companies.[19] One of those companies was Owens Corning; the same company defense counsel was precluded from mentioning in the trial's opening statements because Moors did not affirmatively claim exposure to Kaylo.

The Ravenswood Powerhouse provides another example of inconsistent exposure allegations between the tort and trust system. In trust filings, Belluck & Fox list the Ravenswood Powerhouse as a site where Moors was exposed to asbestos.[20] Belluck & Fox, however, knew that Moors had denied being exposed to asbestos at Ravenswood in his deposition.[21]

Q: When you were working at the powerhouse sir, was that full-time work?

A: Yes.

Q: Where was the Ravenswood powerhouse located?

A: Burnham Boulevard in Queens I think it is.

Q: And were you employed there as a journeyman mechanic?

A: Yes.

Q: What were your job duties at that site, sir?

A: Installing gas lines for the boilers and the drain lines for the roof drains and storm water drains.

Q: So with respect to the six months that you worked at the Ravenswood powerhouse, sir, do you believe you were exposed to asbestos in any way?

A: No.

The lack of transparency between the tort system and the trust system enables plaintiffs to maintain contradictory exposure profiles. As a result, several trust claims were made on Moors' behalf, in part or in whole, based on his employment at the Ravenwood Powerhouse, even though Moors denied any such exposure in his tort case.

The suppression of evidence in the Moors case is clear. Moors and his counsel suppressed evidence from Crane and 27 other settling defendants by the lack of production of 26 trust claims during the pendency of the case. The suppression persists despite the fact that NYCAL has had rules in place since 1996 mandating the disclosure of trust exposures in standard interrogatories and procedures requiring the production of bankruptcy trust claim forms prior to trial since 2003.[22]

### Chief Brewer v. Alfa Laval Inc. et al.

The case of Chief Brewer exemplifies how the suppression of evidence of bankrupt exposures can affect a jury's allocation of liability in a case that goes to trial. On July 27, 2007 plaintiff law firm Waters & Kraus filed a complaint on behalf of Brewer in Los Angeles, CA Superior Court against 20 defendants who largely manufactured pumps, valves and gaskets for the U.S.

Navy.[23] Brewer alleged that exposure to asbestos as a machinist mate in the forward engine room of the USS Preble from 1961-1965 caused his mesothelioma.[24] Brewer alleged exposure to asbestos from blankets and packing that were put on pumps, gaskets, valves and turbines during work in the engine room; positively identifying the names of eight component-part manufacturers of pumps, valves, gaskets, packing and turbines, including Crane and Garlock.[25] A co-worker additionally testified that he saw Brewer work with Johns Manville dry putty insulation during his work maintaining pumps on the ship.[26]

Brewer further testified that the USS Preble would vibrate "something fierce" on a routine basis during operations, showering the engine room with dust that would fall like "snow" from overhead thermally insulated pipes down to engine-room equipment that Brewer maintained.[27] During deposition and trial, Brewer could not recall any of the manufacturers or suppliers of the thermal pipe insulation.[28]

On May 16, 2008, a Los Angeles jury awarded Brewer $9.7 million in damages and apportioned 50 percent of the liability to the U.S. Navy, 35 percent to 12 valve, pump, turbine and gasket defendants (including Crane), and 15 percent to Johns Manville.[29] Absent product identification by Brewer of the thermal pipe insulation, no liability was allocated to any specific thermal insulation manufacturers or suppliers, except for Johns Manville, based on any of Brewer's repeated thermal insulation exposures. Had such product identification been present, the jury could have allocated liability to the now-bankrupt manufacturers of those products, just as it allocated liability to bankrupt Johns Manville for the dry putty insulation exposures.

In contrast to the disclosures in the tort case and trial, the Garlock discovery data again tells a much different story. The Garlock data reveal that Brewer was able to identify thermal insulation exposure to multiple companies. The DCPF trust data show that beginning six months after the verdict, Waters & Kraus filed claims against asbestos bankruptcy trusts including Armstrong World Industries, Fibreboard, Halliburton, Harbison Walker, Owens Corning, and U.S. Gypsum. Moreover, the data show that six of the trust claims have been paid with one claim pending payment. In addition to the trust claims, the data show that Brewer also cast ballots to vote in the pending (at that time) bankruptcy reorganizations of Pittsburgh Corning, Flintkote and

W.R. Grace. Given that the DCPF facility handles operations for only a limited number of the nearly 50 confirmed trusts, the results of the Garlock data represent only a small subset of the potential trust claims activity of Waters & Kraus on behalf of Brewer.

A California appellate court overturned the Brewer verdict against Crane for reasons unrelated to the then unknown suppression of evidence.[30] Despite the ultimate outcome, the case raises important issues regarding the impact of evidence suppression on the jury's apportionment of liability. In Brewer's case, the fact that Johns Manville was apportioned 15 percent of the liability based on testimony from Brewer's co-worker opens legitimate questions as to how much of the liability may have been allocated to bankrupt thermal insulation companies if those trust claims were produced before, and not *after*, trial.

### The Discovery Process is Significantly Compromised by the Suppression of Exposure Evidence Related to Bankrupt Companies

Essential to the litigation of a personal injury action in our courts of law is the right of all parties to have access to, and knowledge of, all of the facts relevant to the dispute. Rules of procedure require disclosure of all types of evidence that could have an impact upon the ultimate resolution of a case, either by pretrial settlement or by verdict after trial. Availability of only a portion of the facts, or a fraction of the truth, promotes distortion of the fact-finding process.

This extensive suppression of exposure evidence to Crane and other defendants could have been highly probative in the defense of thousands of personal injury actions in this mass tort environment and has undoubtedly tainted the fact-finding function in every court where asbestos cases are litigated. Despite prolonged efforts to restore integrity to this area of the law, either through legislation, case management orders, or procedural rules, the data presented in this paper demonstrates not only the magnitude of the harm that the absence of interface between the tort and trust systems has fostered, but also the urgency of the need for heightened transparency between these dual compensation sources.

The rules of civil procedure generally applicable in state and federal courts are designed to provide full disclosure of all information through the discovery process. But when that evidence is carefully guarded by trust procedures crafted by the same law firms that represent the large majority of asbestos claimants, gaining access to exposure and other vital information has been an expensive, uphill battle. Approximately two-thirds of the asbestos trusts have modified their trust distribution procedures to include provisions designed to prevent tort defendants from gaining access to factual data included in the proofs of claim.[31] Solvent defendants such as Crane must then rely on trial court discovery rules and procedures to obtain this information. Frequently, due to plaintiffs' strategic delays in the filing of trust claims, much of this information does not even exist until after the lawsuit is concluded; a strategy that is aided by a statute of limitations provision adopted by most trusts that allow claims to be filed up to three years from the date of diagnosis without the risk of being time barred for trust compensation.

This significant timing disconnect between the tort and trust systems allows plaintiff attorneys to delay the filing of trust claims until after settlements with tort defendants have been reached, and renders basic discovery procedures in most asbestos courts ineffective because plaintiff attorneys are not required to disclose trust claims that they have not yet filed.[32] In fact, two prominent plaintiff attorneys in Garlock's bankruptcy gave sworn deposition testimony that it is their practice to wait until the tort case has concluded to file bankruptcy trust claims.

*Peter Kraus, Waters & Kraus, Jan. 14 2013 Video Deposition*

"If in my judgment it would benefit the litigation case to delay the filing of a claim, and it was lawful to delay filing the claim, then we would do that."

*Benjamin Shein, The Shein Law Center, Jan. 16, 2013 Video Deposition*

"We file trust claims after the completion of tort litigation."

The discovery process in litigation operates in part by the "honor system," much like the filing of tax returns with the Internal Revenue Service. Counsel are responsible for producing all documents and evidence relevant to the subject matter of a case. Even if the information is ultimately inadmissible, if the information is "reasonably calculated to lead to the discovery of admissible evidence"[33] it must

be disclosed. When it is deliberately withheld as a litigation tactic, the honor system breaks down.

It is particularly important to the companies that are named as defendants in asbestos tort cases to have a complete record of exposure information. They need this information to determine whether a reorganized company's product was partly or wholly responsible for the plaintiff's disease. It also enables them to identify exposure claims that are exaggerated or inaccurate. The facts provide a basis to challenge deposition testimony when plaintiffs frequently fail to recollect product names and they enable defendants to expose self-serving memory losses. For defendants like Crane and Garlock, the discovery process has been greatly distorted because of the widespread suppression of evidence perpetrated by plaintiffs and their law firms, depriving defendants of relevant facts or rendering such facts prohibitively expensive or impossible to acquire.

The suppression of evidence in discovery is further exacerbated for Crane because the specific evidence being concealed from defendants and omitted from the jury's consideration is information regarding the most potent exposures to asbestos. The roster of bankrupt companies and successor trusts includes many large companies that once engaged in the manufacturing, distribution, and installation of thermal insulation products. These thermal insulation products, such as asbestos pipe coverings, presented the greatest asbestos-related risk to exposed workers. A significant majority of today's claimant population, especially if they are alleging exposures from service in the U.S. Navy or other industrial locations, are occupationally exposed to asbestos thermal insulation products.

According to Judge Hodges in his Garlock estimation ruling, "*Garlock's gasket and sealing products exposed people to only a low-dose of less potent chrysotile asbestos and almost always in the context where they were exposed to much higher doses of more potent amphibole asbestos.*"[34] In support of his findings, Judge Hodges cited the 6th Circuit in re *Moeller v. Garlock Sealing Techs., LLC,*[35] stating, *"It is clear that Garlock's products resulted in a relatively low exposure to asbestos to a limited population and that its legal responsibility for causing mesothelioma is relatively de minimus. The Sixth Circuit has noted in an individual pipefitter's case that the comparison is as a 'bucket of water' would be to the 'ocean's volume.'"*[36]

Absent a proper level of consistent trust disclosures in the underlying tort, courts and juries will continue to be left to decide fault and allocate liability based on an exposure history put forth by plaintiffs and their counsel that is strategically designed to represent a fraction of a claimant's overall exposures, and importantly, excludes the very exposures that are the greatest cause of asbestos related disease.

## Suppression of Evidence is a Denial of Crane's Due Process Rights

The concealment of product exposure information relating to the most potent asbestos exposures (i.e. amphibole asbestos from the now bankrupt thermal insulation companies) and the concomitant focus of the judicial system on solvent defendants whose potential culpability is *de minimis* in the context of the claimant's real exposure history should be a matter of grave concern to all members of the judiciary. A fundamental precept of the civil justice system is that it permits a jury of ordinary citizens to assess a defendant's conduct in light of all of the relevant facts. When those jurors are deprived of information that is critical to the assessment of the true cause of an asbestos claimant's injuries, that system fails in its essential purpose, and the participants in that system lose confidence in that system's ability to provide a fair outcome.

The Fourteenth Amendment to the United States Constitution mandates that no person be deprived "of life, liberty, or property, without due process of law."[37] This provision of the Constitution, commonly known as the "due process clause" includes the right to a fair trial as a fundamental liberty. Indeed, so basic to our jurisprudence is the right to a fair trial that it has been called "the most fundamental of all freedoms."[38] State constitutions generally mirror the Fourteenth Amendment's due process guarantee of the right to a fair trial.[39] They speak to the importance of providing a neutral, dependable, and fair judicial process that complies with the mandates of the Constitution of the United States.

Plaintiff counsels' effective control over the production of evidence of exposure to asbestos-containing products, and their use of that control to suppress evidence of exposure to the products of reorganized companies, constitutes a practice that is a fundamental violation of due process. Unless and until all factual statements made in proofs of claims are made available to defendants, and the deadlines for trust claim submissions are sufficiently in advance of the completion of discovery in

tort cases, the statistics herein demonstrate that jurors continue to receive incomplete pictures of a claimant's true asbestos exposure history, and this deprives jurors of an ability to assess fairly the respective responsibility of all potentially responsible parties, not just those from whom plaintiffs can recover a civil judgment.

In the final analysis, what is important to solvent defendants in tort cases is not the amount that a trust must pay to a particular claimant, but the factual assertions of exposure to bankrupt defendants' products. These essentially constitute admissions that are highly probative pieces of evidence and enable personal injury liability to be fairly distributed based on culpability rather than solvency. So long as suppression of "credible and meaningful" exposures prevails, due process will continue to be denied to litigants.

## A Contemporary Look at the Issue of Non-Disclosure in Asbestos Litigation

As previously noted, our analysis for this commentary measured the level of non-disclosure in Crane cases from 2007 through 2011. It made sense to examine cases from that time period because it predominately predates Garlock's June 2010 bankruptcy filing and is during a time in which a substantial number of well-funded trusts first became operational. In their bankruptcy, Garlock collected virtually all of the PIQs, ballots, and other trust discovery materials in 2011-2012, thus the recently released Garlock discovery data lags the current inventory of cases in the tort system by several years. However, evidence of plaintiff law firm non-disclosures from more recent cases illustrate that the practice has and will continue absent judicial or legislative intervention. Examples of the continued inequities against Crane include three verdicts, two of which are currently pending appeal for issues that include but are not limited to, trust disclosures and related recoveries.[40]

Multiple other cases that illustrate the continued suppression of evidence exist as well and can be found in recent cases where Crane was not a named tort defendant. These cases are summarized below:

**Montgomery v. A.W. Chesterton Co.**[41] — Despite a standing order to produce bankruptcy trust claims, evidence of 20 bankruptcy trust claims forms were produced to the defendants and the Delaware court on the very morning that trial was set to begin. When questioned regarding the lack of disclosure, the plaintiff counsel bringing the tort action in *Montgomery* claimed

he was unaware of the trust claims and payments made to the plaintiff because they were filed by another plaintiff law firm handing that aspect of the case.

**Warfield v. AC&S, Inc.**[42] — Bankruptcy claim forms were produced on the eve of trial which directly contradicted the exposure evidence given to tort defendants; the exposure period alleged in the tort case was materially different than the exposure period given to bankruptcy trusts. The bankruptcy claims were not disclosed despite repeated discovery requests during the pendency of the case. Eight of the nine bankruptcy claims were submitted to the trusts, but not disclosed in the tort system, prior to the plaintiff testifying in court.

**Edwards v. ACandS, Inc.**[43] — Prior to trial, the plaintiff amended his discovery responses to allege that his sole exposure to asbestos containing products came from products manufactured by the last remaining solvent defendant in the tort case. However, despite repeated discovery requests, no bankruptcy claim forms were produced in the case until two weeks before trial when the plaintiff law firm disclosed claims made against 16 trusts. Most of the trust claim forms had been previously filed before any discovery requests were made.

**Golik v. CBS Corp.**[44] — Following a $4 million verdict that was rendered in favor of the plaintiff, an Oregon Circuit Court judge ordered a new trial upon finding out that the plaintiff law firm failed to disclose all claims against bankruptcy trusts. After trial, defendants found that the plaintiff firm had failed to timely disclose the existence of the bankruptcy trust claims, some of which outlined additional plaintiff exposures that were relevant and directly responsive to the defendants' discovery requests.

**Cummings v. General Electric Co.**[45] — A Kentucky Circuit Court judge called the behavior of the asbestos plaintiff law firm in the case "disingenuous" and "disturbing" for failing to disclose and acknowledge the existence of bankruptcy trust claims. In a dispute over what constitutes a valid bankruptcy trust filing, the judge commented, "You know, you're pregnant or you're not. You submitted a claim or you didn't. And that's the problem I have." The judge declared a mistrial based on the lack of disclosure by the plaintiff firm.

## Conclusion

This commentary provides further evidence of the abuse that is being perpetrated on the U.S. civil justice

system through the strategic suppression of exposure evidence by plaintiff law firms in asbestos litigation. It is clear from the Garlock discovery data that Garlock, Crane and other tort defendants have been denied constitutional rights to due process. To the extent that judges or other principal players involved in national asbestos litigation remain unconvinced of the magnitude of the abuse, or simply choose to ignore it, the findings revealed by this analysis of the Garlock data should serve as powerful evidence of the urgent need for enhanced transparency and more open interface between the two available sources of payment.

Crane's statistics explicitly demonstrate that Garlock's experience is not a random or isolated situation. The practices revealed in the Garlock case have now been shown to have had a similar prejudicial impact on at least one other solvent defendant and it is likely that these schemes have affected many more, if not all, defendants who have been immersed in this litigation, for years or even decades. We now know with greater certainty that the practice of withholding highly relevant information has resulted in a system rife with evidentiary abuse affecting every major asbestos jurisdiction nationwide. And importantly, it is difficult to overlook or discount the fact that this abuse, which amounts to a denial of due process, is largely facilitated by the secrecy in the trust claiming process.

What is even more disturbing about these statistics is that even now, with additional documented examples of widespread manipulation and gamesmanship, the legislative process in most states, and nationally, has had only modest success in addressing or remedying the problem. To date only a handful of states have enacted transparency legislation and a federal bill sits pending in Congress.[46] In the absence of legislative reform, it is imperative that judges, through the exercise of their inherent powers, step up and do their part to improve the asbestos litigation landscape. Indeed, it is the duty of the members of the judiciary - administrators of the rule of law and stewards of the principles of justice - to deal directly with this crisis by implementing case management orders or procedural rules to avert this threat to the truth-seeking function of the courts.

---

### Endnotes

1.  *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC.), Feb. 2, 2015.

2.  *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January, 10, 2014), Judge Hodges estimation ruling, pg. 26.

3.  *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January 10, 2014), Judge Hodges estimation ruling, pg. 59-60.

4.  *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January 10, 2014), Judge Hodges estimation ruling, pg. 59-60.

5.  These trust statistics are derived from the publicly available documentation produced by various asbestos bankruptcy trusts established pursuant to Section 524(g) of the U.S. bankruptcy code and the publicly available documentation produced during the proceedings of various Section 524(g) bankruptcy reorganizations.

6.  In order to properly calculate the relevant timing statistics, the timing analysis based on those trust disclosures in the Garlock DCPF Data since those records include trust claim filing, approval, and payment dates when applicable. Moreover, we only considered trusts that were confirmed and operational as of 2007 and tort cases that were filed after 2007.

7.  Of the 100 cases in the PIQ sample, 9 of the submissions were non-responsive to the PIQ section regarding trust disclosures (Table B), and 88 disclosed filing at least one trust claim as of the date of the PIQ submission, while 72 disclosed filing at least 10 trust claims.

8.  *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January 10, 2014), Judge Hodges estimation ruling, pgs. 31-35.

9.  *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Complaint, Oct. 22, 2009.

10. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Plaintiffs' Response to Defendants' Interrogatories and Request for Production of Documents, Dec. 2, 2009, Chart A.

11. Moors additionally alleged exposure to asbestos friction brake products during automotive repairs and installation, Deposition under Oral Examination of Gerald Moors Volume II, Dec. 23, 2009, Pgs. 259-260.

12. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL); Plaintiffs' Response to Defendants' Interrogatories and Request for Production of Documents, Dec. 2, 2009, Chart A; Videotaped Deposition under Oral Examination of Gerald Moors, Feb. 3, 2010, Page 34,; Deposition under Oral Examination of Gerald Moors, Dec. 22, 2009, Page 157; Deposition under Oral Examination of Gerald Moors Volume II, Dec. 23, 2009, Page 192; Deposition under Oral Examination of Gerald Moors, Volume 4, Jan. 13, 2010, Pgs. 68, 486-487, 524, 551; Deposition under Oral Examination of Gerald Moors Volume II, Dec. 23, 2009, Pgs. 189, 194-196.

13. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL); Deposition under Oral Examination of Gerald Moors Volume II, Dec. 23, 2009, Pgs. 194, 3-7; 197, 6-13; 201, 13-21, 206, 17-22; 220, 4-8; 221, 22-25,. 222, 1; 224, 20-24; 226, 13-17;. 227, 2-6; 230, 3-7; 239, 5-9; 238, 12-16; 240, 4-7; 242, 14-18; 244, 20-25; 245, 5-9; Deposition under Oral Examination of Gerald Moors, Dec. 22, 2009, Pgs. 88-89, 91-94.

14. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Plaintiffs' Response to Defendants' Interrogatories and Request for Production of Documents, Dec. 2, 2009, Chart A; Deposition under Oral Examination of Gerald Moors, Dec. 22, 2009, Page 116, 21-25, Page 117, 1; Page 43, 21-25; Videotaped Deposition under Oral Examination of Gerald Moors, Feb. 3, 2010, Pg. 109; Deposition under Oral Examination of Gerald Moors, Volume V, Pgs. 574-578.

15. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Deposition under Oral Examination of Gerald Moors Volume III, Jan. 12, 2010, Pages 321-327.

16. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Trial Day 2, Opening Statements by Belluck and Fox, Nov. 10, 2010, Page 115, 10-11.

17. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Trial Day 2, Opening Statements by Belluck and Fox, Nov. 10, 2010, Page 179-194.

18. Crane settled the Moors case on Nov. 18, 2010. After the date Crane settled the case, bankruptcy trust claim forms were subsequently submitted to trusts representing predecessor companies Federal-Mogul (T&N), Raytech, Owens Corning, National Gypsum, Keene, Harbison-Walker, Halliburton (DII), Federal-Mogul (Flexitallic), Federal-Mogul (Ferodo), Owens Corning,, Fibreboard, Eagle-Picher, Babcock & Wilcox and Armstrong.

19. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Deposition under Oral Examination of Gerald Moors Volume III, Jan. 12, 2010, Pages 321-327.

20. The Ravenwood Powerhouse was listed as an approved site for trust claims filed against Owens Corning, Fibreboard and Federal-Mogul (T&N). The Ravenwood Powerhouse site was also listed as a place of Moors' asbestos exposure to support trust claims against UNR, Raytech, Ascarco, ABB Lummus, Keene, H.K. Porter, GAF, Federal-Mogul (Flexitallic), Federal-Mogul (Ferodo), Eagle-Picher, Combustion Engineering and Armstrong.

21. *Gerald Moors and Joan Moors v. A.O. Smith Water Products, et al.*, No. 190363/09, N.Y. Sup. Ct. (NYCAL), Deposition under Oral Examination of Gerald Moors, Dec. 22, 2009, Page 143, 1-18.

22. *In re New York City Asbestos Litigation* (NYCAL), Index No. 40000/88, Motion Seq. 004, Decision and Order by Judge Sherry Klein Heitler, Nov. 15, 2012, Page 4-5.

23. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc., et al.*, Case No. BC374988, Calif. Super., Los Angeles Co.,Complaint, July 27, 2007.

24. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc.*, et al., Deposition of Chief Brewer, Deposition Volume 1, Sept. 25, 2007, Pgs. 24-28; Plaintiffs Case Report, Dec. 14, 2007.

25. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc., et al.*, Deposition of Chief Brewer, Deposition Volume 1, Sept. 25, 2007, Pgs. 27-,29; 34; 40-44; 56-58; 110; 207; Plaintiffs Case Report, Dec. 14, 2007.

26. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc., et al.*, Deposition of John Dill, March 18, 2008, Page 133.

27. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc., et al.*, Deposition of Chief Brewer, Deposition Volume 1, Sept. 25, 2007, Pg. 223-225; Deposition of Chief Brewer, Deposition Volume 2, Sept. 26, 2007. Pgs. 396-397.

28. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc., et al.*, Deposition of Chief Brewer, Deposition Volume 2, Sept. 26, 2007. Pgs.394-396; Videotaped Oral Deposition of Chief Brewer, Volume 2, Sept. 27, 2007, Pgs. 584-585.

29. *Chief Y.R. Brewer and Gale Brewer v. Alfa Laval Inc.*, et al., Case No. BC374988, Calif. Super., Los Angeles Co., Jury Verdict Form, May 16, 2008; Mealey's Litigation Report: Asbestos, Vol. 23, Issue #8, "*Los Angeles Jury Awards $9.7 Million to Meso Sufferer, Wife.*"

30. *Chief Brewer v. Crane Co.*, California 2nd Appellate District, Division Two, Case No. B213096, Opinion, Aug. 12, 2012; Mealey's Litigation Report: Asbestos, Vol. 27, Issue #14, "*Court Reverses $9.7M Award, Finds O'Neil Bars Liability,*" Aug. 29, 2012.

31. See, Wilson, Thomas M., *Institutionalized Fraud in Asbestos Bankruptcy Trusts*, Mealey's Litigation Report, Asbestos Volume 29, Issue #7 (May 7, 2014); Brickman, Lester, "*Fraud and Abuse in Mesothelioma Litigation*" 88 Tulane L. Rev. 1071, 1099 (2014).

32. *See* testimony of Judge Peggy L. Ableman (ret.), Hearing testimony on H.R. 982, the "Furthering Asbestos Claim Transparency (FACT) Act of 2013", U.S. House Judiciary Committee's Subcommittee on Regulatory Reform, Commercial and Antitrust Law, March 2013.

33. Rule 26(b)(1) Federal Rules of Civil Procedure.

34. *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January 10, 2014), Judge Hodges estimation ruling, pg. 8.

35. *Moeller v. Garlock Sealing Techs., LLC, 660 F.3d 950, 954-55 (6th Cir. 2011).*

36. *In re Garlock Sealing Technologies*, No. 10-31607, 2014 Bankr. LEXIS 157 (Bankr. WDNC. January 10, 2014), pg. 2.

37. United States Constitution Amended XIV, Section 1.

38. *Bailey v Systems Innovation*, Inc., 852 F.2d 93, 98 (30 Cir. 1988) (citing, Estes v. Texas, 381 U.S. 352, 340, (1965).

39. See, e.g., New York Constitution, Article I, Section 6, Constitution of the State of Delaware, Article 1, Section 7; North Carolina Constitution, Article I, Section 17; California Constitution, Article I, Section 3(b)(4).

40. *James Hellam v. Crane Co.*, No. A140326, Calif. App., 1st District, Div. 4; *Elaine Paulus v. Crane Co.*, No. 5218222, Calif. Sup.; Jeanette Poage v. 3M Co., et al., No. 1322-cc00059.

41. *Montgomery v. A.W. Chesterton Co.*, No. 096-11-217, Del. Super.

42. *Warfield v. AC&S Inc.*, No.'24X06000460, Consolidated Case No. 24X09000163,Md. Cir. Ct., Baltimore City.

43. *Edwards v. John Crane-Houdaille, Inc.*, No.'24X060 00460. Md. Cir. Ct., Baltimore City; *See* Problems with Asbestos Compensation System, Hearing Before The Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, 111th Cong. (Sept. 9, 2011) (statement of James L. Stengel), *at* 2011 WLNR 24791123.

44. *Golik v. CBS Corp.*, No. 1308-11192, Ore. Cir., Multnomah Co.

45. *David Cummings, Executor of the Estate of William Gale Cummings v. General Electric Co., et al.*, No. 13-CI-6374, Ky. Cir., Jefferson Co., Division Nine.

46. Ohio - H.B. 380, March 18, 2015; Oklahoma S.B. 404, - May 7, 2013; West Virginia, S.B. 411 - March 18, 2015; Wisconsin - A.B. 19, May, 27, 2014; Arizona - H.R. 4369, April 19, 2015; Texas - H.B. 492, June 16, 2015; H.R. 526, Furthering Asbestos Claims and Transparency (FACT) Act. ■

**MEALEY'S LITIGATION REPORT:  ASBESTOS**
*edited by Bryan Redding*
**The Report** is produced twice monthly by



1600 John F. Kennedy Blvd., Suite 1655, Philadelphia, PA 19103, USA
Telephone: (215)564-1788 1-800-MEALEYS (1-800-632-5397)
Email: mealeyinfo@lexisnexis.com
Web site: http://www.lexisnexis.com/mealeys
ISSN 0742-4647

## The Time Has Come For Courts To Respond To The Manipulation Of Exposure Evidence In Asbestos Cases: A Call For The Adoption Of Uniform Case Management Orders Across The Country

*by*
*Peggy L. Ableman*

*McCarter & English, LLP*
*Wilmington, Delaware*

A commentary article
reprinted from the
April 8, 2015 issue of
Mealey's Litigation
Report: Asbestos



# Commentary

## The Time Has Come For Courts To Respond To The Manipulation Of Exposure Evidence In Asbestos Cases: A Call For The Adoption Of Uniform Case Management Orders Across The Country

By
**Peggy L. Ableman**[†]

*[Editor's Note: A former Delaware Superior Court Judge, Peggy Ableman is Special Counsel in McCarter & English, LLP in Wilmington, Delaware. She has nearly thirty years of experience as a state trial judge and has testified before the U.S. House of Representatives, Wisconsin Senate and Pennsylvania House Judiciary Committees, and Task Force on Asbestos Litigation and Bankruptcy Trusts of the American Bar Association's Tort Trial and Insurance Practice Section. Copyright © 2015 by Peggy L. Ableman. Responses are welcome.]*

As the longest running mass tort in our country's history, asbestos litigation has seen more than its share of ethical scandals, widespread abuse, and by some standards fraud.[1] These problems continue, with the decision in the bankruptcy case of gasket and packing manufacturer Garlock Sealing Technologies, LLC taking center stage.[2]

In January 2014, a North Carolina federal bankruptcy judge set the asbestos plaintiffs' bar reeling with his landmark opinion in *In re Garlock Sealing Technologies, LLC*[3] ("*Garlock*"). The discovery done and subsequent decision in *Garlock* exposed widespread manipulation and abuse of asbestos bankruptcy trust claims and suppression of evidence of plaintiff exposures to asbestos from third-parties. These problems were facilitated by the existence of two separate but parallel compensation systems that are available to individuals who have sustained injury through exposure to asbestos or asbestos-containing products. The *Garlock* decision also served to lend credence to long-suspected fraudulent practices that had previously been randomly exposed in a smattering of individual cases.

From my perspective as a former state trial judge, the courts themselves share some of the blame by their failure to face up to the reality that the soundness of our civil justice system is in jeopardy as long as critical, highly relevant information about plaintiffs' asbestos exposures is routinely suppressed in civil asbestos litigation. Indeed, the lack of transparency between the asbestos bankruptcy trust claim system and civil asbestos litigation has broader implications for how fairly and equitably our justice system operates.

The threat to the truth-seeking function of the courts posed by the absence of transparency between the trust compensation and tort systems had already informed my judicial sensibility as a result of an unfortunate, yet eye-opening experience during my tenure on the Superior Court of the State of Delaware.[4] I was forced to continue and ultimately dismiss a scheduled, lengthy asbestos personal injury trial moments before it was to commence because I learned that evidence of twenty-two asbestos bankruptcy trust claims had been suppressed by plaintiffs or their counsel. As a result, the striking revelations in the *Garlock* opinion were hardly surprising to me. Instead, they served to validate my experience and provided added support for asbestos bankruptcy trust claim transparency as an essential component of the defense of every asbestos-related personal injury case. What is surprising, and even troubling, however, is the limited response or reaction from courts to date, even in the face of powerful, documented examples of the ease with which plaintiffs have been able to conceal asbestos exposure evidence in tort litigation, while asserting exposures in order to receive additional compensation from the bankruptcy trusts.

Given the broad media reporting following *Garlock*,[5] and the protracted efforts to achieve legislative reform, it is incumbent upon the courts to promulgate procedural mechanisms to eliminate the abuses described in *Garlock*.

## The Garlock Decision And Courts' Reaction

Until the early 2000s, Garlock Sealing Technologies, LLC had been a relatively minor participant in the asbestos tort system.[6] Garlock had relative success in settling cases for reasonable amounts consistent with the level of its possible culpability.[7] But as companies exited the tort system for bankruptcy protection, plaintiffs' lawyers began to target "peripheral defendants" like Garlock to replace "top-tier defendants that had produced thermal insulation and refractory products and had accounted for a substantial share of the compensation paid by defendants in the tort system."[8] "[T]he payments by the peripheral defendants increased, even though the extent of their responsibility for exposure remained unchanged."[9] Defendants struggled to prove that alternative exposures were partly or entirely responsible for plaintiffs' injuries because "evidence of plaintiffs' exposure to other asbestos products often disappeared."[10] "This occurrence was a result of the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries from Garlock (and other viable defendants)."[11] In this new environment, Garlock sustained a few hefty verdicts and was forced to pay higher values to settle cases. Garlock continued to settle cases until its insurance was exhausted and it filed bankruptcy in 2010 to establish a 524(g) asbestos trust.

Following a lengthy bankruptcy estimation trial, Bankruptcy Court Judge George Hodges issued an exhaustive opinion wherein he found that Garlock's previous settlements of mesothelioma cases were "infected by the manipulation of exposure evidence by plaintiffs and their lawyers."[12] As part of the future liability estimation process, the court allowed the parties to conduct extensive discovery into the facts of fifteen randomly selected cases out of hundreds that had settled. In those fifteen cases, "Garlock demonstrated that exposure evidence was withheld in *each and every one* of them."[13] As such, any further extensive discovery was deemed unnecessary because "the startling pattern of misrepresentation that has been shown is sufficiently persuasive."[14]

Accordingly, Garlock's pending and future mesothelioma claims were valued at $125 million, not a modest sum by any means, until it is juxtaposed against the approximately $1–1.3 billion that had been requested by the plaintiffs' committees.[15]

The *Garlock* decision generated a flurry of articles and commentaries by legal scholars, plaintiff and defense asbestos attorneys, and from mainstream media.[16] Interest continues as the judge in *Garlock* has opened the previously sealed *Garlock* record to the public and Garlock pursues civil racketeering, fraud, and conspiracy suits against various asbestos plaintiffs' law firms and individual attorneys that were involved in the dubious claim patterns and practices exposed by Judge Hodges.[17]

Even with all the attention that the *Garlock* case has received, however, neither the courts nor defense attorneys in general have reacted in any large scale way to address the abuses detailed in the opinion. If the judicial response is merely to recognize the existence of the deception fostered by the dual asbestos trust and civil tort compensation schemes, or simply to decry the findings—without more—then those who care deeply about fairness in the judicial process bear equal responsibility for allowing the harmful effects of any continued fraudulent activity.

We now know that the secrecy of the trust claiming process has created a system rife with the potential for abuse, and we are aware of the existing loopholes that enable these practices to continue. It is the duty of judges—administrators of the rule of law and stewards of the principles of fairness and justice—to deal with these obstacles by implementing procedures or case management orders to avert this threat to the truth-seeking function of the courts.

Our judicial system cannot afford to solve this crisis with only a protracted and piecemeal legislative response or through the limited disclosure late in discovery (if at all) ordered on a case-by-case basis by individual judges in singular jurisdictions. A lesson of *Garlock* is that there are a myriad of opportunities to "game the system" in asbestos litigation and neither legislative nor judicial efforts have thus far been sufficient to stop such abuses. It is, therefore, a matter of urgency that the courts address abuses in asbestos personal injury litigation, and not wait for legislatures to act.

### The Judiciary Represents The Most Immediate Path To Reform

Judges should not overlook the important role that the judiciary has had—and should have—in improving the asbestos litigation landscape. In the past, courts have addressed other crises in this area of the law. For example, when mass filings by unimpaired claimants were creating judicial backlogs and exhausting available resources, the courts generally responded by realizing that too much efficiency could interfere with fairness. Likewise, when mass filings by unimpaired claimants, largely through plaintiff lawyer-arranged screenings, caused some asbestos dockets to reach crisis proportions, a number of courts used their inherent power to manage their caseloads by implementing inactive asbestos dockets, also referred to as "pleural registries."[18] These management tools gave priority to persons who were genuinely sick and suspended the claims of the non-sick.

When the federal judge responsible for multi-district litigation of silica claims exposed widespread fraud in the unreliable diagnoses of thousands of cases,[19] the courts acted promptly by wholesale dismissal of those cases that were recruited by the attorneys, or at least by excluding the offending physicians from offering expert testimony.[20] Other high-volume diagnosticians hired by plaintiffs' attorneys to perform screenings that would result in positive findings for disease were also banned from continuing their activities by courts who properly accepted their judicial gate-keeping function.[21]

Just as these judicial responses to unfair practices were able significantly to expand, it is reasonable to expect that courts should eliminate the fraudulent concealment of bankruptcy trust claiming activity and suppression of evidence of alternative exposures that was revealed in *Garlock*. Indeed, given the challenges inherent in the legislative process, the most immediate path to reform must be through the trial courts in this country where the fraud is actually occurring and where so much is at stake.

The judiciary's responsibility to improve the administrative of justice can best be accomplished by the entry of a uniform case management order ("CMO") or "Order" that will address all of these transparency issues, including mandatory disclosure of all trust claims, the timing of filing of claims, the evidentiary issues regarding admissibility at trial and presumptions attributed to them, the responsibility of attorneys to monitor and disclose claims filed by other counsel, and the procedures for challenging non-submission of claims.

The CMO that I am urging courts to implement across the nation imposes obligations on plaintiffs to investigate, file, and produce all asbestos bankruptcy trust claims soon after an asbestos action is filed and before any evidence is preserved by deposition, so that defendants are given the opportunity to question the plaintiff and all witnesses with knowledge of the plaintiff's total exposure history and facts supporting the lawsuit.

Production of trust claim submissions has consistently been opposed by the plaintiffs' bar, which has long taken the position that trust forms are privileged settlement documents. Since that argument has been rejected in virtually every jurisdiction that has addressed it,[22] the time is now ripe, especially in the aftermath of *Garlock*, for courts to address the urgent need for reform. The crucial role that the judiciary has had in the past in changing the asbestos litigation environment should not be overlooked in the face of such widespread fraud, and the task of convincing trial judges to account for bankruptcy recoveries so that defendants will have the information they need to defend tort litigation should no longer be an uphill battle.

### Judges Have Broad, Inherent Authority To Actively Manage Their Caseload

Courts have broad, inherent authority to manage cases "to serve the interests of justice."[23] Examples of case management techniques that have been used by courts to govern asbestos and other toxic tort claims include inactive asbestos dockets that set aside and suspend the claims of unimpaired claimants,[24] as mentioned earlier, and *Lone Pine* orders that require plaintiffs to provide facts in support of their claims through expert reports or risk having their cases dismissed.[25]

Many jurisdictions that historically experienced large numbers of asbestos filings have inactive asbestos dockets (also called deferred dockets or pleural registries) to give trial priority to the sick.[26] Under these docket management plans, the claims of the non-sick are suspended and exempt from discovery. Claimants may petition for their case to be activated and removed to the trial docket when credible medical evidence of impairment is shown.[27]

Numerous courts have held that inactive asbestos dockets represent a traditional exercise of a court's inherent power to control its docket.[28] For instance, in *In re Asbestos Cases (Mulligan v. Keene Corp.)*,[29] an Illinois appellate court upheld Cook County's (Chicago) inactive asbestos docket as "a tool whereby the court may prioritize the litigation of cases already filed and an example of the court exercising its inherent authority to control its docket."[30] An Ohio appellate court reached the same conclusion in *In re Cuyahoga County Asbestos Cases*.[31] There, plaintiffs sought the unimpaired docket "in order to give the more seriously impaired claimants quicker access to the courts while preserving the claims of the less impaired plaintiffs."[32] As in Illinois, the appellate court found that the inactive docket "demonstrates a traditional exercise of the court's authority to control its docket."[33]

Federal asbestos cases under MDL-875 in the U.S. District Court for the Eastern District of Pennsylvania have become streamlined and organized under an administrative order similar to a *Lone Pine* order.[34] Amended Administrative Order No. 12 requires plaintiffs to submit a medical diagnostic report or opinion "based upon objective and subjective data which shall be identified and descriptively set out" and sufficient to withstand a dispositive motion.[35] The order has proven successful at unclogging one of the largest and long-running asbestos dockets in the country by establishing a "toll gate at which entrance to the litigation is controlled."[36]

## The Proposed Uniform Case Management Order

The CMO that I propose would substitute the following language as an amendment to any existing CMO (or can be adopted in whole where no such order exists):

Asbestos Bankruptcy Trust Claim Disclosures

(a)   Within 30 days after an asbestos action is filed (or within 30 days after entry of this Order, whichever is later) and before any evidence is preserved by deposition-

   (1)   The Plaintiff shall provide the Court and the parties with a sworn statement signed by Plaintiff and Plaintiff's counsel, under penalties of perjury, indicating that an investigation of all asbestos-related bankruptcy

trust claims ("trust claims") has been conducted, that all trust claims that can be made have been filed, and, if applicable, that to the best of their information and belief there are no other law firms representing Plaintiff with respect to trust claims.

(2)   Plaintiff shall indicate whether there has been a request to defer, delay, suspend, or toll any trust claim, and provide the disposition of each trust claim;

(3)   Plaintiff shall provide all parties with all trust claims materials, including for conditions other than those that are the basis for the immediate asbestos action, and with respect to all law firms connected to Plaintiff relating to exposure to asbestos, including anyone at a law firm involved in the asbestos action, any referring law firms, and any other firm that has filed trust claims on the Plaintiff's behalf. "Trust claims materials" includes all documents and information related to trust claims, including final executed proof of claim forms, supplementary materials, affidavits, deposition and trial testimony, work history, medical and health records, correspondence and documents reflecting the status of a trust claim, and if the trust claim has settled, all supporting documents and information relating to the settlement of the trust claim; and

(4)   If Plaintiff's trust claim is based on exposure to asbestos through another person (so-called "take home exposure"), Plaintiff shall produce all trust claims materials submitted by the directly exposed person to an asbestos-related bankruptcy trust if available to Plaintiff. The presumption is that Plaintiff has access to and shall provide all trust claims materials filed by his or her spouse, parent, or child.

(b)   No initial trial date will be set until the requirements of paragraph (a) are met. Plaintiff has a continuing obligation to supplement the information and materials required under paragraph (a).

(c)   If a defendant believes that Plaintiff is eligible to file one or more additional trust claims, then a defendant may move the Court for an Order to require Plaintiff to file said trust claims.

(1) Within 10 days of receiving a defendant's motion, Plaintiff shall file the trust claims identified by the defendant and produce all trust claims materials or file a written response with the Court stating why there is insufficient evidence to file the trust claim(s).

(2) If the Court determines that Plaintiff is eligible to file the trust claim(s) identified by Defendant, the Court shall stay the civil action until Plaintiff files the trust claim(s) and produces all trust claims materials.

(d) Not less than 30 days prior to trial, the Court shall enter into the record a document identifying each trust claim Plaintiff has made to an asbestos bankruptcy trust.

(e) Trust claims materials are presumed to be relevant and authentic, and are admissible in evidence. No claims of privilege apply to any trust claims materials.

(f) Trust claim materials that are sufficient for payment under the applicable trust governance documents may support a jury finding that Plaintiff was exposed to products for which the trust was established to provide compensation and that such exposure may be a substantial factor in causing Plaintiff's claimed injury that is at issue in the civil action.

*[handwritten margin note: States under oath admiss's of a party opponent under Rule 801]*

(g) To ensure compliance with this Order, and as an exercise of its inherent authority to administer justice, this Court will retain jurisdiction over all asbestos personal injury cases and the parties thereto for a period of two years following resolution or entry of judgment. Counsel for Plaintiff is ordered to serve notice to the Court and all parties of record of the resolution of each case within 30 days of resolution. The court reserves the right to impose any and all remedies allowed by law in the event of noncompliance with this order, upon noticed motion.

(h) [For jurisdictions that allow set-offs] If a Plaintiff proceeds to trial before a trust claim is resolved, there is a rebuttable presumption that Plaintiff is entitled to, and will receive, the compensation specified in the trust governance document applicable to the claim at the time of trial. The Court shall take judicial notice that the trust governance document specifies compensation

amounts and payment percentages and shall establish an attributed value to Plaintiff's trust claims.

The CMO first addresses the popular plaintiff strategy of deliberately delaying the filing of trust claims until the conclusion of tort litigation. The Order requires that all available trust claims be filed within thirty days of the filing of the asbestos action, or within thirty days of the entry of the CMO for cases already pending. This deadline will have a huge impact on the litigation because it will ensure that important factual information will be available to defendants *before* any evidence is preserved by deposition. Under these circumstances, deponents will be more likely to provide honest testimony because they will know that defendants will have better tools available to challenge the credibility of product identification evidence. The trust claim forms will also enable counsel to overcome the persistence of "I don't recall" testimony, as the trust claims represent powerful admissions on the part of a plaintiff in a tort case.

As a practical matter, plaintiffs' attorneys may be within the bounds of ethical conduct when the timing of bankruptcy trust claims is calculated to achieve maximum recovery for their clients. Plaintiffs' attorneys may characterize delayed filings as zealous advocacy. What is not fair play, however, is for asbestos trust claims to be deliberately delayed so that inexplicable discrepancies between the positions taken in court and those presented in the trust claims can be hidden and not revealed.

Another feature of the proposed CMO is the requirement that the information produced by plaintiff be accompanied by a sworn statement, signed by both the plaintiff and his or her counsel under penalty of perjury, certifying that an investigation of all trust claims has been conducted and that all available trust claims have been filed. Importantly, plaintiff and counsel must also affirm that *no other* law firms have been retained for the purpose of submitting bankruptcy trust claims. This provision will eliminate the common practice of retaining a separate law firm to file the trust claims while deliberately withholding any information about the process from litigation counsel. The CMO further mandates the disclosure of any requests to defer

or toll any claims that have already been filed, thus requiring that delayed claims be specifically identified rather than withheld in discovery under the guise that they have not technically been docketed.

In addition to information sharing, the proposed CMO contains requirements for the production of all trust claim documents and materials. These must be produced from all law firms or attorneys that are in any way connected to a plaintiff relating to asbestos exposure, including settlement documents and related materials.

The proposed uniform CMO contains a provision specifically related to "take home exposure" cases, where the plaintiff's exposure to asbestos was through an occupationally exposed family member or by handling that person's work clothes. In those instances, the plaintiff will be required to produce all trust claim materials submitted by the family member who was directly in contact with the asbestos-containing products manufactured by the bankrupt entities. The requirement presumes that the plaintiff will be given access to a spouse, parent, or other resident's employment and health-related records. Additional general provisions of the uniform CMO include a continuing obligation on the part of plaintiffs and their counsel to update production and a prohibition against the court reserving an initial trial date until all documents required by the CMO are produced.

Once a trial date is allocated, any defendant who believes that a plaintiff is eligible to file additional trust claims may file a motion with the court. If the trust claim materials are not produced within ten days, the plaintiff is required to file a written response to the motion explaining why the evidence is insufficient to support such a claim. If the court finds that the plaintiff is eligible to file that claim, the court must stay or suspend all further proceedings in the case until the claim or claims have been filed and produced.

The CMO also includes procedures that will govern the trial without the need for extensive motions *in limine* or other pretrial motion practice. For instance, the court is charged with entering into the record a list of each trust claim submitted by a plaintiff. Also, all trust claim materials are presumed relevant, authentic, and admissible in evidence. In addition, if payment is authorized

under a trust's governance documents, that circumstance will support a jury finding that a plaintiff was exposed to the products that are the subject of the trust compensation, and that the exposure was a "substantial factor" in the cause of the plaintiff's injury.

Perhaps the most unique feature of the proposed CMO is the court's exercise of its inherent authority to retain jurisdiction over the parties for a period of two years after either resolution or entry of final judgment. This measure, while perhaps inconsistent with a court's natural inclination to clear its dockets in an efficient and speedy manner, will help assure that defendants can account for and be given credit for any post-trial submissions that were not revealed. Given the resourcefulness of the plaintiffs' bar when faced with new obstacles to pursuing compensation for their clients, and the handsome percentage to which the attorneys are entitled as contingency fees, it is conceivable that they will continue to devise alternate methods of concealing or downplaying their clients' claims about exposure to other sources of asbestos. This provision of the CMO should serve to eliminate these incentives after the tort case is concluded.

Finally, for jurisdictions that provide for set-offs, the Order mandates judicial notice of trust governance documents specifying compensation amounts and payment percentages in order to attribute a value to a plaintiff's asbestos trust claims that are pending at the time of trial.

## Expected Impact Of The Proposed Uniform Case Management Order

The proposed CMO should not dramatically alter the manner in which courts have been addressing the trust claim problem nor does the CMO demand radical modifications to the procedures already adopted in jurisdictions that have addressed the discovery of trust claim materials. A number of courts (and a few state legislatures) have already made some strides in eliminating incentives for fraudulent or purposefully delayed asbestos trust claiming activity.

A California Court of Appeal in *Volkswagen of America, Inc. v. Superior Court of San Francisco*,[37] was one of the first appellate courts to permit discovery of trust claims filed by asbestos tort plaintiffs. The court ordered discovery of trust claim forms and supporting information over plaintiffs' objections on the ground that they were

protected settlement documents. The California Court declared the trust materials to be relevant and reasonably calculated to lead to admissible evidence, including admissions against interest.[38] In *Seariver Maritime, Inc. v. Superior Court of San Francisco*,[39] another California appellate division "agree[d]" with the *Volkswagen* court's analysis.[40]

Following California's lead, the vast majority of courts that have been called upon to determine the discoverability of trust claim submissions have ordered their production, generally reasoning that the information, such as plaintiffs' work histories and medical data related to exposures to asbestos, are essential and highly relevant to defendants' strategy.[41] As one court commissioner noted in a Missouri case, "[t]here simply is no perceived basis to preclude a defendant from obtaining unprivileged factual information discussing work history, asbestos exposure and injury data allegedly attributable to it."[42] Similarly, the New York Supreme Court ordered production of bankruptcy trust proofs of claim in *Drabcyzk v. Amchem Prods., Inc.*,[43] reasoning that:

> It seems likely that proof of claim forms submitted by plaintiffs in asbestos litigation to trusts established by bankrupt entities may contain information concerning product identification, the claimant's work history and exposure to asbestos, causation and apportionment of fault. Such information is not presumptively privileged and is clearly relevant for disclosure purposes. . . . Even if a proof of claim is employed to encourage settlement discussions, admissions of fact made in it are admissible and therefore, discoverable. . . .[44]

Federal courts as well have ordered that bankruptcy trust claims and supporting documentation information be produced to defendants, and they have rejected the notion that a claim made to a bankruptcy trust is analogous to an offer of settlement or compromise and thus not discoverable.[45]

Several high volume asbestos litigation jurisdictions have gone even further by adopting standing Case Management Orders ("CMOs") that require production of trust claims information. Perhaps the most all encompassing of these is the recent amendment to the CMO governing all asbestos personal injury actions in Massachusetts. The Massachusetts CMO provides that within thirty days of trial, the plaintiff will serve a certification with the court that "all known bankruptcy claims have been filed."[46] Also, several state legislatures have enacted legislation to promote honesty in litigation by requiring trust claims to be filed and produced before trial.[47]

All of these measures that are intended to resolve the persistence of trust claiming fraud have helped in a piecemeal fashion, but even considered collectively, will not have as significant an impact as can be achieved by sweeping adoption of the uniform CMO in jurisdictions that adjudicate asbestos personal injury cases.

There are a myriad of benefits to the concept of a uniform CMO. Beyond eliminating the opportunity for inconsistent filings between trusts and courts that was detailed by Judge Hodges in *Garlock*, the truth-seeking function of the courts will be served by more fully informed juries and greater fairness in the litigation of asbestos personal injury claims. Juries would have more information to determine whether a reorganized company's product was partly or wholly responsible for the plaintiff's disease, and will be able to identify exposure claims that are exaggerated or deceitful. Discovery of information submitted to an asbestos bankruptcy trust can even lead to correcting any misinformation provided at a deposition with regard to the plaintiff's memory of the specific asbestos products to which plaintiff was exposed.

A uniform CMO will have the additional advantage of providing uniformity in procedures and processes across state lines, removing an incentive for forum shopping. Also, since a few high profile plaintiffs' law firms account for the major proportion of asbestos litigation in courts that have substantial dockets, attorneys who appear in those venues will no longer have to abide by different sets of rules in different jurisdictions. Uniformity will assist defense counsel as well for the same reason.

## Conclusion

The course of asbestos litigation over the past forty years or so hardly be deemed the legal profession's finest hour. The massive sums of money that are at stake in asbestos litigation, and the enormous windfall fees the litigation has generated for plaintiffs' lawyers, have encouraged those lawyers to be resourceful in

finding new ways to recruit more clients. Indeed, they have succeeded in keeping the litigation alive and thriving no matter how tenuous the nexus is between the injured plaintiffs and the ever-growing number of alleged wrongdoers.

Many other circumstances have contributed to the pall that has for so long been cast over this litigation. In addition to the excessive amounts of money at stake, the diseases caused by asbestos exposure are so horrific that juries—and even judges—tend to be overly sensitive to plaintiffs' needs, and this may account for some of the excessive damages awards. Or perhaps the special dockets that courts have set up under experienced judges have led to too much tolerance for fraud. At the same time, defendants' attorneys in many high volume jurisdictions are equally loathe to upset an enterprise that has both contributed to their personal wealth and in some cases fueled their local economies. Despite the prevalence of ethical rules violations that have long been a hallmark of this litigation, the asbestos bar has been largely immune from judicial sanctions or discipline by state authorities. All of these factors collectively conspire to upset the scales of justice and threaten the integrity of the judicial process.

What has often been missing from the discussion and commentary in reaction to *Garlock* is any assessment of what this all means for the actual asbestos-exposed victims who turn to these trusts for compensation for their injuries. Most of the trusts are paying only pennies on the dollar of actual liability. When a claimant honestly identifies all sources of exposure, that individual ends up with only minimal compensation, while those willing to go from trust to trust and alter facts to suit the circumstances can unfairly amplify their recoveries. Plaintiffs who play by the rules have not only sustained physical injury from their exposures, but they are doubly victimized by those lawyers and their clients who are willing to play fast and loose with the truth.

In the face of increasing instances of specious claiming, and growing evidence of the illegitimacy of these practices, the failure of lawyers, disciplinary boards, and the courts to enforce fundamental ethical rules, and to ensure that procedures are administered fairly and even-handedly, stands as a glaring indictment not only of the legal profession, but also of the judges who are ultimately responsible for the administration of justice and adherence to the rule of law. Asbestos litigation does not have to continue along this trajectory if courts will take action to end this continued threat to the soundness of their legal processes created by the lack of transparency between the two compensation regimes. It is imperative that the trial courts act swiftly to adopt the Case Management Order that is proposed here, enforce it consistently upon promulgation, and do their part to restore fundamental fairness to this area of tort law.

## Endnotes

†  Research support for this article was provided by the Coalition for Litigation Justice, Inc.

1.  *See* Lester Brickman, *Fraud and Abuse in Mesothelioma Litigation*, 88 TUL. L. REV. 1071 (2014); Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 PEPP. L. REV. 33 (2003); Peggy L. Ableman, *A Case Study From a Judicial Perspective: How Fairness and Integrity in Asbestos Tort Litigation Can Be Undermined by Lack of Access to Bankruptcy Trust Claims*, 88 TUL. L. REV. 1185 (2014).

2.  *See* Peggy L. Ableman, *The Garlock Decision Should Be Required Reading for All Trial Court Judges in Asbestos Cases*, 37 AM. J. TRIAL ADV. 479 (2014); Mark D. Plevin, *The* Garlock *Estimation Decision: Why Allowing Debtors and Defendants Broad Access to Claimant Materials Could Help Promote the Integrity of the Civil Justice System*, 23 J. BANKR. L. & PRAC. 458 (2014).

3.  504 B.R. 71 (Bankr. W.D.N.C. 2014).

4.  *See Asbestos Claims Transparency: Hearing Before the Subcomm. on Reg. Reform, Com. and Antitrust Law of the House Comm. on the Judiciary*, 113th Cong. (2013) (Hon. Peggy L. Ableman), *available at* 2013 WLNR 7440143.

5.  *See* Paul M. Barret, *Judge Finds Fraud and Deceit by Plaintiffs' Lawyers in Asbestos Cases*, BLOOMBERG BUSINESSWEEK, Jan. 13, 2014, *available at* http://www.bloomberg.com/bw/articles/2014-01-13/garlock-asbestos-claims-cut-90-percent-because-of-plaintiffs-lawyers-deceit; Sara Warner, *Court Order Disrupts Asbestos World, but What of the 'Perjury Pawns'?*, HUFFINGTON POST, Feb. 28, 2014, *available at* Sara

Warner, *Court Order Disrupts Asbestos World, but What of the 'Perjury Pawns'?*, HUFFINGTON POST, Feb. 28, 2014, *available at* 2014 WLNR 5632432; Daniel Fisher, *Judge Slashes Asbestos Liability In Garlock Bankruptcy to $125 Million*, FORBES, Jan. 10, 2014, *available at* http://www.forbes.com/sites/danielfisher/2014/01/10/judge-slashes-asbestos-liability-in-garlock-bankruptcy-to-125-million; Editorial, *The Double-Dipping Legal Scam*, WALL ST. J., Dec. 26, 2014, at A12; Editorial, *Busting the Asbestos Racket*, WALL ST. J., Feb. 8-9, 2014, at A16; Editorial, *Exposing Asbestos Fraud*, WALL ST. J., Aug. 20, 2013, at A14; Michael Tomsic, *Case Sheds Light On The Murky World Of Asbestos Litigation*, NPR ALL THINGS CONSIDERED, Feb. 4, 2014, *available at* 2014 WLNR 3168502; *Bankruptcy Judge: Plaintiffs, Lawyers Covered Up Evidence in Garlock Mesothelioma Cases*, LITIG. RESOURCE CTR., Jan. 13, 2014, *available at* 2014 WLNR 1048954.

6. *See In re Garlock Sealing Tech.*, 504 B.R. at 73.

7. *Id.*

8. Lester Brickman, Testimony on H.R. 526, the "Furthering Asbestos Claim Transparency (FACT) Act of 2015, Hearing Before the House Judiciary Comm. Subcomm. on Reg. Reform, Com. & Antitrust L., Feb. 4, 2015, *available at* 2015 WLNR 3578295; *see also* O'Neil v. Crane Co., 2010 WL 2984322, at *11 (Cal. July 28, 2010) **(Application and *Amicus Curiae* Brief of Bates White LLC Supporting Respondents)** ("the defendants that remained in the tort system after the bankruptcy wave saw a dramatic increase in the frequency with which they were named, and new defendants, thousands of whom had never been named in an asbestos case, were brought into the litigation.").

9. Ableman, 88 Tul. L. Rev. at 1209.

10. *In re Garlock Sealing Tech.*, 504 B.R. at 73.

11. *Id.* at 84.

12. *Id.* at 82.

13. *Id.* at 84 (emphasis in original).

14. *Id.* at 86.

15. *Id.* at 74.

16. *See supra* nn. 1 & 5.

17. *See* Garlock Sealing Tech., LLC v. Shein Law Center Ltd., No. 3:14-ap-03035 (Bankr. W.D.N.C.); Garlock Sealing Tech., LLC v. Belluck & Fox LLP, No. 3:14-ap-03036 (Bankr. W.D.N.C.); Garlock Sealing Tech., LLC v. Simon Greenstone Panatier Bartlett PC, No. 3:14-ap-03037 (Bankr. W.D.N.C.); Garlock Sealing Tech., LLC v. Waters & Kraus LLP, No. 3:14-ap-03038 (Bankr. W.D.N.C.).

18. See Victor E. Schwartz, *A Letter to the Nation's Trial Judges: Asbestos Litigation, Major Progress Made over the Past Decade and Hurdles You Can Vault in the Next*, 36 AM. J. TRIAL ADV. 1 (2013).

19. *See In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563 (S.D. Tex. 2005).

20. *See* Mark A. Behrens, *Asbestos Litigation Screening Challenges: An Update*, 26 T.M. COOLEY L. REV. 721 (2009).

21. *See id.*

22. *See* Willis v. Buffalo Pumps, 2014 WL 2458247, *1–2 (S.D. Cal. June 2, 2014); Sweredoski v. Alfa Laval, Inc., 2014 WL 466019, *1 (R.I. Super. Providence Cnty. Jan. 30, 2014); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Porter Hayden Co., 2012 WL 628493, *4 (D. Md. Feb. 24, 2012); Reed v. Honeywell Int'l, Inc., 2011 WL 6645694, *10 (Pa. Super. Ct. Dec. 6, 2011), *appeal denied*, 51 A.3d 839 (Pa. 2012); Ferguson v. Lorillard Tobacco, Co., Inc., MDL 875, 2011 WL 5903453, *1 (E.D. Pa. Nov. 22, 2011); Scapa Dryer Fabrics, Inc. v. Saville, 16 A.3d 159, 179 (Md. 2011); Shepherd v. Pneumo-Abex, LLC, MDL 875, 2010 WL 3431633, *2 (E.D. Pa. Aug. 30, 2010); *In re* Asbestos Prods. Liab. Litig. (No. VI) (Lyman v. Union Carbide Corp.), MDL 875, 2009 WL 6869437, *1 (E.D. Pa. Sept. 18, 2009); Petros v. 3M Co., 2009 WL 6390886, *1 (Cal. Super. Ct. Alameda Cnty. Aug. 18, 2009); Volkswagen of Am., Inc. v. Superior Court, 139 Cal. App. 4th 1481, 1485 (1st Dist. Div. 3 2006); Seariver Maritime, Inc. v. Superior Court, 2006 WL 2105431, *1 (Cal. Ct. App. 1st Dist. Div. 4 July 28, 2006); Porter Hayden Co. v. Bullinger, 713 A.2d 962,

969 (Md. 1998); Skonberg v. Owens-Corning Fiber-glas Corp., 576 N.E.2d 28, 34 (Ill. Ct. App. 1st Dist.), *appeal denied*, 580 N.E.2d 135 (Ill. 1991).

23.     Lang v. Pataki, 674 N.Y.S.2d 903, 914 (Sup. Ct. N.Y. Cnty. 1998); *see also* Werner v. Miller, 579 S.W.2d 455, 457 (Tex. 1979) (stating that "the supervision of the trial docket is properly left to the discretion of the trial judge"); Eichelberger v. Eichelberger, 582 S.W.2d 395, 398 (Tex. 1979) (defining "inherent" judicial powers as those a court "may call upon to aid in the exercise of its jurisdiction, in the administration of justice, and in the preservation of its independence and integrity").

24.     *See* Mark A. Behrens & Manuel Lopez, *Unimpaired Asbestos Dockets: They Are Constitutional*, 24 Rev. Litig. 253 (2005).

25.     *See* Lore v. Lone Pine Corp., 1986 WL 637507 (N.J Super. Ct. Nov. 18, 1986); *see also* Acuna v. Brown & Root, Inc., 200 F.3d 335, 340 (5th Cir. 2000) (affirming dismissal for failure to comply with pretrial evidentiary *Lone Pine* order). *Lone Pine* orders have become a "common trial management technique," Arias v. DynCorp, 752 F.3d 1011, 1014 (D.C. Cir. 2014), in both state and federal courts in complex mass tort and environmental actions. *See In re* Vioxx Prods. Liab. Litig., 388 F. App'x 39 (5th Cir. 2010).

26.     *See* Jeb Barnes, *Rethinking the Landscape of Tort Reform: Legislative Inertia and Court-Based Tort Reform in the Case of Asbestos*, 28 Just. Sys. J. 157 (2007).

27.     Peter H. Schuck, *The Worst Should Go First: Deferral Registries in Asbestos Litigation*, 15 Harv. J.L. & Pub. Pol'y 541 (1992).

28.     *See In re* All Asbestos Cases, Order Establishing An Inactive Docket For Cases Filed By the Law Offices of Peter T. Nicholl Involving Asbestos-Related Claims, at 1 (Cir. Ct. Portsmouth, Va. Aug. 4, 2004) (entering unimpaired asbestos docket order based on "the Court's inherent power to control its docket.") (on file with the authors); *In re* All Asbestos Litigation Filed in Madison County, Order Establishing Asbestos Deferred Registry, at 1 (Cir. Ct., Madison Cnty., Ill. Jan. 23, 2004) ("This Court has the inherent

power to control cases on its docket and to order the trial or disposition of these cases in a manner consistent with an economical allocation of judicial resources and the parties' interests.") (on file with the authors); *In re* Asbestos Cases, at 2 (Cir. Ct., Cook Cnty., Ill. Mar. 26, 1991) (Order to Establish Registry for Certain Asbestos Matters) ("This Court has the inherent power to control cases on its docket and to order the trial or disposition of these cases in a manner consistent with an economical allocation of judicial resources and the parties' interests.") (on file with the authors); *In re* Asbestos Pers. Injury and Wrongful Death Asbestos Cases, No. 92344501, 1992 WL 12019620, at *1 (Cir. Ct. Baltimore City, Md. Dec. 9, 1992) (Order Establishing an Inactive Docket for Asbestos Personal Injury Cases) (stating that "the Court's inherent power to control its docket" permitted the entry of an order to create an unimpaired asbestos docket).

29.     586 N.E.2d 521 (Ill. App. 1991).

30.     *Id.* at 524.

31.     713 N.E.2d 20 (Ohio Ct. App. 1998).

32.     *Id.* at 23.

33.     *Id.* at 25.

34.     *See* Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?*, 23 Widener L.J. 97, 136–38 (2013).

35.     Amended Admin. Order No. 12, *In re* Asbestos Prods. Liab. Litig. (No. VI), MDL 875 (E.D. Pa. Sept. 3, 2009), *available at* https://www.paed.uscourts. gov/documents/MDL/MDL875/adord12.pdf.

36.     Robreno, *supra*, at 186–87.

37.     139 Cal. App. 4th 1481 (1st Dist. Div. 3 2006).

38.     *Volkswagen*, 139 Cal. App. 4th at 1497.

39.     2006 WL 2105431 (Cal. Ct. App. 1st Div. 4 July 28, 2006).

40.     *Id.* at *1.

41. *See, e.g.*, *Willis*, 2014 WL 2458247, at *1 ("Federal and state courts have routinely held that claims submitted to asbestos bankruptcy trusts are discoverable. . . .").

42. Alvey v. 999 Quebec, Inc., No. 04CV200183, at 8, 10-12 (Mo. Cir. Ct. Jackson Cnty. Mar. 19, 2007) (Order of the Discovery Commissioner Relating to Bankruptcy Claims).

43. *In re* Eighth Judicial Dist. Asbestos Litig. (Drabczyk v. Amchem Prods., Inc.), No. 2005/1583, at 5 (N.Y. Sup. Ct. Erie Cnty. Jan. 18, 2008) (Decision and Order).

44. *Id.*

45. *Willis*, 2014 WL 2458247, *2; *Nat'l Union Fire Ins. Co.*, 2012 WL 628493, at *4; *Ferguson*, 2011 WL 5903453, at *1; *Shepherd*, 2010 WL 3431633, at *2; *Lyman*, 2009 WL 6869437, at *1.

46. *In re* Mass. State Court Asbestos Litig., Amended Pre-Trial Order No. 9, ¶ XIII(C)(7)(o)(2)(e) (Mass. Super. Ct. Middlesex Cnty. June 27, 2012) (Case Management Order entered for all asbestos personal injury litigation in Massachusetts). Interestingly, some plaintiffs' attorneys, who have been outspoken against transparency legislation such as the federal Furthering Asbestos Claim Transparency (FACT) Act (H.R. 526, 114th Cong. (2015)), appear to countenance court procedures that integrate trust claims into the tort system without the need for legislative interference. *See* Bruce Mattock *et al.*, *Perspectives on Mass Tort Litigation, Part II: Clearing Up The False Premises Underlying The Push For Asbestos Trust "Transparency,"* 23 WIDENER L.J. 725, 750 (2014).

47. *See* Ariz. H.B. 2603 (2015) (to be codified at ARIZ. REV. STAT. § 12-7825); OHIO REV. CODE §§ 2307.951 to 2307.954; OKLA. STAT. TIT. 76, §§ 81 to 89; W. Va. S.B. 411 (2015) (to be codified at W. VA. CODE §§ 55-7E-1 to 55-7E-11); WIS. STAT. § 802.025. ∎

**MEALEY'S LITIGATION REPORT:  ASBESTOS**
*edited by Bryan Redding*
**The Report** is produced twice monthly by



1600 John F. Kennedy Blvd., Suite 1655, Philadelphia, PA 19103, USA
Telephone: (215)564-1788 1-800-MEALEYS (1-800-632-5397)
Email: mealeyinfo@lexisnexis.com
Web site: http://www.lexisnexis.com/mealeys
ISSN 0742-4647

Testimony of Judge Peggy L. Ableman (ret.)
Before the Judiciary Committee of the United States House of Representatives
Furthering Asbestos Claim Transparency (FACT) Act of 2013
March 13, 2013

Prior to my retirement in December 2012, I served for more than 29 years as a Trial Judge in the Delaware State Court system.    During the last few years of my term on the Delaware Superior Court I was solely responsible for the asbestos litigation docket, which comprised approximately 500 to 600 pending cases filed by plaintiffs from all over the United States and even by foreign nationals.

My experience in one particular case gave me a unique insight into the inherent unfairness associated with a system that permits plaintiffs' filings of bankruptcy claims to remain secret and undisclosed while a plaintiff is also actively engaged in asbestos tort litigation.

Unquestionably, asbestos-related diseases, and particularly mesothelioma, are gruesome and frequently deadly and no amount of compensation can ever take the place of a loved one who succumbs to these diseases. I wholeheartedly agree that every defendant that has exposed an individual to asbestos should bear its share of responsibility.    The problem that I came to recognize, however, is far more serious because it goes to the very heart and integrity of this litigation.    Absent full disclosure, the defendants cannot be informed of the full extent of an individual's exposure. They are therefore often led to believe‐ erroneously‐that their products were far more responsible for the plaintiff's disease than what may have been the case, because they have no way of knowing the substance of an individual plaintiff's claims.

The irony of my encountering this problem in Delaware is that we actually impose a requirement in our state, by Standing Order, that within 30 days of the filing of an asbestos action plaintiffs are required to serve upon the Defense Coordinating Counsel "all claim forms and related

1 of 6

materials related to any claims made by a Plaintiff to any...trust, entity, or person related to or in any way involved with asbestos claims." This is further defined to include specifically, "claims made to trusts for bankrupt asbestos litigation defendants." These disclosure requirements are ongoing under the Delaware Order and require plaintiffs to supplement the information up to the time of trial. Yet, even in a state where there is an express requirement of full disclosure of these claims early on in the litigation, deception can still occur, often resulting in irreversible prejudice to one or more defendants.

What transpired in the case before me is illustrative of the highly prejudicial effect upon defendants of any system where one or more defendants are not made aware of the full scope of a particular plaintiff's claims of exposure. A brief discussion of the case of *Montgomery v. A. W. Chesterton Co. Del. Super. Civil Action No. 09C-11-217 ASB*, underscores the problem.

On April 3, 2009, June Montgomery was diagnosed with pleural mesothelioma. Her son, Brian Montgomery, a sheriff's deputy in Broward County, Florida, assisted his mother and father, Arthur Montgomery, to find an attorney shortly after she was diagnosed. Brian retained the Law Offices of Brent Coon several weeks later. He expressly understood that the Brent Coon firm would assist his parents in finding counsel in Florida where his parents lived. Ultimately, they hired Florida attorneys, Levin, Papantonio, Thomas, Echsner & Proctor. P.A. While Brian claimed at his deposition that no other law firms were involved, in fact he had both Delaware counsel when the decision was made to file in Delaware, and Virginia counsel was retained to perform the videotaped trial examination of plaintiff's proffered expert, Jacques Legier, M.D.

On November 25, 2009, Delaware counsel filed a lawsuit in the Superior Court in New Castle County, Delaware on behalf of June and Arthur Montgomery against 22 defendants, alleging that June's malignant mesothelioma was caused by exposure to asbestos from the products and/or conduct of the named defendants, the case was assigned to me in my capacity as the asbestos docket judge.

ME1 15191885v.1

Delaware has already remedied the problem that this legislation seeks to address. Asbestos related suits in Delaware are governed by Standing Order No. 1, which sets forth mandatory disclosure obligations related to bankruptcy trust claims. Despite this Order and specific interrogatories directed to plaintiffs requesting this information, from the outset of this case and up until the weekend before trial, nowhere did plaintiffs identify exposure through any of the twenty entities to whom bankruptcy claims were submitted. Instead, in their responses to interrogatories propounded by defendants, Plaintiffs claimed that Mrs Montgomery was exposed to asbestos solely through laundering of her husband's work clothing throughout his career, as opposed to any work she performed herself with or around products outside of the home. Specifically, Plaintiffs asserted that Mr. Montgomery brought home asbestos-containing dust on his clothing from his work as an electrician at the Everglades Power Plant. In response to an interrogatory asking Plaintiffs to identify all entities who were not defendants, but with whose asbestos-containing products June came into contact, Plaintiffs identified no additional entities.

Mrs. Montgomery died on April 3, 2010 and her son Brian, as Personal Representative of the Estate, was substituted as Plaintiff by Amended Complaint filed on October 21, 2010. The allegations of exposure to asbestos remained largely unchanged from the original complaint.

Arthur Montgomery was deposed on June 8, 2011. Although he had spent his entire career working as an electrician, with and around a wide variety of products and materials, at multiple locations throughout Florida, the impression garnered from the Complaint, answers to written discovery, and Mr. Montgomery's sworn testimony was that the bulk of his work around asbestos occurred only during a short period at the Everglades Power Plant.

During discovery, Plaintiffs specifically denied submitting claims to Owens-Corning, United States Gypsum, Armstrong World Industries, Babcock & Wilcox, Plibrico, and ASARCO even though

their state-of-the-art expert, Barry Castleman, addresses the conduct of many of these companies in his book, "Asbestos Medical and Legal Aspects" Fifth Ed. (2004). Nor did Plaintiffs' proffered causation expert, Dr. Jacques Legier, during his videotaped deposition, address exposures to many of the products manufactured by the entities that established the bankruptcy trusts, and from whom Plaintiffs made claims.

The parties had agreed that Florida law was applicable to the case. It permits jurors to allocate fault to parties not present at trial, including bankrupt entities. Because Foster Wheeler was aware of other cases where lawyers representing asbestos claimants had submitted conflicting work histories to multiple trusts, it filed a motion in advance of trial requesting that the Court order disclosure of all pretrial settlements, including monies received from bankruptcy trusts. Counsel for Plaintiff emphatically reported to me at the pretrial conference that no bankruptcy submissions had been made and no monies had been received.

On Saturday, November 5, 2011, two days before a two-week trial in this case was scheduled to begin, Plaintiff's counsel advised that his client had received two bankruptcy settlements of which he was previously unaware. This disclosure was directly inconsistent with his unequivocal representations to the Court and to opposing counsel at the pretrial conference. By late afternoon the following day - the day before trial was to commence- counsel for Foster Wheeler learned that a total of **twenty** bankruptcy trust claims had been submitted. Although Foster Wheeler had been led to believe that Mrs. Montgomery's exposure was solely the result of take-home fibers on her husband's clothing, at this late point in the litigation, it became obvious that one or more of Plaintiff's attorneys had been claiming exposure through Mrs. Montgomery's own employment. That is, she worked with and around these products herself. In essence, the representations to the bankruptcy trusts painted a much broader picture of exposure to asbestos than either Plaintiff or any of Plaintiff's attorneys had

acknowledged during the entire course of the litigation in Delaware. Plaintiff's failure to disclose and produce the trust claims precluded Foster Wheeler from investigating Mrs. Montgomery's exposure to asbestos from those additional entities, or identifying additional exposures from products that were not developed in the Delaware litigation – which was severely prejudicial to Foster Wheeler.

On the first day of the scheduled trial, November 7, 2011, in preparation for which the Court had devoted a huge amount of time and resources, with a jury already selected and waiting to serve, the Court learned of Plaintiff's failure to disclose the trust submissions. This circumstance dramatically affected the entire litigation, including the lengthy discovery process and trial preparation, which had been conducted without knowledge of the true facts, not to mention the waste of the Court's time and limited resources. Since I was understandably upset, I called counsel to a chambers conference room, because the withholding of critical information went to the very heart of the defense:

> This isn't something I could possibly fix after the trial is over. This deals with the verdict sheet. It deals with the way they present their defense. It deals with what information they have. It deals with how they cross-examine the witnesses. They have not been able to do any cross-examination or any discovery on the other aspects of disclosure that are listed in this letter because they were not made aware that there were these claims that were made. I just think that it's in such bad faith that I don't know that I can possibly remedy it any other way.

By the time of trial Foster Wheeler was the sole remaining defendant in the case, as all remaining 22 defendants had either settled or been dismissed. Plaintiff had litigated the case as though Foster Wheeler had predominant responsibility for Mrs. Montgomery's asbestos exposure. Literally on the eve of trial, however, twenty new entities surfaced that had neither been named nor disclosed. Had these claims been timely disclosed by Plaintiff, Foster Wheeler would have taken steps towards developing discovery and defenses to explore these exposures at the depositions of Arthur

ME1 15191885v.1

Montgomery and of Plaintiff's experts. Foster Wheeler would have also retained its own experts to address these exposures but it was never given that opportunity.

In my opinion, the bankruptcy filings go to the core of what this litigation is about. The very crux of the Montgomery case, as in virtually all asbestos litigation, was a determination of responsibility for Mrs. Montgomery's exposure. I noted this emphatically at the conference where I determined that the trial could not go forward, noting that, in asbestos litigation:

> The most important thing is that a Plaintiff disclose what they think caused their disease. And if they don't disclose honestly when they're asking for money from another company and don't even let the defendant know about that, that's so dishonest. It is just so dishonest.

Where twenty manufacturers of asbestos and asbestos-containing products are removed from the equation, a true allocation of fault cannot occur. More importantly, the fact that Plaintiff denied exposures in this case, and yet submitted claims for exposures and accepted money for those claims, went directly to the issue of credibility.

In the final analysis, there can be no real justice or fairness if the law imposes any obstacles to ascertaining and determining the complete truth. From my perspective as a judge, it is not simply the sheer waste of resources that occurs when one conducts discovery or trials without knowledge of all the facts, although that circumstance is indeed unfortunate and one that courts can ill afford in this day and age. What is most significant is the fact that the very foundation and integrity of the judicial process is compromised by the withholding of information that is critical to the ultimate goal of all litigation — a search for, and discovery of, the truth.

ME1 15191885v.1

Testimony of Judge Peggy L. Ableman (ret.)
Before the Judiciary Committee of the United States Senate
The Need for Transparency in the Asbestos Trust
February 3, 2016

For the past six years or so, I have been a staunch advocate for legislation that will create greater transparency and openness between the two compensation systems available to plaintiffs who have been injured as a result of exposure to asbestos. While I have no current role in the judiciary and no specific sponsor urging me to continue to advocate for passage of the FACT Act, I do have experience in this area because I was a State Court trial Judge in Delaware for almost 30 years (I retired from the bench only 3 years ago). For the last few years of my tenure on the Superior Court I was solely responsible for the statewide asbestos docket, which consisted of approximately 600-700 cases.

In that capacity, I had an experience that deeply troubled me, and opened my eyes to the need for greater transparency between the two compensation systems. It has also led me to advocate for both state and federal legislation to eliminate the deceptive practices that the current system fosters.

I have seen this lack of transparency played out in my own courtroom, where I personally believed that I possessed all the power necessary to ensure a fair and just result in every case over which I presided. I was wrong. Even with standing judicial orders and rules requiring disclosure the problem persists.

1

The case that I will briefly describe precipitated my post-retirement interest in advocating for reform of the current system. And, as I have come to learn over the past few years, it was not an isolated or unique situation. It is a national problem that threatens the very integrity and fairness of our court proceedings. It is a problem that is so widespread that it has been addressed by an increasing number of state legislatures and has been the topic of dozens of scholarly legal articles and reviews.

The irony of my encountering this problem in Delaware is that we have (and had) a statewide standing case management Order requiring plaintiffs in asbestos cases to provide to defendants copies of all bankruptcy trust claim forms filed. But even in a state where an express requirement of full disclosure exists, withholding or suppression of vital information can still occur, often resulting in irreversible prejudice to one or more defendants.

The case to which I refer was called Montgomery v. A.W. Chesterton, but by the time of trial, all but one defendant, Foster Wheeler, had settled. The original plaintiff in the case, June Montgomery, was diagnosed in April of 2009 with pleural mesothelioma. Her son Brian first retained Texas counsel to assist his parents in finding Florida counsel where they resided. Florida counsel ultimately filed the case in Superior Court in New Castle County, Delaware in November

2

2009. The suit named 22 defendants and alleged that June's mesothelioma was caused by exposure to their products.

As I stated, asbestos-related lawsuits in Delaware are governed by a Standing Order that sets forth mandatory disclosure obligations related to bankruptcy trust claims. But despite this Order – and specific interrogatories directed to plaintiffs requesting this information from the outset -- up until the weekend before trial was to commence on Monday, at no time did plaintiffs identify the products of any of the twenty entities to whom bankruptcy trust claims had been submitted. Instead, they consistently asserted that Mrs. Montgomery was exposed to asbestos solely through her laundering of her husband's work clothes, as opposed to any work she personally performed with or around products outside the home.

Although Mr. Montgomery, her husband, was an electrician who had worked with and around a variety of products and materials at multiple locations in Florida throughout his entire career, the distinct impression from the Complaint, discovery responses, and his sworn deposition testimony was that the bulk of his work around asbestos occurred only during a short period of time at the Everglades Power Plant – where, coincidentally, Foster Wheeler boilers were located.

Because Foster Wheeler was aware of other cases where lawyers representing asbestos claimants had submitted conflicting work histories to

multiple trusts, it had filed a motion in advance of trial requesting that the Court direct the plaintiffs to disclose all pretrial settlements and any monies received from bankruptcy trusts. Plaintiff's counsel reported to me, unequivocally, that no trust submissions had been made and no monies received. But two days before trial was to begin – on Saturday night – defense counsel first learned from Plaintiff's counsel that Plaintiff had received two bankruptcy settlements of which he was previously unaware. The disclosure was directly inconsistent with counsel's representations to the Court.

By the following day, it was revealed that a total of twenty bankruptcy trust claims had been submitted. Although the defendant had been led to believe that Mrs. Montgomery's exposure was solely the result of take-home fibers on her husband's clothing, at this late point in the litigation, it was discovered that one or more of plaintiff's attorneys had been claiming exposure through Mrs. Montgomery's own employment, as she had worked in and around the products herself.

In essence, the representations to the bankruptcy trusts painted a much broader picture of exposure to asbestos than Plaintiff or her attorneys had acknowledged during the entire course of the litigation in Delaware. Under Florida law, jurors are permitted to allocate fault to parties not present at trial, including bankrupt entities. But plaintiff's failure to disclose and produce the trust claims

4

precluded Foster Wheeler from investigating Mrs. Montgomery's exposure to asbestos from these additional bankrupt companies or from identifying additional exposures from products that were not developed in the Delaware litigation. And that, of course, was severely prejudicial to defendant Foster Wheeler.

Plaintiff had been poised to try the case before a jury as though Foster Wheeler had sole, or at least predominant, responsibility for Mrs. Montgomery's exposure and disease. This is important because the crux of the Montgomery case, as in all asbestos litigation today, is a determination of who had responsibility for the Plaintiff's exposure and to what extent. When twenty manufacturers of asbestos are removed from the equation, an honest and fair allocation of fault simply cannot occur.

Perhaps the most unfortunate consequence of the misrepresentations and withholding of evidence in that case was that 22 other defendants had already settled the claims against them. Those co-defendants had made their respective determinations regarding what settlement amounts would be fair based upon insufficient data and an incomplete picture of the plaintiff's total exposure history. A full knowledge of all of the facts may even have led some defendants to remain in the case rather than settle.

Aside from the sheer waste of valuable resources, what was most disturbing to me was that I was completely unaware that I was depriving litigants before me

5

of a fair and level playing field. I had always been able to rely upon the attorneys in my court to act honorably, and I had no concept of the ingenuity of plaintiffs' counsel to devise methods to withhold this information without running afoul of ethical rules. In the end, it was disheartening to see firsthand how easily the judicial process could be manipulated by the withholding of information that was critical to the truth-seeking function of our courts.

When I first began advocating for greater transparency I was often led to believe that there was no such thing as widespread fraud in this dual compensation scheme. Three years ago, I appeared before the Committee on the Judiciary of the House of Representatives in support of this same FACT Act. When I related the circumstances of the *Montgomery* case, I was faced with vehement opposition from representatives of the Plaintiffs bar, insisting that there was not a shred of evidence of fraud, that my case was an aberration or an anomaly, that the FACT Act was nothing more than a "solution in search of a problem," and even a back-handed complement that "good judges like Judge Ableman are able to discover fraud and promptly act to impose sanctions against offending attorneys."

In the intervening three years since I last testified, extensive evidence has surfaced that demonstrates just how widespread and systemic these claiming abuses have become. We now have additional proof and many examples demonstrating that the *Montgomery* case was not an isolated or rare circumstance.

6

To be sure, a federal bankruptcy judge in North Carolina made national headlines two years ago after he wrote an exhaustive Opinion in the bankruptcy case involving gasket maker Garlock Sealing Technologies, LLC. The court in that case concluded that the practice of withholding exposure evidence concerning the products of bankrupt companies was sufficiently widespread that Garlock's prior settlements of mesothelioma claims in the tort system were "infected by the manipulation of exposure evidence by plaintiffs and their lawyers." Characterizing the scheme as a "startling pattern of misrepresentation" Judge Hodges ultimately reduced the amount of money to fund the Garlock trust for pending and future claims from the $1 billion dollars plaintiffs were seeking to $125 million. Shortly thereafter, Garlock filed four adversary complaints against several leading plaintiffs' law firms and attorneys, alleging conspiracy, fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Unfortunately, the revelations of abuse in the *Garlock* case were just the tip of the iceberg. In July 2014, the Court granted access to the data in Garlock's bankruptcy case. The information that was made public comprises the most robust and extensive set of asbestos claims data ever assembled, and it was this database that played a crucial role in Garlock's ability to prove and quantify the systemic suppression of vital exposure evidence related to reorganized companies and their successor trusts.

7

We now have additional proof that evidence of manipulation exists well beyond Garlock's experience. The recent Mealy's article that I co-authored, based on the research and analysis of my colleagues from Bates White Economic Consulting, Marc Scarcilla and Peter Kelso, establishes the same systemic suppression of evidence against Crane Co., a solvent company still subject to suit in the tort system. The specific cases highlighted in that article expose a similar pattern of withholding, concealing, and misrepresenting the asbestos exposures upon which the trust claims were based.

My experience, then, can no longer be considered unique or unprecedented. The Opinion of Judge Hodges in the *Garlock* bankruptcy case, the research and analysis of Bates White involving Crane Co.'s settlement history, the increasing number of states that have passed or are considering specific legislation to increase transparency, as well as the growing number of jurisdictions that have implemented Standing Case Management Orders requiring early disclosure, all speak to the magnitude of the problem of inconsistent claiming patterns and fraudulent practices.

In fact, just last week, another solvent defendant, John Crane, Inc. (JCI) (not related to Crane Co.) filed motions to intervene in the RICO cases pending against Plaintiffs' law firms in North Carolina. These motions contain even more examples of the massive fraud that is routinely practiced in mesothelioma

litigation. The asbestos litigation landscape has changed dramatically since I testified three years ago. We should now be asking ourselves whether our legal system should continue this tolerance for fraud. In my opinion, we can no longer turn a blind eye to this ongoing assault to the integrity and fairness of our legal processes.

It is not necessary to single out any particular attorneys or plaintiffs to lay blame. The system as it is now structured encourages attorneys to wait until the litigation is concluded before filing trust claims. In my case, the lawyers were clearly not forthright when they concealed the trust filings in violation of the Case Management Order and when they failed to disclose the claims in discovery. Yet, the plaintiff could just as easily have waited to file trust claims until after the case was concluded. In that case, there would be nothing to disclose and therefore no fraud. Attorneys continue to take advantage of this loophole because they can justify their actions by asserting that they have a duty to maximize recovery for their clients. But when these claim filings are delayed, with the express purpose of deliberately concealing evidence of exposure to other products, the outcome is unfair to the remaining solvent defendants in the case as well as to those defendants who have settled. The practice also depletes the resources available to those claimants who honestly seek compensation.

9

Finally, I want to emphasize the difficulty in relying upon the courts to achieve greater transparency. Courts have scant resources and are extremely limited in their ability to police these fraudulent practices. The *Montgomery* case is a quintessential example of how difficult it is for judges to control this deliberate withholding of exposure evidence through Case Management Orders or even through disciplinary proceedings. Even after plaintiff's scheme was exposed, the real culpable lawyer turned out to be a Texas attorney, who had never entered his appearance in the Delaware Superior Court and who had filed trust claims on plaintiff's behalf without advising litigation counsel. He was beyond the reach of our Court's disciplinary powers.

When I first became a member of the judiciary in Delaware I truly believed that our system was so superior to any other that our procedures were able to ferret out fraud and deceit. I retired from the bench almost 30 years later with the sinking feeling that, at least in asbestos litigation, the civil justice system in our country is facing a real crisis. For too long, our courts have been manipulated by the withholding of vital evidence from judges and juries.

I am a passionate supporter of this legislation because I am convinced that it will help to restore integrity to asbestos tort litigation. From my perspective as a former judge, justice and fairness are compromised if the law imposes any obstacles to ascertaining and determining the complete truth. Indeed, the very

foundation of our judicial process is at great risk when we continue to tolerate the withholding of information that is critical to the ultimate goal of all litigation – a search for, and discovery of, the truth.

ME1 21923745v.1

# EXHIBIT 3

**THE FAIRBANKS COMPANY – INTERESTED PARTIES**
**18-41768-PWB**

**Debtor**
The Fairbanks Company

**Debtor's Officers, Directors, and Equity Holders**
Richard W. Colburn
Robert P. Lahre
Mark White
Betsy P. Colburn, c/o Henley Management Company
BMO Harris Bank, N.A., Hilary P. Colburn 2011 Trust c/o Henley Management Company
BMO Harris Bank, N.A., Trevor W. Colburn 2011 Trust c/o Henley Management Company
Keith W. Colburn, Trustee U/D/T dated 2/16/78 with Keith W. Colburn as Settlor c/o Henley Management Company
Keith W. Colburn, Trustee U/D/T for the benefit of Alexander J. Colburn c/o Henley Management Company
Keith W. Colburn, Trustee U/D/T for the benefit of Sarah J. Colburn c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T dated 7/13/78 with Richard W. Colburn as Settlor c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T for the benefit of Andrew S. Colburn c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T for the benefit of Catherine Hogel c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T for the benefit of Elisabeth Hogel c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T for the benefit of Erik Hogel c/o Henley Management Company
Richard W. Colburn, Trustee U/D/T for the benefit of Richard W. Colburn II c/o Henley Management Company
The Colburn School
Delos Dunton, LLC

**Insurance Entities**
Liberty Mutual Insurance Company
The National Union Fire Insurance Company of Pittsburgh
Fireman's Fund Insurance Company
Aetna Casualty Company of CT
Federal Insurance
Pacific Employers
Mission Insurance
Integrity Insurance
Agricultural Insurance
National Surety Corporation
National Union Insurance

Lumberman's Mutual
Hartford Fire Insurance Co.
Travelers Insurance
Liberty Life Assurance Company of Boston
AXA Royale Belge
The Hartford Insurance Company
Traveler's Casualty & Surety Company

**Debtor's Professionals**
Ogier, Rothschild & Rosenfeld, PC
Reed Smith LLP
Logan & Company, Inc.
Cohen & Grigsby, P.C.

**Attorneys for Committee of Asbestos Claimants Members and Their Attorneys**
Jones & Walden
Caplin & Drysdale, Chtd.

**Committee of Asbestos Claimants Members and Their Attorneys**
Karen Colella (as executrix for the estate of Dionisio Gomez)
James P. Digan
Dorothy A. Kliner
James Stock
Douglas Wenz
Belluck & Fox LLP
Goldberg, Persky & White, P.C.
Maune Raichle Hartley French & Mudd
Weitz & Luxenberg, P.C.

**Ten Law Firms Representing the Largest Number of Asbestos Claimants**
Weitz & Luxenberg, P.C.
Goldberg, Persky & White, P.C.
Shrader & Associates, L.L.P.
Belluck & Fox LLP
Wilentz, Goldman & Spitzer P.A.
Thornton Law Firm LLP
Prim Law Firm, PLLC
Savinis, D'Amico, & Kane
The Williams Law Firm, P.C.
Early, Lucarelli, Sweeney & Meisenkothen

**Creditors with Scheduled Non-Asbestos Claims**
All persons and entities listed as such in the Debtor's Schedules [Doc. No. 44 - see attached]

**Named Creditors with Asbestos Claims**
All persons listed as such in the Notice of Appearance by Lisa Nathanson Busch [Doc. No. 59 -
see attached]

**Office of the United States Trustee and Staff**

**Northern District of Georgia Bankruptcy Judges**
Honorable Wendy L. Hagenau, Chief Judge
Honorable Paul M. Baisier
Honorable Paul W. Bonapfel
Honorable Jeffery W. Cavender
Honorable W.H. Drake Jr.
Honorable Barbara Ellis-Monro
Honorable Lisa Ritchey Craig
Honorable James R. Sacca
Honorable Sage M. Sigler

**Other Entities**
Dentons US LLP

| Fill in this information to identify the case: |
|---|
| Debtor name **The Fairbanks Company** |
| United States Bankruptcy Court for the: NORTHERN DISTRICT OF GEORGIA |
| Case number (if known) **18-41768-PWB** |

☐ Check if this is an
amended filing

# Official Form 206Sum
## Summary of Assets and Liabilities for Non-Individuals 12/15

---

### Part 1: Summary of Assets

1. **Schedule A/B: Assets-Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*.................................................................................... $ 1,209,753.15

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*.................................................................................. $ 4,600,016.28

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*.................................................................................... $ 5,809,769.43

---

### Part 2: Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D*.................... $ 0.00

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 5a of *Schedule E/F*.......................................... $ 61,533.21

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 5b of *Schedule E/F*.......................... +$ 306,805.27

4. **Total liabilities** ....................................................................................................
   Lines 2 + 3a + 3b          $ 368,338.48

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **The Fairbanks Company** |
| United States Bankruptcy Court for the: | NORTHERN DISTRICT OF GEORGIA |
| Case number (if known) | **18-41768-PWB** |

☐ Check if this is an amended filing

## Official Form 206A/B
## Schedule A/B: Assets - Real and Personal Property                12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:        Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | | | Current value of debtor's interest |
|---|---|---|---|
| 2. **Cash on hand** | | | **$501.95** |

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | **Comerica Bank** | **Deposit & Lockbox Account** | **1664** | **$199,669.78** |
| 3.2. | **Comerica Bank** | **Controlled Disbursement Account** | **2022** | **$1,000.00** |
| 3.3. | **Suntrust Bank** | **Payroll Account** | **8179** | **$2,606.84** |
| 3.4. | **Comerica Bank** | **Medical Disbursement Account** | **5413** | **$1,000.00** |

4. **Other cash equivalents** *(Identify all)*

| | | |
|---|---|---|
| 4.1. | **None** | **$0.00** |

5. **Total of Part 1.**

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

   | $204,778.57 |
   |---|

Case 18-41768-pwb    Doc 42    Filed 01/31/19    Entered 01/31/19 15:06:35    Desc Main
Document    Page 3 of 20

Case 18-41768-pwb    Doc 42-1    Filed 01/31/19    Entered 01/31/19 20:55:06    Desc
Exhibit Ex. 1 - Abelman Materials    Page 129 of 162

| Debtor | **The Fairbanks Company** | Case number *(If known)* | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

---

| Part 2: | **Deposits and Prepayments** |
|---|---|

**6. Does the debtor have any deposits or prepayments?**

☐ No. Go to Part 3.
■ Yes Fill in the information below.

7.     **Deposits, including security deposits and utility deposits**
    Description, including name of holder of deposit

8.     **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**
    Description, including name of holder of prepayment

| 8.1. | **Prepaid General Insurance** | **$8,896.68** |
|---|---|---|
| 8.2. | **Prepaid Worker's Compensation Insurance** | **$7,172.33** |
| 8.3. | **Prepaid Freight** | **$14,988.89** |

9.     **Total of Part 2.**
    Add lines 7 through 8. Copy the total to line 81.

**$31,057.90**

| Part 3: | **Accounts receivable** |
|---|---|

**10. Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.
■ Yes Fill in the information below.

11.     **Accounts receivable**

| 11a. 90 days old or less: | **558,756.44** | - | **27,548.71** | = .... | **$531,207.73** |
|---|---|---|---|---|---|
| | face amount | | doubtful or uncollectible accounts | | |

12.     **Total of Part 3.**
    Current value on lines 11a + 11b = line 12. Copy the total to line 82.

**$531,207.73**

| Part 4: | **Investments** |
|---|---|

**13. Does the debtor own any investments?**

■ No. Go to Part 5.
☐ Yes Fill in the information below.

| Part 5: | **Inventory, excluding agriculture assets** |
|---|---|

**18. Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.
■ Yes Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|

---

| Debtor | **The Fairbanks Company** | Case number *(If known)* | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

| 19. | **Raw materials**<br>**Lumber, steel, pipe,**<br>**tubing, bearings, bolts,**<br>**and nuts** | October 2017 | $428,015.42 | Standard Cost | $428,015.42 |
|---|---|---|---|---|---|
| 20. | **Work in progress**<br>**Work in progress** | October 2017 | $2,546.38 | Standard Cost | $2,546.38 |
| 21. | **Finished goods, including goods held for resale**<br>**Trucks, wheels, and**<br>**casters** | October 2017 | $915,053.79 | Standard Cost | $915,053.79 |
| 22. | **Other inventory or supplies**<br>**Obsolete inventory** | | $0.00 | Standard Cost | $2,117.73 |

| 23. | **Total of Part 5.** | | **$1,347,733.32** |
|---|---|---|---|
| | Add lines 19 through 22.  Copy the total to line 84. | | |

24. **Is any of the property listed in Part 5 perishable?**
■ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☐ No
■ Yes. Book value    170112.49   Valuation method    Standard Cost    Current Value    170112.49

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
■ No
☐ Yes

| Part 6: | **Farming and fishing-related assets (other than titled motor vehicles and land)** |
|---|---|

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

■ No.  Go to Part 7.
☐ Yes Fill in the information below.

| Part 7: | **Office furniture, fixtures, and equipment; and collectibles** |
|---|---|

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No.  Go to Part 8.
■ Yes Fill in the information below.

| General description | Net book value of<br>debtor's interest<br>(Where available) | Valuation method used<br>for current value | Current value of<br>debtor's interest |
|---|---|---|---|
| 39. **Office furniture**<br>Office furniture, fixtures, and equipment | $0.00 | Standard Cost | $30,501.52 |

40. **Office fixtures**

41. **Office equipment, including all computer equipment and**
**communication systems equipment and software**

Case 18-41768-pwb    Doc 420    Filed 08/14/18    Entered 08/14/18 20:55:06    Desc Main
Document    Page 5 of 20

Case 18-41768-pwb    Doc 402-1    Filed 01/31/19    Entered 01/31/19 15:06:35    Desc
Exhibit Ex. 1 - Ableman Materials    Page 131 of 162

| Debtor | **The Fairbanks Company** | Case number *(If known)* | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

42. **Collectibles** *Examples*: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

43. **Total of Part 7.**
Add lines 39 through 42.  Copy the total to line 86.

$30,501.52

44. **Is a depreciation schedule available for any of the property listed in Part 7?**
☐ No
☑ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**
☑ No
☐ Yes

| Part 8: | Machinery, equipment, and vehicles |
|---|---|

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No.  Go to Part 9.
☑ Yes Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 48. **Watercraft, trailers, motors, and related accessories** *Examples:* Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 49. **Aircraft and accessories** | | | |
| 50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** **Machinery and equipment used to manufacture products** | $69,001.55 | Standard cost | $2,016,994.21 |
| **Molds and dies** | $0.00 | Standard Cost | $437,743.03 |

51. **Total of Part 8.**
Add lines 47 through 50.  Copy the total to line 87.

$2,454,737.24

52. **Is a depreciation schedule available for any of the property listed in Part 8?**
☐ No
☑ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☑ No
☐ Yes

| Part 9: | Real property |
|---|---|

54. **Does the debtor own or lease any real property?**

☐ No.  Go to Part 10.
☑ Yes Fill in the information below.

| Debtor | **The Fairbanks Company** | | Case number *(if known)* | **18-41768-PWB** |
|---|---|---|---|---|
| | Name | | | |

**55.** **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building, if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1.  **Land and building located at:  202 N. Division Street, Rome, Georgia 30165** | **Fee Simple** | **$291,892.23** | **Standard Cost** | **$1,209,753.15** |

**56.** **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets.
Copy the total to line 88.

| **$1,209,753.15** |
|---|

**57.** **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No
☑ Yes

**58.** **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No
☐ Yes

| Part 10: | Intangibles and intellectual property |
|---|---|

**59. Does the debtor have any interests in intangibles or intellectual property?**

☐ No.  Go to Part 11.
☑ Yes Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60.** **Patents, copyrights, trademarks, and trade secrets**<br>**U.S. Trademark Reg. No. 662,965** | **$0.00** | | **$0.00** |
| **U.S. Trademark Reg. No. 1,408,215** | **$0.00** | | **$0.00** |
| **U.S. Trademark Reg. No. 784,755** | **$0.00** | | **$0.00** |
| **U.S. Trademark Reg. No. 1,258,492** | **$0.00** | | **$0.00** |
| **U.S. Trademark Reg. No. 1,735,672** | **$0.00** | | **$0.00** |
| **U.S. Trademark Reg. No. 0096506** | **$0.00** | | **$0.00** |
| **61.** **Internet domain names and websites**<br>**Internet domain name is owned** | **$0.00** | | **$0.00** |

| Debtor | **The Fairbanks Company** | Case number *(If known)* **18-41768-PWB** |
|---|---|---|
| | Name | |

62.   **Licenses, franchises, and royalties**

63.   **Customer lists, mailing lists, or other compilations**

64.   **Other intangibles, or intellectual property**

65.   **Goodwill**

66.   **Total of Part 10.**

      Add lines 60 through 65. Copy the total to line 89.

<div align="right">

**$0.00**

</div>

67.   **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C.§§ 101(41A) and 107**?**
   - ■ No
   - ☐ Yes

68.   **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
   - ■ No
   - ☐ Yes

69.   **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
   - ■ No
   - ☐ Yes

**Part 11:    All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**
    Include all interests in executory contracts and unexpired leases not previously reported on this form.

   - ☐ No.  Go to Part 12.
   - ■ Yes Fill in the information below.

| | Current value of debtor's interest |
|---|---|
| 71.   **Notes receivable**<br>Description (include name of obligor) | |
| 72.   **Tax refunds and unused net operating losses (NOLs)**<br>Description (for example, federal, state, local) | |
| 73.   **Interests in insurance policies or annuities** | |
| 74.   **Causes of action against third parties (whether or not a lawsuit has been filed)**<br>**The Fairbanks Company v. The National Union Fire Ins. Co. of Pittsburgh, et al., Civil Action No. 15-cv-1141 (JGK)** | **$0.00** |
|   Nature of claim       Declaratory relief regarding insurance coverage | |
|   Amount requested       $0.00 | |
| 75.   **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**<br>**Insurance claim for property damage caused by storm** | **Unknown** |
|   Nature of claim       Insurance claim | |
|   Amount requested       $170,983.12 | |

Debtor    **The Fairbanks Company**                          Case number *(If known)*  **18-41768-PWB**
          <span style="font-size:smaller">Name</span>

76.    **Trusts, equitable or future interests in property**

77.    **Other property of any kind not already listed** *Examples:* Season tickets,
       country club membership

78.    **Total of Part 11.**                                                        | **$0.00** |
       Add lines 71 through 77. Copy the total to line 90.

79.    **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
       ■ No
       ☐ Yes

Debtor    **The Fairbanks Company**                                    Case number *(If known)*  **18-41768-PWB**
          Name

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1* | $204,778.57 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $31,057.90 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $531,207.73 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $0.00 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $1,347,733.32 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $30,501.52 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $2,454,737.24 | |
| 88. **Real property.** *Copy line 56, Part 9*.......................................................> | | $1,209,753.15 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $0.00 | |
| 91. **Total.** Add lines 80 through 90 for each column | $4,600,016.28 | + 91b.  $1,209,753.15 |
| 92. **Total of all property on Schedule A/B.** Add lines 91a+91b=92 | | $5,809,769.43 |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com                                                           Best Case Bankruptcy

**Fill in this information to identify the case:**

Debtor name    **The Fairbanks Company**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF GEORGIA

Case number (if known)    **18-41768-PWB**

☐ Check if this is an amended filing

## Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property    12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☑ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

☐ Yes. Fill in all of the information below.

<div style="border:1px solid black;">

**Fill in this information to identify the case:**

Debtor name   **The Fairbanks Company**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF GEORGIA

Case number (if known)   **18-41768-PWB**

</div>

☐ Check if this is an
amended filing

# Official Form 206E/F
## Schedule E/F: Creditors Who Have Unsecured Claims     12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:**     List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).

   ☐ No. Go to Part 2.

   ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|
| **2.1** | Priority creditor's name and mailing address<br>**A&B Fasteners, Inc.**<br>**P.O. Box 760**<br>**Bethlehem, GA 30620** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $219.25 | $219.25 |
|  | Date or dates debt was incurred<br>**7/23/18 and 7/24/18** | Basis for the claim:<br>**503(b)(9)/507(a)(2)** |  |  |
|  | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (2) | Is the claim subject to offset?<br>☑ No<br>☐ Yes |  |  |
| **2.2** | Priority creditor's name and mailing address<br>**A. I. E.**<br>**6670 Best Friend Road**<br>**Norcross, GA 30071** | As of the petition filing date, the claim is:<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $5,894.50 | $5,894.50 |
|  | Date or dates debt was incurred<br>**7/12/18 and 7/25/18** | Basis for the claim:<br>**503(b)(9)/507(a)(2)** |  |  |
|  | Last 4 digits of account number<br>Specify Code subsection of PRIORITY<br>unsecured claim: 11 U.S.C. § 507(a) (2) | Is the claim subject to offset?<br>☑ No<br>☐ Yes |  |  |

| Debtor | **The Fairbanks Company** | Case number (if known) | **18-41768-PWB** |
|--------|---------------------------|------------------------|-------------------|
|        | Name |  |  |

---

| 2.3 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $32,898.50 | $32,898.50 |
|-----|----------------------------------------------|-----------------------------------------------|------------|------------|

**Atlanta Hardwood Corporation**
**5596 Riverview Road SE**
**Mableton, GA 30126-2914**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/27/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.4 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $975.08 | $975.08 |
|-----|----------------------------------------------|-----------------------------------------------|---------|---------|

**Berliss Bearing Company**
**644 Route 10**
**Livingston, NJ 07039**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/17/18 and 7/19/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.5 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $465.77 | $465.77 |
|-----|----------------------------------------------|-----------------------------------------------|---------|---------|

**Camp Industries Inc.**
**P.O. Box 933**
**Rome, GA 30162-0833**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/20/18 and 7/25/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.6 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $850.32 | $850.32 |
|-----|----------------------------------------------|-----------------------------------------------|---------|---------|

**Coosa Steel Corp.**
**98 Darlington Drive SW**
**VA 20161-4708**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/20/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| Debtor | **The Fairbanks Company** | Case number (if known) | 18-41768-PWB |
|---|---|---|---|

Name

---

**2.7**

Priority creditor's name and mailing address
**Davis Core & Pad Company, Inc.**
**P.O. Box 408**
**Cave Spring, GA 30124**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$380.00    $380.00

Date or dates debt was incurred
**7/24/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.8**

Priority creditor's name and mailing address
**Durable U.S.A., Inc.**
**2801 East Abram Street**
**Arlington, TX 76010**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$4,229.33    $4,229.33

Date or dates debt was incurred
**7/17/18; 7/20/18; 7/24/18; and**
**7/27/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.9**

Priority creditor's name and mailing address
**Fastenal Co.**
**P.O. Box 978**
**Winona, MN 55987-0978**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$35.28    $35.28

Date or dates debt was incurred
**7/12/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

**2.10**

Priority creditor's name and mailing address
**Fastening Solutions, Inc.**
**P.O. Box 161842**
**Atlanta, GA 30321-1842**

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$173.34    $173.34

Date or dates debt was incurred
**7/18/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

Case 18-41768-pwb Doc 202 Filed 01/31/19 Entered 01/31/19 15:06:35 Desc
Exhibit Ex. 1 Ableman Materials 14 Page 140 of 162

| Debtor | **The Fairbanks Company** | Case number (if known) | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

---

| 2.11 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $151.21 | $117.45 |
|---|---|---|---|---|

**Georgia Department of Revenue
Processing Dept.
P.O. Box 740317
Atlanta, GA 30374-0317**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

| Date or dates debt was incurred | Basis for the claim: |
|---|---|
| | **Sales and Use Tax and Late Penalty** |

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.12 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $353.60 | $353.60 |
|---|---|---|---|---|

**Grainger
4748 Forbes Blvd.
Lanham, MD 20706-4302**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

| Date or dates debt was incurred | Basis for the claim: |
|---|---|
| **7/24/18** | **503(b)(9)/507(a)(2)** |

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.13 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $855.04 | $855.04 |
|---|---|---|---|---|

**Holston Gases-Rome
703 Calhoun Avenue
Rome, GA 30161**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

| Date or dates debt was incurred | Basis for the claim: |
|---|---|
| **7/19/18 and 7/26/18** | **503(b)(9)/507(a)(2)** |

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| 2.14 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $335.53 | $335.53 |
|---|---|---|---|---|

**J&B Importers Inc.
P.O. Box 161859
Miami, FL 33116-1859**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

| Date or dates debt was incurred | Basis for the claim: |
|---|---|
| **7/18/18** | **503(b)(9)/507(a)(2)** |

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
■ No
☐ Yes

---

| Debtor | **The Fairbanks Company** | Case number (if known) | 18-41768-PWB |
|---|---|---|---|
| | Name | | |

| 2.15 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $1,029.60 | $1,029.60 |
|---|---|---|---|---|

**Janbar Wheel Corporation**
**810 Commerce Parkway**
**Carpentersville, IL 60110**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/20/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.16 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $196.30 | $196.30 |
|---|---|---|---|---|

**MSC Ind. Supply Co.**
**P.O. Box 953635**
**Saint Louis, MO 63195-3635**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/20/18 and 7/26/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.17 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $647.17 | $647.17 |
|---|---|---|---|---|

**Quill Corp.**
**100 Schelter Road**
**Lincolnshire, IL 60069**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/17/18 and 7/19/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
☑ No
☐ Yes

---

| 2.18 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | $6,550.72 | $6,550.72 |
|---|---|---|---|---|

**S.I. Storey Lumber Company, In**
**Attn:  Karen Storey**
**285 Sike Storey Road**
**Armuchee, GA 30105-2021**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/20/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

Is the claim subject to offset?
☑ No
☐ Yes

| Debtor | **The Fairbanks Company** | Case number (if known) | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

| 2.19 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$3,920.78** | **$3,920.78** |
|---|---|---|---|---|

**Siskin Steel & Supply Co.**
**1901 Riverfront Parkway**
**Chattanooga, TN 37408-1037**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/18/18 and 7/25/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

☑ No
☐ Yes

---

| 2.20 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$270.41** | **$140.59** |
|---|---|---|---|---|

**TriState Cutting Tools**
**1682 Buchanan Hwy.**
**Cedartown, GA 30125**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/17/18 and 7/25/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

☑ No
☐ Yes

---

| 2.21 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$215.00** | **$215.00** |
|---|---|---|---|---|

**ULINE**
**ATTN ACCOUNTS RECEIVABLE**
**2200 S. LAKESIDE DRIVE**
**Waukegan, IL 60085**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/19/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

☑ No
☐ Yes

---

| 2.22 | Priority creditor's name and mailing address | As of the petition filing date, the claim is: | **$886.48** | **$886.48** |
|---|---|---|---|---|

**Valco/Valley Tool & Die**
**10020 York/Theta Drive**
**North Royalton, OH 44133**

*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
**7/17/18**

Basis for the claim:
**503(b)(9)/507(a)(2)**

Last 4 digits of account number

Is the claim subject to offset?

Specify Code subsection of PRIORITY
unsecured claim: 11 U.S.C. § 507(a) (2)

☑ No
☐ Yes

---

**Part 2:** List All Creditors with NONPRIORITY Unsecured Claims

**3.** List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

| Debtor | **The Fairbanks Company** | Case number *(if known)* | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

---

**3.1** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$0.00**
Alexander Voils
12 W. 2nd Avenue SE
Lindale, GA 30147

■ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Workers' Compensation**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.2** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,018.58**
American Builders Ins. Co.
2410 Paces Ferry Road
Suite 300
Atlanta, GA 30339-1802

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Insurance Premium**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**3.3** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$1,353.87**
AT&T Long Distance Services
2561 Piedmont Road NE C110
Atlanta, GA 30324-2029

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Telephone Service**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**3.4** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$511.34**
Dixie Industrial Finish
4925 S. Royal Atlantucke
Tucker, GA 30084

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Trade**

Is the claim subject to offset? ☐ No  ☐ Yes

---

**3.5** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$2,921.48**
FireSide Natural Gas, LLC
2655 Dallas Hwy.
Suite 250
Marietta, GA 30064

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Utility**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.6** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$0.00**
Floyd County Tax Commissioner
4 Government Plaza
Attn:  Kevin Payne
Rome, GA 30161

■ Contingent
■ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Property Tax**

Is the claim subject to offset? ■ No  ☐ Yes

---

**3.7** | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$100,000.00**
Keith W. Colburn
c/o Henley Management Company
555 Skokie Boulevard, Ste. 555
Northbrook, IL 60062

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

Last 4 digits of account number __

Basis for the claim:  **Promissory Note**

Is the claim subject to offset? ■ No  ☐ Yes

---

| Debtor | **The Fairbanks Company** | Case number (if known) | **18-41768-PWB** |
|---|---|---|---|
| | Name | | |

| 3.8 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$100,000.00** |
|---|---|---|---|

**Keith W. Colburn,Trustee U/D/T
for Carol Colburn Grigor
555 Skokie Boulevard, Ste. 555
Northbrook, IL 60062**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

**Basis for the claim:** __Promissory Note__

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

| 3.9 | Nonpriority creditor's name and mailing address | As of the petition filing date, the claim is: *Check all that apply.* | **$100,000.00** |
|---|---|---|---|

**Richard W. Colburn
c/o Henley Management Company,
555 Skokie Boulevard, Ste. 555
Northbrook, IL 60062**

☐ Contingent
☐ Unliquidated
☐ Disputed

Date(s) debt was incurred __

**Basis for the claim:** __Promissory Note__

Last 4 digits of account number __

Is the claim subject to offset? ■ No ☐ Yes

| Part 3: | **List Others to Be Notified About Unsecured Claims** |
|---|---|

**4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

**If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.**

| Name and mailing address | On which line in Part1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|

| Part 4: | **Total Amounts of the Priority and Nonpriority Unsecured Claims** |
|---|---|

**5. Add the amounts of priority and nonpriority unsecured claims.**

| | | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ 61,533.21 |
| 5b. Total claims from Part 2 | 5b. + | $ 306,805.27 |
| 5c. Total of Parts 1 and 2
Lines 5a + 5b = 5c. | 5c. | $ 368,338.48 |

**Fill in this information to identify the case:**

Debtor name **The Fairbanks Company**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF GEORGIA

Case number (if known)   **18-41768-PWB**

☐ Check if this is an amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                    12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.  **Does the debtor have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the debtor's other schedules.  There is nothing else to report on this form.
    ☑ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal      Property*
    (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1.** State what the contract or lease is for and the nature of the debtor's interest **Annual Equipment Maintenance Agreement dated 2/19/18** <br><br> State the term remaining **3/15/18 - 3/14/19** <br><br> List the contract number of any government contract | **ABA Moriah Corporation** <br> **P.O. Box 350** <br> **Gainesville, VA 20156** |
| **2.2.** State what the contract or lease is for and the nature of the debtor's interest **Quarterly Equipment Maintenance Agreement** <br><br> State the term remaining **7/1/18 - 9/30/18** <br><br> List the contract number of any government contract | **ABA Moriah Corporation** <br> **P.O. Box 350** <br> **Gainesville, VA 20156** |
| **2.3.** State what the contract or lease is for and the nature of the debtor's interest **Commercial Lease Agreement dated April 1, 2017** <br><br> State the term remaining **April 1, 2020** <br><br> List the contract number of any government contract | **American Pipe Support of** <br> **401 John Davenport Drive** <br> **Rome, GA 30165** |
| **2.4.** State what the contract or lease is for and the nature of the debtor's interest **Equipment Agreement dated 8/23/17** <br><br> State the term remaining **8/23/2021** <br><br> List the contract number of any government contract | **RJ Young Company - Nashville** <br> **P.O. Box 40623** <br> **Nashville, TN 37204** |

| Fill in this information to identify the case: |
|---|

Debtor name    **The Fairbanks Company**

United States Bankruptcy Court for the:    NORTHERN DISTRICT OF GEORGIA

Case number (if known)    **18-41768-PWB**

☐ Check if this is an amended filing

## Official Form 206H
## Schedule H: Your Codebtors

12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

### 1. Do you have any codebtors?

■ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☐ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, Schedules D-G.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| Column 1: Codebtor | | Column 2: Creditor | |
|---|---|---|---|
| Name | Mailing Address | Name | Check all schedules that apply: |
| 2.1 _____ | Street _____ <br> City   State   Zip Code | _____ | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.2 _____ | Street _____ <br> City   State   Zip Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.3 _____ | Street _____ <br> City   State   Zip Code | | ☐ D <br> ☐ E/F <br> ☐ G |
| 2.4 _____ | Street _____ <br> City   State   Zip Code | | ☐ D <br> ☐ E/F <br> ☐ G |

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com      Best Case Bankruptcy

Case 18-41768-pwb    Doc 44-1    Filed 03/13/19    Entered 03/13/19 15:06:35    Desc
Declaration    Page 1 of 1

---

**Fill in this information to identify the case:**

Debtor name    **The Fairbanks Company**

United States Bankruptcy Court for the:   NORTHERN DISTRICT OF GEORGIA

Case number (if known)   **18-41768-PWB**

☐ Check if this is an
    amended filing

---

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

---

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ■  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ■  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ■  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F )
- ■  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ■  *Schedule H: Codebtors* (Official Form 206H)
- ■  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐  Amended *Schedule*
- ☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ☐  Other document that requires a declaration _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   08 / 14 / 2018        x _____
                                        Signature of individual signing on behalf of debtor

                                        **Robert P. Lahre**
                                        Printed name

                                        **CEO, Secretary, and Treasurer**
                                        Position or relationship to debtor

---

Software Copyright (c) 1996-2018 Best Case, LLC - www.bestcase.com

Best Case Bankruptcy

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

IN RE:

**THE FAIRBANKS COMPANY,**

      **Debtor.**

**CHAPTER 11
CASE NO. 18-41768-PWB**

### NOTICE OF APPEARANCE PURSUANT TO BANKRUPTCY RULE 9010(B) AND REQUEST FOR COPIES OF ALL NOTICES, DOCUMENTS, COPIES, AND PLEADINGS

      PLEASE TAKE NOTICE that the undersigned, Lisa Nathanson Busch, hereby enters this Notice of Appearance as counsel of record for the litigants listed on Exhibit "A" attached hereto and made a part hereof by reference (collectively, "Litigants"), creditors in the above-referenced case.

      Further, request is hereby made that all notices given or required to be given in this case and any cases consolidated herewith, and all papers served or required to be served in this case, and any cases consolidated herewith, be given to and served upon:

Lisa Nathanson Busch
Weitz & Luxenberg P.C.
700 Broadway
New York, NY 10003
LBusch@weitzlux.com

      This request encompasses, but is not limited to, all notices, copies, documents, and pleadings referred to in Section 1109(b) of Title 11, United States Code, or in Rules 2002, 3017, 4001 or 9007 of the Bankruptcy Rules including, without limitation, notices of any orders, motions, demands, complaints, petitions, pleadings, papers, requests, applications, or any other documents brought before this Court in this case.

      This Notice of Appearance shall not be construed or deemed to be acquiescence or consent by Litigants to jurisdiction or venue in this Court.  The Litigants specifically reserve the right to object to the jurisdiction and venue of this Court.

      This 31st day of August, 2018.

**JONES & WALDEN, LLC**
*/s/ Leslie Pineyro*
Leslie Pineyro
Georgia Bar No. 969800
Local Designated Counsel
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
lpineyro@joneswalden.com

**WEITZ & LUXENBERG P.C.**
*/s/ Lisa Nathanson Busch*
Lisa Nathanson Busch
Admitted *Pro Hac Vice*
700 Broadway
New York, NY 10003
212-558-5500
LBusch@weitzlux.com

| ClientName | Disease | DiagDate | Trial_Group |
|---|---|---|---|
| Abney, Johanna | | | |
| Adamo, Daniel | | | |
| Adamovich, Kathleen | | | |
| Adams, Raymond E | | | |
| Adelmann, Charles | | | |
| Agosto, Richard R | | | |
| Albin, Robert | | | |
| Alford, Mark P | | | |
| Alston, Paul | | | |
| Amato, Joseph J | | | |
| Andia, Marco A | | | |
| Angevine, Joseph F | | | |
| Anzalone, Aniello | | | |
| Arch, Seth R | | | |
| Arteschene Sr., Ivan C | | | |
| Astras, John | | | |
| Audette, Gilbert R | | | |
| Aurelio, Thomas A | | | |
| Aylward, Carl Kenneth | | | |
| Baeyens, Joseph | | | |
| Baldwin, Archie D | | | |
| Bales, Harry E | | | |
| Banks, Burnstein E | | | |
| Barcavage, Alfred | | | |
| Barfield, Leroy | | | |
| Barniak, Theodore | | | |
| Barr, Edwin | | | |
| Barton, Joseph | | | |
| Beckwith, Scott W | | | |
| Beers, Walter J | | | |
| Bell, Samuel H | | | |
| Bell, Thomas C | | | |
| Bellaff, Leslie | | | |
| Belostock, Arvin | | | |
| Benenati, Vincent | | | |
| Bergstrand Jr., Carl H | | | |
| Beringer, Milton R | | | |
| Bertuzzi, Bruno | | | |
| Best Sr., James L | | | |
| Beyrouty, George | | | |
| Bienz, Nancy L | | | |
| Billings, James P | | | |
| Bitetto, Gary V | | | |
| Blahowicz, James S | | | |
| Blamowski, Ann M | | | |
| Blatt, William | | | |

Boccafola, Joseph V
Bodden, Clifton M
Bodden, William I
Boehl, Edwin F
Boehning, Michelle
Bohlmann, John
Bohnenberger, Walter
Bolling, Thomas H
Bordone, Giacomo
Bott Jr., Charles C
Bouchee, Clifton
Bower, John S
Boyle, Bruce J
Bradshaw, Martin
Brady, Thomas
Brandis, Gill J
Brennan, Joseph F
Brophy, Michael E
Brumbaugh, Ronald
Burnett Jr., Frank
Burnett, Francis J
Butcher, Robert D
Butterfield, Raymond
Buum, LoRena K
Cacalano, Nicholas A
Caggino, Gary
Calderon, Rafael J
Calimano, Vincent J
Callanan, Thomas P
Callegari, Gayle
Calvin, Charles
Cammarata, Anthony
Cammarata, Anthony L
Camp, Raymond
Campbell, Ronald D
Capps, Neal
Carlstrand, Richard
Carpenter Jr., Leonard F
Casa, James
Casey, Charles J
Castelluccio, Albert J
Castillo, Pedro Carlos
Cederroth, John
Celeste, Albert F
Centineo, Philip A
Chalco, Wilson
Chandler, George R

Chantilope, Margarito
Charbonneau, Robert F
Christy, Frederick
Chroniger, James R
Ciero, Daniel
Clancy, Arthur T
Clark, Robert B
Clark, Stephen J
Cohen, Jerry M
Colantone, Romolo G
Colantonio, Dennis
Colley, Deborah L
Connelly, Joseph
Conolly, Elvet
Conrad, Albert C
Corbett, Donald F
Corsello, William F
Cote, Robert
Cotugno Sr., Patrick A
Crew, Charles P
Criscuoli, Andrew S
Cristallo, Frank
Cronin, James
Cunningham, Ralph
Curry, John
D'onofrio, Dominick P
Davis Jr., George H
Davis, John
De Forne, John V
Decker, William S
DeGlopper, Warren H
DeGlopper, Warren H
Delikat, Leon
Delise, Frank
DeLuca, Joseph L
DeMaio, Anthony M
DeMaria, Antonio
Demeri, Angelo C
Demeri, Anthony
Dempsey, James R
Deneault, Daniel
DeRenzis, Ronald
DeTura, Frank J
Dickson, Jonas
Diliberto, Stefano
Dionne, Clarence
Ditullio, James

Case 18-41768-pwb   Doc 502-1   Filed 08/31/18   Entered 08/31/18 15:06:35   Desc Main
Exhibit Ex. 1 - Abelman Materials   Page 152 of 162

Case 18-41768-pwb   Doc 502-1   Filed 08/31/18   Entered 08/31/18 12:48:10   Desc Main
Document   Page 5 of 15

Doll, Frederick E
Donnelly, James
Donovan, Thomas
Dougherty, Edward
Dowling, Edna
Drum, Thomas N
Dubray, William T
Dunford, William  L
Dunn, Kevin C
Dunphy, Stephen M
Ebanks, Claude L
Ebanks, Ernest K
Ebanks, James L
Ebanks, William D
Eckrich, Thomas L
Ehrich, Willard L
Ekaitis, Harry L
Elliot, William
Elliott Sr., Robert F
Ennis, John R
Erno Sr., Raymond J
Esturo, Charles W
Evangelista, Patrick
Fahr, Lloyd C
Fairweather, Lystine G
Fallon, Michael
Famiglietti, Thomas
Faust, Terry
Federocko, Julius
Felix, Sydney
Ferguson, Steven
Ferguson, Steven
Ferrari, Salvatore
Fiore, Frederick J
Fiorillo, Henry
Fischbach, Joseph A
Fitzpatrick, John F
Flewelling Jr., Joseph L
Flood, Joseph
Foley, Richard T
Foley, Robert G
Foster, Joseph
Foster, Minard S
Fountain Jr., Albert E
Franklin, Morton
Fraser, James
Frezza, Senatro

Funke II, Cortland A
Gagliardi, Vincent
Gala, Stephen
Gallo, Anthony T
Gatling, David L
Giangrande, Salvatore
Gilbert Sr., Edward
Glussich, Saverio
Gordon, Arnold
Gourley, Robert
Graves, William D
Gray Sr., Arthur W
Gray, Phillip
Green, Patrick J
Greenberg, Edward
Grey Sr., Vincent P
Griffin Sr., Robert Lee
Gross, Daniel
Gryn, John M
Grzybowski, Brian E
Gullett, Charles
Guy, Edwin J
Haas, Thomas M
Haas, Willard H
Halatas, John
Halem, Sidney
Hamaker, James
Hanford, Walter W
Hanley, Michael J
Hanna, Lawrence R
Hannan, George M
Haragsim, Edward J
Harder, Richard
Harper, Dorothy
Harris, Edward
Hartley, Gilbert L
Harvey, Wycliffe
Hastings, James R
Hauptner, Richard
Heeks, Howard A
Henderson, Paul M
Henry, Patrick
Henry, Thomas E
Hermans, Albert
Hernandez, Juan Armando
Hertzke, William
Hettinger, Paul M

Hill, Charles
Hill, Norman Louis
Hobish, Stanley
Hochman, Arnold
Hofmann, William C
Hogan, Patrick
Holbert, Ron
Holm, Jeffrey
Hosey, James J
Howton, Harold Douglas
Hulbert, William R
Hulefeld, Edward H
Hulsizer, James W
Hunold, Cynthia
Hunter, Howard H
Hydes, Chester K
Hytinen, Paul R
Imbro, Alfred
Ingianne, Salvatore
Irving, Richard
Isernia, John Michael
Ivie, Kent L
Jackson, Hemmings L
Jennings, Madison
Johansen, William J
Johnson Jr., Ralph O
Johnson, Rebecca A
Joiner, Nathaniel
Joyce, John
Kachocki, Edward B
Kelly, Clara
Kelly, James J
Kelly, Peter T
Kenah, John
Kilgallen, James J
Kittelstad, Robert
Klein, George W
Klemm, Robert C
Koenig, William
Komiak, Peter
Korkowski, John
Kotecki, Thomas
Krebs, John H
Krebs, Thomas E
Kriskey, Edward J
Kroll Jr., Conrad A
Kuhn Jr., John



Kujda, Robert Joseph
Kulp, Norman C
Kultgen, Clifford E
Kurtz, Richard
LaClair, Brian
Laine, Charles F
Lalli, Ronald
Lambert, Lawrence
Lane, Richard L
Lang, Donald
Lano, Thomas
Larsen, Ronald
Lasky, Bernard
Latorre, Basil J
Lauke, Manfred
LaVodie Jr., Joseph J
Laws, Charles W
Le Duc, Donald
Leavitt, Russell
Leben, Simeon
Ledbetter, Gary
Legg Sr., Thomas C
Leistikow, David E
Leistikow, David E
Leonard, Daniel K
Leonardi, Edward
Levy, Mark N
Lewis, Gail M
Lewis, Joel W
Lewis, Stanley B
Liguori, Ferdinand
Lindberg, Frederick F
Linsky, Allison
Livernois, William J
Lo Monaco, Charles
Lonergan, Edward
Lovelock, M Kenneth
Lowe Jr., John
Lowy, Martin
Lubniewski, Leonard
Lucchese, Faro
Lucenti, Joseph D
Luinetti, Charles J
MacGregor, Richard E
MacLeod, William
MacMillan, James
Mady, Joseph A

Mahn, Donald R
Makar, William J
Manderson, Alinton R
Marcantonio, Thomas
Marenbach, Harry Alfred
Marsi Sr., Vincent J
Martin, Mary A
Martin, Stephen A
Mas, Robert
Mascarella, Cono Amilo
Materese Jr., Joseph John
Matessino, Jack
Mathews, Samuel T
Mayfield, Arthur E
McCarthy, Arthur R
McClish, Eugene
McCloud, Shawn
McCluskey, James
McCool, Michael J
McCort, John
McCoy, Julian E
McCulloch, James F
McDougall, Charles B
McLaughlin Jr., Kenneth C
McLaughlin, Douglas
McNally, Peter P
McNally, Peter P
McSpedon, Richard
McVey, James
Mears, Sue
Meismer, Leon
Melvin Jr., Lawrence J
Melvin, Donnie R
Mercado, Palma
Mercatante, Frank L
Meyer, Heinz
Miller, Leon
Millwood, Patrick D
Minervini, Eugene W
Misuraca, Arthur A
Mizsak, George
Mlincsek, John
Moffatt, William J
Monaco, Anthony
Montell, James R
Montoya, Elizabeth
Moody, Charles D

Moore, John M
Moran Jr., LeRoy V
Morano, Joseph
Mosher, Kent E
Motley, Richard
Mueller, Richard Dale
Murphy, Harry R
Murphy, Justin G
Muse, Heidy M
Myrick, Wayne
Nankervis, Kenneth
Natoli, John
Neddo, James D
Neglia, Ronald J
Negron, David
Nelson, Thomas
Nichols, Jesse A
Nostrom, Donald
Nunes, James J
Nye, George M
O'Connell, Joseph
O'Connell, Thomas J
O'Connor, George
O'Connor, Robert
O'Leary, Joseph
O'sha, Jerry
Outerbridge, William
Ozzella, Carl P
Pacella Jr., Anthony
Pagano, Ann
Papa, Salvatore
Papandrikos, Alex
Parker, Stewart C
Parsons Sr., Phil R
Pecunia cajigas, Jose
Perone, Ralph F
Perosi, Victor A
Petrone, John
Pfeiffer, Frank H
Phillips, Norman D
Pieno Jr., John A
Pinyuh, George
Plott, Gary
Pochily, David
Pollaro, Anthony J
Pranzo, Peter J
Prestia, Joseph





Proctor, George C
Pugliese, Edward D
Purrington, Russell A
Pursel, Lyle Dean
Quilty III, James A
Quinonez, Lety Antonio
Quirk, James J
Raimo, Richard
Randall, Joseph L
Raphael, John
Ravan, Roy
Redfearn, Everett
Reich, Raymond J
Reynolds, Ward A
Reynolds, Ward A
Riccardi, Ralph
Ricker, Robert L
Ritz, Audrey
Robins, Edward S
Rock, Mark
Rodriguez, Joseph
Rojas, Isidro
Rom, Herman J
Ross, Richard
Ruggeri, Francis
Russell, Charles M
Russo, James M
Russo, Michele
Russo, Sebastian C
Rutledge, Thomas
Sabin, Philip H
Salisbury, Kenneth L
Santamarina, Anthony
Scarcella, Domenick
Schaefer, Edward T
Scher, Philip
Schmidt, Robert A
Schneider, William G
Schone, John
Schwartz Jr., Linwood Richard
Scott, Edward O
Scott, Lionel E
Scott, Thomas J
See, Robert Charles
Semiz, Anthony
Serrano, Salomon
Sessa, Salvatore

Shanahan, Arthur
Shaw, Rosa L
Sheehan, James L
Shook, Terry E
Simmons, Florence
Simonson, Richard M
Smith, Charles William
Smith, Harold
Smith, Hilton A
Smith, Joel G
Sopczyk, Donna M
Soreco, Carl
Souther, Gretchen S
Sparacino, Ernest R
Sparago, Alex
Spicijaric, John
Spiro, Allen
Spitalieri, Vincent
Srsic, Anton
Stecher, James R
Steinberg, Benjamin
Stewart, John
Stiglitz, Louis
Stiles, Louis D
Strasser, David T
Stroud, Franklin T
Surre, John J
Susi, Lawrence
Swiacki, Peter J
Sykes, William D
Taber, Patricia
Tagliamonte, Joseph
Tannenbaum, Bernard
Tanyi, Alexander
Tauraso, Patrick
Taylor, Craig L
Taylor, Guy R
Taylor, Richard J
Theodore, Gregory
Thompson, James
Thorn, Edward
Tibbetts, Ronald L
Tobin, Nelson J
Tompkins, Norman R
Toney, William
Toomey, Daniel J
Torreggiani, Lawrence

Toscani, Frank Eugene
Tracy, Arthur
Travis, John Daniel
Trent, David C
Trent, Fitzroy
Trim, Willie  P
Trimm, Johnny  R
Trimmer, Newton
Tuck Jr., Lawrence
Tuckfelt, Sondra M
Tuckfelt, Sondra M
Tully, Clifford
Turner, Norvin
Tuthill Sr., Todd L
Uhe, Donald
Umland, Richard C
Upenieks, Kenneth
Valachovic, Thomas Anthony
Van Durme, Philip L
Vaughn Jr., William H
Velez, Jose M
Viele Jr., Lester
Virgilio, Edward F
Vono, Richard
Vukasin, Geraldine M
Wahlers Sr., Richard H
Wald, Richard P
Wallace, Donald G
Walters, Kristen L
Warner, Debra
Warner, Jeffrey A
Warters, Lanetta L
Wasserman, Lee
Watson, Frederick E
Watson, Frederick E
Watson, Frederick G
Wegenaar, Brian
Wenz, Douglas
Werlau, Robert J
Westley, Maria I
White, James R
Whitenack, Donald F
Whitson, William D
Widing, John A
Wiggins, Jimmy
Wilkinson, Claude Alfred
Willemssen, David L



Williams, Danny
Williams, Ted S
Wolf, Donald
Wood, Cyril
Xifo, Gary A
Zagier, Allen
Zito, Robert
Zollman, Louis
Zollo, Louis

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

IN RE:

**THE FAIRBANKS COMPANY,**

     **Debtor.**

**CHAPTER 11
CASE NO. 18-41768-PWB**

**CERTIFICATE OF SERVICE**

     This is to certify that I have served a copy of the "NOTICE OF APPEARANCE" via U.S. Mail with appropriate postage affixed thereto to ensure delivery upon the following:

The Fairbanks Company
P.O. Box 1871
Rome, GA 30161

Office of the United States Trustee
362 Richard B. Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

William L. Rothschild
Ogier, Rothschild & Rosenfeld, PC
P. O. Box 1547
Decatur, GA 30031

Luke A. Sizemore
Paul M. Singer
Reed Smith LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

     This 31st day of August, 2018.

**JONES & WALDEN, LLC**

*/s/ Leslie Pineyro*
Leslie Pineyro
Georgia Bar No. 969800
Local Designated Counsel for Weitz & Luxenberg P.C.
21 Eighth Street, NE
Atlanta, Georgia 30309
(404) 564-9300
lpineyro@joneswalden.com